No. 23-15492

UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

FRIENDS OF THE INYO, a non-profit organization; WESTERN WATERSHEDS PROJECT, a non-profit organization; CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; and THE SIERRA CLUB, a non-profit organization,

*Plaintiffs and Appellants*

*vs.*

U.S. FOREST SERVICE; and LEEANN MURPHY, in her official capacity as Acting Mammoth District Ranger,

*Defendants and Appellees,*

*and*

KORE MINING LIMITED,

*Defendant-Intervenor and Appellee-Intervenor*

APPEAL FROM DENIAL OF MOTION FOR SUMMARY JUDGMENT

By the United States District Court, Eastern District of California
Honorable Kimberly J. Mueller, Chief U.S. District Judge

**APPELLANTS' OPENING BRIEF**

| | |
|---|---|
| Roger Flynn | Talasi B. Brooks |
| Western Mining Action Project | Western Watersheds Project |
| P.O. Box 349, 440 Main St., #2 | P.O. Box 2863 |
| Lyons, CO 80540 | Boise, ID 83714 |
| (303) 823-5738 | (208) 336-9077 |
| roger@wmaplaw.org | tbrooks@westernwatersheds.org |

Lisa Belenky
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7107
lbelenky@biologicaldiversity.org

Justin Augustine
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
jaugustine@biologicaldiversity.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ v

CORPORATE DISCLOSURE STATEMENT ................................... ix

STATEMENT OF JURISDICTION ........................................... 1

STATEMENT OF ISSUES ..................................................... 3

STATEMENT OF ADDENDUM ............................................... 4

STATEMENT OF THE CASE AND PROCEDURAL HISTORY ........................ 4

STATEMENT OF FACTS ....................................................... 7

**A.**    **Project Description.** ............................................... 7

**B.**    **Harm to the Designated and Imperiled Bi-State Sage-Grouse.** ............ 11

**C.**    **Additional Environmental Harms from the Project.** ............................ 16

SUMMARY OF ARGUMENT ................................................. 19

STANDARD OF REVIEW ..................................................... 20

ARGUMENT .................................................................... 21

**I.**    **The Forest Service's Reliance on CE-8 Violates NEPA, as the Project Will Not Be Completed Within One Year.** ................................ 21

**II.**    **The Agency's Attempt to Create a New "Habitat Restoration Project" To Circumvent the Public Review Process Violates Its Own Mining Regulations and Policy, NEPA, and the Forest Service Organic Act** ........................................................... 27

**A.**    The Eleventh-Hour Bifurcation of the Project and Reliance on the "Habitat Restoration" CE-6 Violates NEPA and Agency Regulation and Policy ............................................................ 27

B.    The Illegality of USFS' Reliance on CE-6 for the "Habitat Restoration Project" Is Further Shown by its Failure to Follow the Review and Permitting Requirements of the Organic Act and Agency Regulations........................................................................ 31

III.    **The Agency Illegally Approved the Project in the Face of "Extraordinary Circumstances" Precluding Use of a Categorical Exclusion.** ............................................................... 33

A.    Harm to the Designated Bi-State Sage Grouse Is an Extraordinary Circumstance. ......................................................... 39

B.    Harm to the Endangered Owens Tui Chub Is an Extraordinary Circumstance. .......................................................... 50

IV.    **USFS Violated NEPA By Failing to Adequately Consider The Project's Impacts, and the Cumulative Impacts of Other Activities in the Area.** ............................................................... 52

V.    **This Court Should Vacate the Unlawful Agency Action** ..................... 58

**CONCLUSION** ................................................................... 62

CERTIFICATES OF COMPLIANCE AND SERVICE ........................ 63

STATEMENT OF RELATED CASES ................................... 63

INDEX OF STATUTORY AND REGULATORY AUTHORITIES (WITH ADDENDUM) ................................................. 64

# TABLE OF AUTHORITIES

## Cases

Alaska Ctr. For Env't v. U.S. Forest Serv.,
189 F.3d 851 (9th Cir.1999) ............................................................ 39, 55

Blue Mountains Biodiversity Project v. Blackwood,
161 F.3d 1208 (9th Cir. 1998) ...................................................... 21, 36, 37

Camp v. Pitts,
411 U.S. 138 (1973)............................................................................... 58

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971)............................................................................... 58

Ctr. for Envtl. Health v. Vilsack,
No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ................ 59

Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs,
466 F. Supp. 3d 1217 (W.D. Wash. 2020) .............................................. 59

Conservation Congress v. Forest Serv.,
2:12-02416 WBS KJN, 2013 WL 2457481, 2013 U.S. Dist. LEXIS 80136
(E.D. Cal. June 5, 2013) .......................................................... 34, 37, 38

Ctr. for Biological Diversity v. BLM,
698 F.3d 1101 (9th Cir. 2012) .............................................................. 61

Ctr. for Biological Diversity v. Ilano,
928 F.3d 774 (9th Cir. 2019) ...................................................... 34, 40, 42

Ctr. for Envtl. Health v. Vilsack,
15-cv-01690-JSC, 2016 WL 3383954, 2016 U.S. Dist. LEXIS 79984
(N.D. Cal. June 20, 2016) ..................................................................... 59

Defenders of Wildlife v. U.S. Forest Service,
4:14-cv-02446-RM (D. Ariz. Sept. 15, 2015) ............................ 25, 26, 38, 39, 55

Great Basin Res. Watch v. BLM,
844 F.3d 1095 (9th Cir. 2016) .............................................................. 60

Garcia v. Holder,
659 F.3d 1261 (9th Cir. 2011) ................................................................ 49

Guevara v. Holder,
649 F.3d 1086 (9th Cir. 2011) ................................................................ 49

Hells Canyon Pres. Council v. Connaughton,
3:11-cv-00023-PK, 2013 WL 665134, 2013 U.S. Dist. LEXIS 10539
(D. Or. Feb. 22, 2013)............................................................................. 55

Humane Soc'y v. Locke,
626 F.3d 1040 (9th Cir. 2010) ................................................................ 59

Idaho Conservation League v. U.S. Forest Service,
1:18-CV-504-BLW, 2020 WL 2115436, 2020 U.S. Dist. LEXIS 78529
(D. Idaho May 4, 2020) ........................................................................... 60

Idaho Farm Bureau Federation v. Babbitt,
58 F.3d 1392 (9th Cir. 1995) .................................................................. 60

In re Clean Water Act Rulemaking,
60 F.4th 583 (9th Cir. 2023)……………………………………………………58

Karuk Tribe of California v. U.S. Forest Service,
681 F.3d 1006 (9th Cir. 2012) ................................................................ 20

Klamath Siskiyou Wildlands Ctr. v. Grantham,
642 Fed. Appx. 742 (9th Cir. 2016)........................................................ 60

Lands Council v. Powell,
395 F.3d 1019 (9th Cir. 2005) .......................................................... 20, 21

Metcalf v. Daley,
214 F.3d 1135 (9th Cir. 2000) ................................................................ 61

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
886 F.3d 803 (9th Cir. 2018) .................................................................. 38

Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency,
3:12-cv-01751-AC, 2018 WL 6524161, 2018 U.S. Dist. LEXIS 209529
(D. Or. Dec. 12, 2018) ............................................................... 59

Oregon Natural Desert Ass'n v. Jewell,
840 F.3d 562 (9th Cir. 2016) .................................................... 59

Oregon Nat. Resources Council Fund v. Brong,
492 F.3d 1120 (9th Cir. 2007) .................................................. 21

Pacific Coast Federation of Fisherman's Assoc. v. Ross,
1:20-CV-00431-DAD-SAB, 2020 WL 1699980, 2020 U.S. Dist. LEXIS 62051
(E.D. Cal. April 7, 2020) ........................................................... 31

Pollinator Stewardship Council v. EPA,
806 F.3d 520 (9th Cir. 2015) .................................................... 59

Price Road Neighborhood Ass'n v. U.S. Dept. of Transportation,
113 F.3d 1505 (9th Cir. 1997) .................................................. 28

Save the Yaak Comm. v. Block,
840 F.2d 714 (9th Cir. 1988) ............................................. 21, 61

Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,
100 F.3d 1443 (9th Cir. 1996) ............................................ 34, 38

The Steamboaters v. FERC,
759 F.2d 1382 (9th Cir. 1985) .................................................. 39

W. Watersheds Proj. v. Bernhardt,
428 F. Supp. 3d 327 (D. Or. 2019) ........................................... 50

W. Watersheds Project v. Kraayenbrink,
620 F.3d 1187 (9th Cir. 2010) .................................................. 31

Western Watersheds Project v. Bernhardt,
392 F. Supp. 3d 1225 (D. Oregon 2019) .................................... 49

**Statutes**

5 U.S.C. § 701-06 ........................................................................... 2
5 U.S.C. § 706(2) ....................................................................... 20, 58
16 U.S.C. § 475 ..................................................................... 2, 3, 19
16 U.S.C. § 478 ..................................................................... 2, 3, 19
16 U.S.C. § 551 ..................................................................... 2, 3, 19
28 U.S.C. § 1291 ............................................................................. 2
28 U.S.C. § 1331 ............................................................................. 2
42 U.S.C. § 4321 et seq. ......................................................... 2, 19
42 U.S.C. § 4332(2)(C) ................................................................ 36

**Regulations**

36 C.F.R. § 219.9 ..................................................................... 12, 40
36 C.F.R. § 220.6(a) ................................................................. 6, 33
36 C.F.R. § 220.6(b) ................................................................. 6, 34
36 C.F.R. § 220.6(b)(1)(i) ............................................................ 33
36 C.F.R. § 220.6(c) ...................................... 34, 37, 40, 43, 50, 52
36 C.F.R. § 220.6(e)(6) .................................................................. 5
36 C.F.R. § 220.6(e)(8) ........................................................... 21, 30
36 C.F.R. § 228.3 ......................................................................... 24
36 C.F.R. § 228.3(a) ............................................................... 25, 29
36 C.F.R. § 228.8(g) ..................................................................... 29
36 C.F.R. § 228.13 ....................................................................... 25
36 C.F.R. § 228.13(b) ................................................................... 25
36 C.F.R. § 251.50(a) ................................................................... 32
36 C.F.R. § 251.53 ....................................................................... 32
40 C.F.R. § 1500.1(b) ................................................................... 28
40 C.F.R. § 1500.2(d) ................................................................... 28
40 C.F.R. § 1501.4(b) ................................................................... 29
40 C.F.R. § 1502.5 ....................................................................... 61
40 C.F.R. § 1506.6(a) ................................................................... 29
40 C.F.R. § 1508.4 ....................................................................... 36
40 C.F.R. § 1508.9(a)(1) ............................................................... 29
40 C.F.R. § 1508.27(b)(1) ............................................................. 36

**Other Authorities**

46 Fed. Reg. 18,026 (March 23, 1981)...................................................... 29
88 Fed. Reg. 25,613 (April 27, 2023).............................................. 12, 40

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiffs-Appellants Friends of the Inyo, Western Watersheds Project, Center for Biological Diversity, and Sierra Club, have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

ix

## <u>STATEMENT OF JURISDICTION</u>

**Jurisdiction of the District Court**

Plaintiffs-Appellants Friends of the Inyo (FOI), Western Watersheds Project (WWP), Center for Biological Diversity (Center), and Sierra Club (collectively, "Friends") challenge the federal government's review and approval of the Long Valley Exploration Drilling Project (Project), a large mineral exploration drilling project on public lands in Mono County on the eastern flank of the Sierra Nevada Mountains near Mammoth Lakes, proposed by Defendant-Intervenor KORE Mining Ltd. (KORE).

The Defendant-Appellee U.S. Forest Service (USFS) approved the Project via a Decision Memo (Decision) on September 27, 2021, 2-ER-90-107, and approved KORE's Plan of Operation (PoO), 2-ER-108-160, for the Project two days later. The Decision authorizes KORE to conduct extensive mineral exploration drilling, road construction, and other ground-disturbing operations in various locations spread across over 1,800 acres. The actions will result in immediate and irreparable harm to the imperiled Bi-State sage-grouse Distinct Population Segment (DPS)—a species proposed to be listed as threatened with extinction under the Endangered Species Act, and a USFS-designated "Species of Conservation Concern" and "Sensitive Species"—as well as other public resources.

1

To avoid preparing a thorough review under the National Environmental Policy Act (NEPA), the Forest Service bifurcated the Project, using two Categorical Exclusions (CEs) from NEPA review, rather than preparing a more comprehensive Environmental Assessment (EA). Not only do these Categorical Exclusions fail to adequately analyze and disclose the serious environmental impacts of the Project, the Project also does not fit within the categorical exclusion category the Forest Service chose because the Project activities cannot be completed within the one-year time limit set by agency regulations. Furthermore, the agency's illegal bifurcation of the Project violates the review, resource protection, and permitting requirements of the Forest Service Organic Act of 1897, 16 U.S.C. §§478, 475, 551.

The district court had subject matter jurisdiction under 28 U.S.C. §1331 because the action arose under federal laws including: the Administrative Procedure Act (APA), 5 U.S.C. §§701-706; the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 *et seq.,* and the Forest Service Organic Act of 1897, 16 U.S.C. §§478, 475, 551.

**Jurisdiction of the Court of Appeals**

Friends appeal from the district court's Order and Judgment denying Friends' motion for summary judgment, 1-ER-3-28. This Court has jurisdiction to review the district court's decision under 28 U.S.C. §1291.

**Finality of Judgment and Timeliness of Appeal**

The district court issued its Order on cross-motions for summary judgment on March 9, 2023. 1-ER-4-28. A Final Judgment issued the same day. 1-ER-3. Friends filed their Notice of Appeal on March 28, 2023. 2-ER-308. Pursuant to Fed.R.App.P. 4(a)(1)(B), this appeal is thus timely.

## <u>STATEMENT OF ISSUES</u>

1. Did the USFS violate NEPA by artificially bifurcating the multi-year Project into two separate Projects, under two separate Categorical Exclusions (CEs), to avoid the one-year time limit for mineral exploration projects under agency regulations, so as to avoid conducting a more-detailed Environmental Assessment (EA) and public review under NEPA?

2. Did the USFS violate NEPA by approving the Project via the CEs despite the Project's significant impacts to the Bi-State sage-grouse DPS and the federally-listed endangered Owens tui chub, when such impacts constitute "extraordinary circumstances" under NEPA that preclude the use of a CE?

3. Did the USFS violate NEPA when it admittedly did not consider the cumulative impacts of the Project when combined with other activities in the area?

4. Did the USFS' bifurcation of the Project violate the review, resource protection, and permitting requirements of the Forest Service Organic Act of 1897, 16 U.S.C. §§478, 475, 551?

## STATEMENT OF ADDENDUM

Pursuant to Ninth Circuit Rule 28-2.7, pertinent statutory, regulatory, and other provisions are set forth in an addendum attached to this brief as Attachment A.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY

The USFS initially, and correctly, determined that due to the potentially significant impacts from the Project, the agency was obligated under NEPA to prepare an "Environmental Assessment" (EA) with full public review opportunities and detailed environmental analysis: "Our initial review of the Plan of Operation indicates that an Environmental Assessment will need to be completed for this project." July 28, 2020 District Ranger G. Martin letter, 2-ER-235.

Yet without any explanation, USFS reversed course and decided it would not prepare an EA, but instead would truncate its review and use a CE to expedite the Project approval. The public found out about this switch when the agency, in April 2021, notified the public, for the first time, that it would now review the entire Project under the CE category for "short term" mineral projects lasting less than one year: "It is anticipated that this project can be completed under a categorical exclusion under the category established under 36 CFR 220.6 (e)(8), because it is a 'short term (1 year or less) mineral investigation and incidental support activities.'" Scoping letter at 2, 2-ER-230.

Friends, along with Mono County and the nearby Town of Mammoth Lakes,

4

submitted detailed scoping comments, explaining why the agency could not rely on the 1-year mineral exploration CE (CE-8), since, among other deficiencies, the Project could not be completed in one year. 2-ER-174-228, 2-ER-304-307. After receiving these comments, USFS again shifted gears and advanced yet another brand-new rationale as part of the agency's final Decision Memo.

The agency now claimed that the Project's required reclamation, mitigation, and monitoring activities were actually **not** part of the approved mineral exploration project, but instead comprised a completely separate project that fell within a different CE category, CE-6, for "habitat restoration projects," without any timing limitation. Decision at 3, 2-ER-92. This directly contradicted USFS' previous determination that the entire Project was covered by CE-8 alone. Feb. 23, 2021 District Ranger G. Martin letter at 2, 2-ER-233.

The new so-called "habitat restoration" project was approved using the CE-6 category for "Timber stand improvement and/or wildlife habitat improvement activities." 36 C.F.R. §220.6(e)(6). The agency never informed the public prior to issuing the Decision Memo that it was considering a new CE-6 category to approve the reclamation, mitigation, and monitoring for the mining exploration Project. USFS never explained or provided any rationale for invoking the new CE category in its review of the Project. Instead, knowing that all required aspects of the exploration Project could not be completed within one year, and thus the previously-

5

relied upon CE-8 category could not apply, the agency split the Project in two and renamed the required reclamation, mitigation, and monitoring for the Project a separate "habitat restoration" project in order to circumvent the strict one-year time limit in CE-8.

According to USFS, since the CE-6 category for a "habitat restoration project" does not have a 1-year limit, by artificially splitting the Project in two, the two projects can be excluded from the public review required by NEPA. USFS' attempt to shield the Project from full review violates NEPA, its implementing regulations, and USFS' NEPA Handbook and policy.

In addition to the illegal bifurcation of the Project, the agency admitted that it failed to consider the cumulative impacts of the Project along with other nearby activities, as required by agency regulations and policy.

NEPA also prohibits use of any CE when "extraordinary circumstances"—including uncertainty about significant adverse impacts to imperiled species and their habitat—exist. 36 C.F.R. §§220.6(a) and (b). That is the case here, as the record demonstrates the Project has the potential to significantly impact protected Bi-State sage-grouse, Owens tui chub, and their habitats in the Project area.

USFS' contorted scheme to avoid full review also violates federal public land law, as the new "habitat restoration" project was approved under the wrong regulatory structure. The Decision approves all aspects of the Project under a

purported "right to explore" for minerals under federal mining laws. Yet in its attempt to justify its artificial bifurcation of the Project, USFS argues that the "habitat restoration" aspect of the Project is unrelated to the mineral exploration.

But if that were true, then this new "habitat restoration project" would be independent of the mineral project and not regulated under the mining laws and regulations. Under the 1897 Organic Act and USFS public land regulations, these activities require a discretionary Special Use Permit (SUP), subject to very different application, review, resource protection, and approval requirements. Instead of applying these laws and regulations, though, the agency approved the "habitat restoration project" as a mining project with a purported "right to explore."

## STATEMENT OF FACTS

### A.    Project Description.

The Long Valley Drilling Project is a large mineral exploration and drilling project on public land just east of Mammoth Lakes. The Project's extensive network of new and reconstructed roads, a dozen industrial drill sites, and supporting mining infrastructure, will result in significant impacts to imperiled wildlife species and threatens critical water resources in the heart of Bi-State sage-grouse habitat. The Project's "purpose is to evaluate the mineral potential within a claim block controlled by KORE on a portion of a claim area that includes 95 contiguous unpatented mineral claims on 1,848 acres." PoO at 1, 2-ER-111.

7

Despite its widespread impacts, and in an effort to downplay the Project's impacts, USFS notes that the disturbed lands total 0.82 acres. Yet the Project's actual impacts are much larger, as the drilling pads, road use and new road construction will be scattered throughout that 1,800+ acre mining claim block, with the associated noise, visual intrusions, dust, and other impacts emanating from the direct operations. *See* Fed. Answer ¶23, 2-ER-85 ("Federal Defendants admit that [the] Decision Memo authorizes activities throughout the claim block.")

The Project is an intensive mineral exploration operation, consisting of at least "[t]welve drill pads, measuring 53 feet by 30 feet, [which] will be constructed and up to 3 core borings will be drilled on each pad." Decision at 2, 2-ER-91. To access these drilling sites, "up to 1,700 feet (0.32 miles) of temporary access road will be created." Id. "Drilling on each pad will include up to 3 core, angle borings at a drill length between 820 feet (250 m) and 1,476 feet (450 m). Individual borings will be drilled at angles of 45 to 75 degrees from vertical. Total depths of the borings will range from approximately 580 feet to 1,424 feet below ground surface." PoO at 13, 2-ER-124. This drilling will puncture the regional groundwater aquifer, as current "[d]epths to water ranged from 69 to 425 feet" below the surface. June 1, 2021 KORE Tech. Memo. at 5, 2-ER-167.

The affected lands are a wildlife-rich and highly scenic area, as shown in this August 2020 photo of the Project site looking west towards the High Sierras

8

(Compl. ¶30, 2-ER-89):



The Project has garnered significant public concern and opposition. Both Mono County and the Town Council of Mammoth Lakes voted unanimously to oppose the Forest Service's use of a CE to cut off public review. Mammoth Lakes stressed to the USFS that there are "extraordinary circumstances" precluding the use of a CE, including adverse effects to Bi-State sage-grouse, a valued scenic corridor, Hot Creek and Little Hot Creek which are eligible for federal Wild and Scenic River designation, and cultural sites. May 12, 2021 Mammoth Lakes letter, 2-ER-304-307.

Mono County raised similar concerns about the extraordinary circumstances and the lack of needed information in the USFS' public notice as to water use and source, water quality impacts, waste storage, containment, and transportation. The County further stressed that the USFS' use of a CE undermined public comment and lacked coordination with the County. May 18, 2021 Mono County letter at 1, 2-ER-286.

> The County reiterates and expands on the concerns expressed in the May 4 Board Letter that a Categorical Exclusion is inappropriate for the Kore Mining Proposal. After reviewing the draft EPO [KORE's Exploratory Plan of Operations], the County finds that the document continues to lack information in several key areas critical to understanding the project impacts and the possible jurisdiction of the County over the proposed project. … The EPO has not provided sufficient information to warrant the use of a Categorical Exclusion in lieu of an environmental analysis.

Id. at 2, 2-ER-287. The County's previous comments stated that "the Board opposes the use of a Categorical Exclusion for Kore Mining's proposed project and finds that the information included in the proposal is insufficient." May 4, 2021 Mono County letter at 1, 2-ER-222.

Despite this, in approving the Project, USFS refused to provide any further opportunities for public review and comment. And additionally, as detailed below, the agency unilaterally, and without any public review or prior notice, relied on the new CE-6 "habitat restoration" category to artificially split the Project and further truncate the required NEPA process.

**B.      Harm to the Designated and Imperiled Bi-State Sage-Grouse.**

"The Bi-State sage-grouse is a genetically unique meta-population of greater sage-grouse identified as a distinct population segment (DPS)."  May 3, 2021 California Department of Fish and Wildlife (CDFW) letter at 2, 2-ER-245.  The greater sage-grouse is a ground-nesting bird known for its famous mating dance performed on breeding grounds called leks.  The species has high site-fidelity and birds return to the same leks and seasonal habitats year after year.  "The Project has potential to impact breeding, nesting and brood rearing activities of the Bi-State Distinct Population Segment (DPS) of greater sage-grouse from the South Mono Population Management Unit (PMU)."  Id.

The Bi-State DPS "has experienced range and population contractions and is threatened by loss and degradation of sagebrush habitats.  Specific threats include infrastructure (fences, powerlines and roads), mining, grazing, invasive species, pinyon-juniper encroachment, recreation, wildfire, and climate change."  Inyo National Forest, Rationales for Animal Species Considered for Designation as Species of Conservation Concern at 32, 2-ER-255.  The Bi-State sage-grouse now occurs only within portions of five counties in western Nevada and three counties in eastern California, including Mono County.  As the U.S. Fish and Wildlife Service (USFWS) noted in its comments to the USFS, both agencies "acknowledge its

unique conservation value to the American people." May 13, 2021 USFWS letter at 2, 2-ER-251.

The Bi-State DPS was recently proposed by the federal government to be listed as threatened under the federal Endangered Species Act. 88 Fed.Reg. 25613-25616 (April 27, 2023) (attached Addendum). The USFS recognizes that the Bi-State sage-grouse is gravely imperiled, and has designated it as a "Species of Conservation Concern" on the Inyo National Forest. Such species are a more-protected subset of what the agency designates as "Sensitive Species" deserving special protection.

> A species of conservation concern is a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which **the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area** (36 CFR 219.9).

Inyo National Forest, Rationales for Animal Species at 1, 2-ER-254 (emphasis added). It is also recognized as a California species of special concern, a bird species of greatest concern, and is a California Bureau of Land Management-designated sensitive species. Id. at 32, 2-ER-255.

The sage-grouse is a sagebrush obligate, which means it relies upon large expanses of intact sagebrush habitat to survive. As USFS explains, "[b]ecause sage-grouse are sagebrush obligates, they are threatened by actions and processes that

12

reduce the extent and integrity of this habitat (Hall et al. 2008)."  Id. at 33, 2-ER-256.

According to the multi-agency Bi-State Action Plan (BSAP) issued in 2012, the Bi-State sage-grouse faces threats from: "Urbanization, infrastructure (fences, powerlines, and roads), mining, energy development, grazing, invasive and exotic species, pinyon-juniper encroachment, recreation, wildfire, and the likely effects of climate change…." BSAP at 3, 2-ER-240.[1]  See also Rationales for Animal Species at 32, 2-ER-255 (detailing threats).  "Cumulatively, … these threats interact in such a way as to fragment and isolate populations."  BSAP at 3, 2-ER-240.

The BSAP developed a comprehensive set of strategies, objectives and actions for effective long-term conservation of the Bi-State sage-grouse.  One of the primary conservation goals of the BSAP was to protect continuous blocks of unfragmented sagebrush habitat, such as that which exists in the Project area.

---

[1] The Bi-State Action Plan was developed by the Forest Service and other agencies to guide agency decision-making to protect the Bi-State sage grouse population.  "In December 2011, the Bi-State Executive Oversight Committee (EOC), which includes resource agency directors from the US Fish and Wildlife Service, Bureau of Land Management, US Forest Service, Natural Resources Conservation Service, US Geological Survey, Nevada Department of Wildlife, and California Department of Fish and Game, was formed to leverage collective resources and assemble the best technical talent to direct and prioritize future conservation actions to ensure consistent regulatory oversight and achieve long-term conservation of the Bi-State greater sage-grouse Distinct Population Segment (DPS)."  2-ER-239.

CDFW letter at 2, 2-ER-245. *See also* Inyo National Forest Plan at 37-41, 2-ER-169-173 (detailing requirements to protect the Bi-State sage grouse population).

The Project will affect the Long Valley subpopulation within the South Mono Population Management Unit (PMU) for the Bi-State sage-grouse, which resides in Long Valley from the upper Owens River south and east to Crowley Lake and the Glass Mountains. CDFW letter at 2, 2-ER-245. The Long Valley population is the largest subpopulation of sage-grouse in the Bi-State DPS. Id. While the Long Valley subpopulation has declined approximately 75% since 2012, it still represents 24.8% of all sage-grouse within the entire Bi-State DPS and 92% of all sage-grouse within the South Mono PMU. Id. The entire Long Valley population comprises only eight long-term trend leks and associated satellite leks. BSAP at 44, 2-ER-241. According to a recent federal agency study, it has approximately a 40 percent chance of extirpation within the next 20 years. Coates et al. (2020), 2-ER-212.

"Based on radio-telemetry data provided by the U.S. Geological Survey (USGS), the Project area and vicinity is known to provide year-round habitat for the Bi-State sage-grouse." CDFW letter at 2-3, 2-ER-245-246. Data of sage grouse activity in the record shows that the birds are present throughout the Project area and utilize the area year-round including during winter months. *See* Bradley Decl. ¶3 n.1, 2-ER-31; 2-ER-52-83. Maps prepared using that data are provided to assist the

14

Court in reviewing this information. *See* Id. The Bi-State Sage-Grouse Committee submitted maps of sage-grouse brooding, nesting, and Active Leks in the Project area, (data from 2012-2020). 2-ER-272-274. *See also* L.A. Dept. of Water and Power, BSSG Adaptive Management Plan, 2-ER-213,

As stated by the Mammoth Lakes Town Council, lek location data from the Bureau of Land Management (BLM) show the Project area is entirely or partially within the three-mile buffer of seven primary and six satellite sage-grouse leks. May 12, 2020 Mammoth Lakes letter, 2-ER-305. "Because 95% of all sage grouse nests in California and Nevada are located within approximately 3.1 miles of a lek, a buffer area of about three miles around leks is important BSSG habitat." Id. The closest primary lek is located 0.4 miles from the Project area boundary and its satellite lek is located within the Project site itself. Id. In their comments, Plaintiffs submitted evidence of photos and GPS points for 26 locations of scat in and near the Project area. 2-ER-214-221.

Indeed, the USFS is "well aware of existing Leks that are very close to the project area" and its wildlife resource specialist stated "I do not doubt that [sage-grouse] use this area extensively for brooding, foraging, etc." April 21, 2021 T. Torres email, 2-ER-292. The bottom line is that, in his words, "This project is going to disturb bi-state sage grouse." Id.

15

**C.** **Additional Environmental Harms from the Project.**

In addition to the significant impacts to the Bi-State sage-grouse, the Project

threatens critical water resources in the region, and the fish and wildlife dependent

on these streams and springs.  As detailed by the CDFW, the Project's drilling,

which will puncture the regional aquifer, could result in severe impacts to both

water quality and quantity:

> Based on the technical report as well as USGS Publications on the Long Valley
> Geothermal Aquifer (e.g. https://pubs.er.usgs.gov/publication/ofr20191063)
> **the test holes will reach both the cold water (unconfined, surface aquifer)**
> **and geothermal (confined aquifer) in Long Valley.** The technical report
> prepared by Kore Mining indicates that previous test holes have resulted in
> 'good [water] flow.' Based on the available literature, it is highly likely that
> these holes should be classified as 'artesian wells,' due to the positive hydraulic
> pressures documented in the area.

CDFW letter at 4, 2-ER-247 (emphasis added).  *See also* May 13, 2021 USFWS

letter at 1, 2-ER-250 (raising serious concerns about the Project's potential impacts

to the endangered Owens tui chub).  This drilling will intercept the aquifer, as

"[d]epths to water ranged from 69 to 425 feet" below the surface, KORE Tech.

Memo. at 5, 2-ER-167, and the "[t]otal depths of the borings will range from

approximately 580 feet to 1,424 feet below ground surface."  KORE PoO at 13, 2-

ER-124.  As a result, CDFW further concluded that:

> Construction of artesian wells can reduce confined aquifer pressures and impact
> the quantity and quality of the groundwater discharged at adjacent springs. In
> addition, the project may increase the permeability of the confining layer
> separating the two surface and deep aquifer systems by constructing uncased
> holes through the confining layers. This leads to an influx of geothermal

16

chemicals (such as arsenic, nitrate, phosphate, halogen anions, and cyanide) into the shallow water aquifer.

CDFW letter at 4, 2-ER-247.

The U.S. Geological Survey (USGS) specifically notified USFS and KORE that previous mineral exploration drilling in "your project area" had resulted in an uncontrolled artesian flow at the surface, as the drilling "rig encountered very hot artesian flow conditions and that they were unable to stop the flow. I recall that it was days before the flowing hole was eventually plugged." May 21, 2021 email from J. Howle (USGS), 2-ER-284. The USFS knew of this well in the Antelope Springs Area around the Clay Pit Cutoff Road "that was drilled for the Royal Gold Exploration Projects possibly in the 80s or 90s and they encountered artesian conditions. The drillers had some difficulty controlling the core hole and drilling activities with this pad site." May 24, 2021 email from C. Garcia, 2-ER-280.[2] *See also* May 21, 2021 KORE consultant email, 2-ER-283 ("an artesian situation was encountered that the driller was not prepared for. FS [USFS] indicated it took several weeks to get under control and apparently caused some significant erosion as well as other problems.").

---

[2] The Project will use the Antelope Springs Road to access the drilling sites, which will occur along or near the Clay Pit Cutoff Road. KORE PoO at 7, Fig. 4, 2-ER-118.

CDFW highlighted the threat that the Project's drilling's intrusion into the aquifer poses to the endangered Owens tui chub in the nearby Little Hot Creek, as well as the Hot Creek Hatchery Spring, which rely on groundwater discharge and would be adversely affected by changes to water quality or quantity.

> Two populations of the federal and State endangered Owens Tui Chub (in Little Hot Creek and the Hot Creek Hatchery Headwater Spring) are located within one mile of the project area. These two populations are dependent on groundwater discharge and may be impacted by loss of water quantity, impacts to water quality and alterations of water chemistry.

CDFW letter at 4, 2-ER-247. In addition, "the sole relict population of Long Valley Speckled Dace, a candidate for listing under the Endangered Species Act, … would be impacted by a decrease in water quantity." Id. The Hot Creek Hatchery, which supports recreational fishing as well as rearing of federally threatened Lahontan Cutthroat Trout, could also be harmed by impacts to its water supply springs, "located one mile from the project area." Id.

CDFW expressed further concerns about impacts to the local springs, which provide water for both Hot Creek (a state-designated Wild Trout Water) and the Upper Owens River, a trophy trout fishery and water supply for the city of Los Angeles. Id. See also May 13, 2021 USFWS letter at 1, 2-ER-250 (raising serious concerns about the Project's potential impacts to the Owens tui chub).

///

///

18

## SUMMARY OF ARGUMENT

USFS's use of two categorical exclusions (CE) to approve the Long Valley Drilling Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 et seq., the Forest Service Organic Act of 1897, 16 U.S.C. §§478, 551, and their implementing regulations and policies. The agency's Decision Memo (Decision) is illegal because: (1) the Project cannot be completed in "one year or less," and thus does not qualify for USFS's chosen CE category (CE-8), and the agency's 11th-hour manufacture of a new CE category (CE-6) to cover the Project's required reclamation operations cannot cure this defect; (2) USFS failed to properly evaluate the significance of the Project's impacts by refusing to consider cumulative impacts as required by USFS's NEPA regulations; (3) the Project may adversely affect endangered and Forest Service Sensitive species and thus presents "extraordinary circumstance" precluding the use of a CE; and (4) USFS approval of the "habitat restoration project" as a mineral project, under an assumed "right to explore," failed to properlay apply the permitting, review and resource protection requirements of the Organic Act.

USFS/KORE attempt to frame the Project as a relatively minor land disturbance. However, two things control whether the USFS may lawfully rely on a CE: Whether the Project fits within the CE, and the Project's environmental impacts. Federal courts have rejected USFS's use of CEs to bypass full NEPA

19

review for projects with less extensive environmental effects. The Project activities include drilling 24 hours per day, seven days a week, with associated road construction and truck traffic, as well as potential changes to groundwater quality. Those impacts will directly and adversely affect imperiled Bi-State sage-grouse and may affect groundwater and the endangered Owens tui chub.

As the USFS itself initially recognized, it must properly analyze these impacts under NEPA through an Environmental Assessment (EA), but it did not. USFS/KORE's portrayal of the Project as "no big deal" in terms of its land disturbance is simple misdirection. Overall, the Project does not fit within CE-8, the record does not support USFS' finding that no "uncertainty" exists as to whether there may be significant impacts, and the approval of the Project under the two CEs cannot stand.

## STANDARD OF REVIEW

The Circuit court "review[s] *de novo* a district court's denial of summary judgment." Karuk Tribe of California v. U.S. Forest Service, 681 F.3d 1006, 1017 (9th Cir. 2012); Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

Pursuant to the APA, a federal court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] … (D) without observance of procedures required by law." 5 U.S.C. §706(2). *See* Blue Mountains

20

Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998).

On *de novo* review, this Court will "engage in a substantial inquiry," and conduct a "thorough, probing, in-depth review." Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1125 (9th Cir. 2007). The agency's decisions must be "fully informed and well-considered." Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir.1988). "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of the problem, if the agency offers an explanation that is contrary to the evidence, … or if the agency's decision is contrary to the governing law." Lands Council, 395 F.3d at 1026.

## ARGUMENT

### I. The Forest Service's Reliance on CE-8 Violates NEPA, as the Project Will Not Be Completed Within One Year.

The USFS violated NEPA by approving the Project under CE-8 because the Project, including the reclamation, mitigation and monitoring required by USFS mineral regulations, cannot be completed in one year. In approving the Project, USFS relied upon CE-8, which applies to "**[s]hort-term (1 year or less)** mineral, energy, or geophysical investigations and their incidental support activities." 36 C.F.R. §220.6(e)(8)(emphasis added). USFS claimed that "[t]his category of action(s) is applicable because this is a one-year Plan of Operations, including reclamation." Decision at 3, 2-ER-92.

21

But USFS acknowledged elsewhere that the required reclamation and monitoring for the Project would take at least three years. As the Forest Botanist stated, "Monitoring should occur for AT LEAST three years but possibly longer. … If monitoring demonstrates that revegetation is not occurring, adaptive management would occur, such as including but not limited to additional seeding, container plants, or vertical mulch and rock placement." June 25, 2021 B. Engelhardt email, 2-ER-270 (emphasis original). The agency's public scoping notice admitted that "[m]onitoring of the revegetation success would continue for three years after seeding." Scoping notice letter at 1, 2-ER-229.

USFS further acknowledged that the Project operations would last "for three or more years" under the agency's reclamation requirements. In USFS' Reclamation Bond Estimate, prepared as part of the agency's duty to ensure that all mineral operations are reclaimed, the agency stated that: "The project biologist will inspect the drill pads and temporary access roads annually for three or more years following the winter season to monitor revegetation success and repeat seeding or planting as needed." Reclamation Bond Estimate at 2, 2-ER-151. The Reclamation Bond was approved by Acting District Ranger Leeann Murphy on September 27, 2021, 2-ER-160. In compliance with these regulations, Ranger Murphy noted that "[t]otal release of the bond can only be approved when all required recontouring and

22

decompaction work is completed, when the revegetation work is completed, and the site is cleaned up to the approving officers satisfaction." Id. at 11, 2-ER-160.

The Reclamation Bond Estimate included costs for "Long-term Operation, Maintenance and Monitoring" of $18,269.89. Id. at 2, 2-ER-151. The agency itemized specific costs, among other long-term costs, for a "Biologist" to conduct "Revegetation Monitoring" of $5,250 for "3 Monitoring Years." Id. at 8, 2-ER-157. The agency further included additional itemized "Labor" costs for "Weed Removal-Reseed" of $3,446 for "3 Years." The USFS also itemized costs to cover the reseeding of the Project area for "1.5 Monitoring Years." Id. at 9, 2-ER-158.

KORE acknowledges that Project operations would last beyond one year, as the "Revegetation monitoring and reclamation maintenance will continue after the one-year period, as required." PoO at 27, 2-ER-138. Its Plan of Operations, under the section entitled "Reclamation Success," states that reclamation obligations and work will continue:

> annually for three years or until success criteria are reached following the winter season to evaluate the progress of the revegetation effort. Should any additional seeding, weed controls or repair appear necessary, KORE will notify the Forest Service, Bishop Office of any efforts that will be implemented. KORE will be prepared each year to implement the recommendations provided by the Project Biologist.

PoO at 26, 2-ER-137. KORE admitted that reclamation

> may take 3 years, or it make take 5 years, but the bond (money) will not be released until those [reclamation success] criteria are accomplished. Until that

23

occurs, the monitoring biologist will assess the situation each year and if they
believe some areas need additional seeding, then it will be done.

Aug. 5, 2021 D. Fransway (KORE consultant) email, 2-ER-260.  KORE's

reclamation bond estimate specifically included costs "for reclaiming new drill sites,

abandoning drill holes, seeding the temporary access roads and pads, mob-

demobilization charges, monitoring and the associated contingency."  PoO at 26-27,

2-ER-137-138.  *See also* Reclamation Bond Estimate, 2-ER-150-160 (discussed

above).

Under USFS policy, the agency cannot artificially divorce the required

reclamation from the drilling operations as a means to avoid doing an

Environmental Assessment of the entire Project.  USFS' mineral regulations define

the authorized "operation" as: "All functions, work and activities in connection with

prospecting, exploration, development, mining or processing of mineral resources

and all uses reasonably incident thereto."  36 C.F.R. §228.3.  "Reclamation shall be

an integral part of Plans of Operation that propose surface disturbance."  USFS

Minerals Manual §2840.3 – Policy (Minerals Manual Chapter 2840, Reclamation)

(Addendum).  All aspects of the exploration Project, including monitoring and

reclamation, are thus part of the authorized "operation."

Accordingly, the regulations require that all Project operations must be

satisfactorily reclaimed, and all reclamation costs must be covered by a financial

guarantee, or bond, submitted by KORE and approved by the agency.  *See* 36 C.F.R.

24

§228.13 ("Bonds"). "In determining the amount of the bond, consideration will be given to the estimated costs of stabilizing, rehabilitating, and reclaiming the area of operations." 36 C.F.R. §228.13(b).

Thus, whether or not the initial drilling may finish in one year, Project reclamation operations "in connection with" and "reasonably incident" to the actual exploration drilling and other Project operations (as defined in 36 C.F.R. §228.3(a)) will not be completed until three years or more after drilling is completed. As such, the Project operations, taken as a whole as mandated by the agency regulations, including reclamation as "an integral part of" Project operations, do not meet the "one year or less" requirement of CE-8 utilized by USFS here.

A similar attempt by USFS to approve a mineral exploration project under the one-year CE-8 was held illegal in <u>Defenders of Wildlife v. U.S. Forest Service</u>, No. 4:14-cv-02446-RM (D. Ariz. Sept. 15, 2015)(<u>Defenders</u> Order), 2-ER-31-47. On very similar facts, the Arizona federal district court held that since monitoring of reclamation success would last three years, and reclamation and mitigation based on that monitoring "may be required during the three-year monitoring period" (the case here as the record detailed above shows), the USFS could not use the "short-term" mineral exploration category for a proposed mineral exploration project:

> Defendants argue that this three-year monitoring period should not be considered part of the project's duration because all ground-disturbing project activities will be completed before the monitoring period begins; however, the Decision Memorandum anticipates that additional ground disturbing

> reclamation activities may be required during the three-year monitoring period. USFS's determination that the project can be completed in one year or less is unsupported by the record.

Id. at 8, 2-ER-38.

The court also rejected USFS' attempt to bifurcate the project reclamation from the exploration itself:

> USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under NEPA. However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval.

Id. at 8 n.5, 2-ER-38. That is the case here, as the post-drilling reclamation will not require any further approvals. This Circuit, like the court in the District of Arizona, should reject the Forest Service's attempt to subvert the NEPA process and its own regulations.

The district court here, however, allowed the agency to bypass the Defenders ruling, by sanctioning the agency's artificial bifurcation of the Project to avoid conducting the needed EA.

///

///

///

///

26

II.     **The Agency's Attempt to Create a New "Habitat Restoration Project" To Circumvent the Public Review Process Violates Its Own Mining Regulations and Policy, NEPA, and the Forest Service Organic Act.**

A.      The Eleventh-Hour Bifurcation of the Project and Reliance on the "Habitat Restoration" CE-6 Violates NEPA and Agency Regulation and Policy.

As detailed above, in an attempt to approve all of the Project operations via a Categorical Exclusion shielded from full NEPA review, USFS invoked a brand-new reliance on CE-6 to approve the reclamation, mitigation, and monitoring aspects of the Project as a separate "habitat restoration" project. Agency staff added the new CE-6 category just prior to the Decision: "I added the new CE category and an explanation, so see if you think it's logical." July 16, 2021 E. Noesser (USFS) email, 2-ER-264.

As a result, the first time the public ever saw any mention of CE-6 was when the Decision was issued approving the entire Project. As the agency admits, "USFS did not seek separate public comment on the agency's decision to rely on a Categorical Exclusion for the habitat restoration activities for the Project." Fed. Ans. ¶49, 2-ER-87. The public thus never had an opportunity to comment upon whether USFS' artificial bifurcation of the Project was legal or whether reliance on this new CE-6 was appropriate and correctly followed agency requirements.

Even KORE, which submitted its final Plan of Operations just a month before the USFS Decision was issued, never mentioned or even implied that any aspect of the Project was a separate "habitat restoration project" and not a mining exploration

27

project. "This Exploration Plan of Operations (EPO) describes the Long Valley Exploration Drilling Project (Project) proposed by KORE Mining (KORE). This EPO is submitted to the Inyo National Forest Office in Bishop, California to comply with 36 CFR Part 228, Forest Service, Department of Agriculture." PoO at iv, 2-ER-111.

The USFS' surprise invocation of CE-6 violates a core mandate of NEPA – that agency decision-making be subject to public review and comment. "One of the twin aims of NEPA is active public involvement and access to information." Price Road Neighborhood Ass'n v. U.S. Dept. of Transportation, 113 F.3d 1505, 1511 (9th Cir. 1997). NEPA regulations require that agencies "shall to the fullest extent possible ... [e]ncourage and facilitate public involvement in the decisions which affect the quality of the human environment." 40 C.F.R. §1500.2(d).[3] "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken ... Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." Id. §1500.1(b). USFS must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA

---

[3] The Council on Environmental Quality revised its national NEPA regulations in 2020 and 2022. Because USFS began conducting its NEPA review before the new regulations became effective, the CEQ regulations existing prior to September 14, 2020 (issued in 1978), at 40 C.F.R. Part 1500, apply to the project and this Court's review, and are relied upon herein.

28

procedures." Id. §1506.6(a).  It "shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by [§] 1508.9(a)(1)." Id. §1501.4(b); *see also* 46 Fed. Reg. 18,026 (March 23, 1981)("Forty Most Asked Questions Concerning CEQ's NEPA Regulations," answer to question 38: "Section 1506.6 requires agencies to involve the public in implementing their NEPA procedures.").

The decision to carve off required mining reclamation into a separate project is also arbitrary because it is contrary to the plain language of USFS' mining regulations.  USFS mining policy states that the required reclamation is "an integral part" of the mineral exploration operation.  USFS Minerals Manual §2840.3 (Addendum).  All aspects of the Project, including monitoring and reclamation, are part of the authorized "operation," as USFS regulations define "operations" as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto."  36 C.F.R. §228.3(a).  Under these regulations, the rehabilitation and restoration of wildlife habitat is part of the required reclamation component of a mineral exploration plan, as "Reclamation" includes: **"**(4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and (5) Rehabilitation of fisheries and wildlife habitat."  36 C.F.R. §228.8(g).  *See also* USFS Minerals Manual §2840.3 ("All lands disturbed by mineral activities shall be reclaimed to a

29

condition that is consistent with forest land and resource management plans, including applicable State air and water quality requirements.") (Addendum). That Policy also mandates that "All reclamation requirements included in a Plan of Operations shall include measurable performance standards." Id.

In contrast, there is no mention in CE-6 or agency policy about applying CE-6 to the reclamation of approved mineral projects. That is because reclamation of damage incurred due to mineral projects is covered by USFS' 36 C.F.R. Part 228A mining regulations and CE-8, not by CE-6 which applies to independent projects intended as "wildlife habitat improvement."

The Forest Service initially recognized, correctly, that "restoration activities **do** fall under support activities necessary for mineral exploration." USFS staff edits to Draft Decision, 2-ER-267 (emphasis added). As such, these reclamation activities must be completed within one year in order for CE-8 to apply. *See* 36 C.F.R. § 220.6(e)(8)(CE-8 applies to "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities….").

But when the USFS devised its plan to bifurcate the Project and rely on CE-6 just before it issued the Decision, it changed course and announced that the Project reclamation activities "***are not*** support activities necessary for mineral exploration; the mineral exploration can proceed without these actions and will be complete before these actions occur." Decision at 3-4, 2-ER-92-93 (emphasis added).

30

As detailed above, this interpretation is contrary to the USFS' regulations and policy. All of the reclamation and mitigation requirements that the agency abruptly peeled-off into a new "habitat restoration" project are necessarily part of the mineral exploration operations and cannot be artificially divorced from the Project. Such deviation from agency policies "without a reasoned explanation" is arbitrary and capricious. W. Watersheds Project v. Kraayenbrink, 620 F.3d 1187, 1208 (9th Cir. 2010). *See also* Pacific Coast Federation of Fishermens Assn. v. Ross, No. 1:20-CV-00431-DAD-SAB, 2020 WL 1699980, at *3 (E.D. Cal. Apr. 7, 2020)(same).

B.    The Illegality of USFS' Reliance on CE-6 for the "Habitat Restoration Project" Is Further Shown by its Failure to Follow the Review and Permitting Requirements of the Organic Act and Agency Regulations.

The error of the agency's eleventh-hour reliance on CE-6 is underscored by USFS' failure to apply the public land laws and regulations that apply to such non-mineral activities on public land. If it were true that this new "habitat restoration project" was completely independent of the mineral exploration project and fell within CE-6, then the Organic Act and USFS regulations require that such separate projects be approved under a Special Use Permit (SUP), subject to very different application, review, resource protection, and approval requirements:

> All uses of National Forest System lands, improvements, and resources, except those authorized by regulations governing … minerals (part 228) are designated 'special uses.' Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use

authorization from the authorized officer, unless that requirement is waived by paragraphs (c) through (e)(3) of this section.

36 C.F.R. §251.50(a).

KORE did not apply for a SUP and USFS never issued one. Instead, the Decision admits that USFS approved all of KORE's operations as a mineral exploration project where, according to the agency, "KORE mining therefore has a legal right to explore/develop and conduct reasonably incident activities" under the General Mining Law of 1872. Decision at 1, 2-ER-90.

This distinction is important. In contrast to non-discretionary valid mineral exploration projects reviewed under the 1872 Mining Law, issuance of a SUP is governed by an entirely different regulatory structure and is completely discretionary with the agency. *See* 36 C.F.R. §251.53 (agency "**may** issue special use authorizations") (emphasis added). The USFS here approved the entire Project under its position that KORE had a "legal right" to conduct all of its operations under the 1872 Mining Law, which the agency had no discretion to reject. Decision at 1, 2-ER-90.

USFS cannot have it both ways. It cannot approve both the exploration drilling/road project and the "habitat restoration project" (to avoid the one-year limit) under asserted "legal rights" under the 1872 Mining Law (under which USFS believed it had no discretion), yet at the same time arguing that the required reclamation, now renamed a "habitat restoration project," is not part of, and is

32

totally independent of, the exploration project and any "rights" under the Mining Law.  The agency should not be allowed to avoid the required reviews and approvals by manipulating the process and bifurcating the Project in an attempt to avoid the one-year limit and yet also avoid the separate permitting requirements for the "habitat restoration project," which would be governed by a different set of public land statues and regulations.

## III.  The Agency Illegally Approved the Project in the Face of "Extraordinary Circumstances" Precluding Use of a Categorical Exclusion.

Even if the Project did fit within a valid CE category, the "extraordinary circumstances" in this case— potentially significant impacts to the imperiled Bi-State sage-grouse and ESA-listed Owens tui chub—preclude use of any CE.  36 C.F.R. §220.6(b)(1)(i).  *See also* Forest Service Handbook 1909.15, Chapter 30, §31.2(1)(extraordinary circumstances include potential adverse impacts to a USFS-designated Sensitive, or ESA-listed, species) (Addendum).

USFS regulations provide that the agency may use one of the CE categories "only if there are no extraordinary circumstances related to the proposed action."  36 C.F.R. §220.6(a).  Paraphrasing the regulations, in <u>Center for Biological Diversity v. Ilano</u>, this Circuit has explained that when conducting an extraordinary circumstances inquiry, the agency must undertake a three-part inquiry:

33

(1) Determine whether the proposed action involves certain natural resources present in the area, such as threatened, endangered, or sensitive species.

(2) If threatened, endangered or sensitive species are present, examine whether there is a cause-effect relationship between a proposed action and the potential effect on the resource.  It is the degree of the effect that determines whether an extraordinary circumstance exists.

(3)  If the agency determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, the agency must prepare an environmental assessment.

See Ctr. for Biological Diversity v. Ilano, 928 F.3d 774, 782 (9th Cir. 2019); 36 C.F.R. §220.6(b), (c).  Where impacts to a species could pose an extraordinary circumstance, the agency may issue a categorical exclusion only "if the agency determines that the project will not impact negatively on the species." Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996); see also Conservation Congress v. Forest Serv., No. 2:12-02416 WBS KJN, 2013 WL 2457481, at *8 (E.D. Cal. June 5, 2013)(same).

The district court incorrectly accepted the USFS' argument that Ilano announced a new legal standard that "impacts to a protected species… are not an extraordinary circumstance if a project is not likely to result in a trend toward federal listing or a loss of viability for the species as a whole."  Order at 20, 1-ER-

34

23 (internal quotation omitted).  Such a new standard is both inconsistent with Ilano, which relied on the thoroughness of the agency's reasoning, and with NEPA.

In Ilano, this Circuit affirmed the USFS' approval of a timber sale project that would affect the California spotted owl under a CE because the Project avoided the most important owl habitat, and the USFS—on the basis of scientific studies and its own expert opinion—concluded that, while individual owls would be harmed in the short term, the species would benefit in the long run.  924 F.3d at 782-783.  The Circuit noted that the USFS had concluded that the project "'may affect individual owls, but is not likely to result in a trend toward federal listing or a loss of viability' for the species as a whole," id. at 782, but upheld the USFS' decision because the USFS "considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record."  Id. at 783. Thus, Ilano did not uphold the agency's CE decision based on the USFS' viability, or species-level harm language, as the District Court did here, but rather based on the thoroughness of the agency's reasoning.

This makes sense, since requiring species-level harm before there could be a significant impact under NEPA would be inconsistent with the statute and regulations, as interpreted by courts in this Circuit for decades.  NEPA requires an agency to prepare a "detailed" environmental impact statement (EIS) before approving "major federal actions significantly affecting the human environment."

42 U.S.C. §4332(2)(C).  It has long been established that "to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur.  It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment."  Blackwood, 161 F.3d at 1212.  A significant effect "may exist even if the Federal agency believes that on balance the effect will be beneficial."  40 C.F.R. §1508.27(b)(1).

Although an agency may define categorically excluded actions "which do not individually or cumulatively have a significant effect on the human environment… and for which, therefore, neither an environmental assessment nor an environmental impact statement is required," the agency must also identify extraordinary circumstances "in which a normally excluded action *may* have a significant environmental effect."  40 C.F.R. §1508.4 (emphasis added).  Thus, USFS' NEPA regulations provide: "If the responsible official determines, based on scoping, that it is *uncertain* whether the proposed action may have a significant effect on the environment, prepare an EA.  If the responsible official determines, based on scoping, that the proposed action *may* have a significant environmental effect, prepare an EIS."  36 C.F.R. §220.6(c) (emphasis added).  Consequently, uncertainty about whether there may be a significant effect on the environment is all it takes to

preclude reliance on a CE. *See* <u>Conservation Congress</u>, 2013 WL 2457481, at *8 (quoting FS NEPA Handbook).[4]

But under the district court's erroneous interpretation of <u>Ilano</u>, an extraordinary circumstance cannot exist until widespread species-level harm is likely to occur. Under that new standard, a more thorough environmental analysis is not required where a significant impact *may* occur (*see* <u>Blackwood</u>, 161 F.3d at 1212), or where there is *uncertainty* as to whether a significant impact *may* occur (*see* 36 C.F.R. §220.6(c)), but only where harm *is likely* to occur to an entire protected species or local population.

That requires even more evidence than would call for an EIS under the USFS' regulations. *See* <u>Blackwood</u>, 161 F.3d at 1212 (EIS is required where action *may* have a significant impact). Indeed, to rise to the level of significance to require even an environmental assessment under the district court's holding, there would have to be "likely" species or population level harm, a higher standard than has been required for injunctive relief. The Ninth Circuit has recognized that harm to even members of an imperiled species may be "irreparable" because "[o]nce a member of an endangered species has been injured, the task of preserving that

---

[4] The language in the USFS NEPA Handbook quoted in <u>Conservation Congress</u> has not changed. *See* NEPA Handbook, Chapter 30, §31.2 (Addendum).

species becomes all the more difficult." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886 F.3d 803, 818 (9th Cir. 2018).

Far from requiring the agency to demonstrate an action "will not impact negatively" on a protected species before relying on a CE, the district court's new standard precludes an agency from relying on a CE only where the action poses an existential threat to the species or a local population as a whole. Sw. Ctr. for Biological Diversity, 100 F.3d at 1450. Such a standard inverts the proper inquiry, which asks whether *any* negative impact on a protected species will occur. *See* Id.

The court in Conservation Congress recognized this, rejecting the use of a CE where an agency determined a timber project may affect but was not likely to adversely affect the northern spotted owl, rather than finding "no effect." Conservation Congress, 2013 WL 2457481, at *8. Similarly, the Arizona District Court's 2015 decision in Defenders, discussed above, found that the Forest Service's use of CE-8 and determination that there was no "extraordinary circumstance" associated with the impacts to a protected species (Mexican Spotted owl) was illegal because "USFS did not provide a convincing explanation of why these potential effects to the Mexican spotted owl are certain to be environmentally insignificant." Defenders, Order at 13, 2-ER-43.[5]

---

[5] The Defenders court did not adopt this Circuit's more-protective "bright-line" rule, noted in Conservation Congress that a "may affect, but is not likely to adversely affect" decision under the Endangered Species Act automatically meant that an

Not only did the district court adopt a new and impermissible standard for showing an extraordinary circumstance precluding reliance on a CE, but it uncritically accepted the USFS' cursory and unsupported explanation for why there were no extraordinary circumstances. "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." Alaska Ctr. For Env't v. U.S. Forest Serv., 189 F.3d 851, 859 (9th Cir. 1999). "An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." Id., citing The Steamboaters v. FERC, 759 F.2d 1382, 1393 (9th Cir. 1985). "The agency must supply a convincing statement of reasons why potential effects are insignificant." Id., citing Steamboaters, 759 F.2d at 1393. USFS failed to do that here.

A.   Harm to the Designated Bi-State Sage Grouse Is an Extraordinary Circumstance.

The Project's impacts to the Bi-State sage-grouse are an extraordinary circumstance, and the record shows that there is at least uncertainty about whether

---

"extraordinary circumstance" existed. Defenders Order at 11, 2-ER-43. Nevertheless, as quoted above, Defenders found that because the USFS failed to "provide a convincing explanation of why these potential effects to the Mexican spotted owl are certain to be environmentally insignificant," the agency could not use a CE to cover the mineral exploration project.

the Project's impacts to the bird will be significant.  Accordingly, the USFS should have prepared an EA.

The Bi-State sage-grouse is not only a USFS-designated Sensitive Species, it is also a USFS "Species of Conservation Concern" warranting additional consideration by the agency because "the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area (36 CFR 219.9)."  2-ER-254.  The DPS was proposed for listing under the ESA as threatened with extinction by the federal Fish and Wildlife Service.  88 Fed.Reg. 25613-25616 (Apr. 27, 2023) (Addendum).  Thus, a protected species is present under part 1 of the Ilano test.  928 F.3d at 782.

During scoping, the Forest Service received comments from CDFW, Mono County, and the Town of Mammoth Lakes, showing that it was at least "uncertain" whether the Project would have significant effects on the Bistate sage-grouse.  36 C.F.R. §220.6(c).  The expert biologists at CDFW determined that the Project could adversely affect the Bi-State sage-grouse through the direct loss and degradation of its habitat.  "The Project has potential to impact breeding, nesting and brood rearing activities of the Bi-State Distinct Population Segment (DPS) of greater sage-grouse from the South Mono Population Management Unit (PMU)."  CDFW letter at 2, 2-ER-245.  Those impacts would occur "through the direct loss and degradation of

40

sagebrush-steppe habitat…The sage-grouse is a sagebrush (Artemisia spp.) obligate species because it depends entirely on sagebrush for foraging, nesting and brood rearing.  Sagebrush loss and disturbance resulting from construction of drill pads and temporary access routes would remove traditional nesting habitat and fragment sage-grouse foraging and brooding habitat**.**"  CDFW letter at 2-3, 2-ER-245-246.

 CDFW also highlighted potential for harms to the Bi-State sage-grouse from the Project's heavy equipment, drill rigs, trucks, and industrial traffic along the existing and new access routes, finding that "Noise and other forms of human intrusion could result in disturbance to sage-grouse breeding, foraging, nesting and brood rearing activities."  Id. at 3, 2-ER-246.  This was because

> The primary access roads (Owens River Road and Antelope Springs Road) to the Project pass within proximity to four known sage-grouse leks. The Antelope Springs Road passes within approximately 150 meters to the south of lek 8, which in 2021 comprised the second largest concentration of breeding male sage-grouse in the Long Valley PMU.

Id.  "Noise and dust generated by daily vehicular traffic associated with the Project could potentially impact grouse breeding behavior and ultimately result in lek abandonment.  Furthermore, human intrusion impacts in the Project area could result in the abandonment of sage-grouse nesting, foraging and brooding habitat."  Id.

Mono County alerted the Forest Service that these impacts could be significant: "[O]perations will be conducted on a 24-hour basis consisting of two 12-

hour shifts" and therefore "the constant noise, vibration, traffic, and lighting **may cause significant impacts** on the birds and success rates of breeding and brood rearing, particularly if broods are deterred from using preferred or known foraging habitat or shelter."  May 18, 2021 Mono County letter, 2-ER-286 (emphasis added).

        As these scoping comments showed, there is a cause-effect relationship between the Project and potential harm to sage-grouse that should give rise to uncertainty about whether a significant impact could occur.  The Forest Service's own biologist agreed that there was cause for concern.  "We are well aware of existing Leks that are very close to the project area.  I have voiced this previously in meetings on the matter, and shared maps/data with KORE and their biological consultants. … I do not doubt that [sage-grouse] use this area extensively for brooding, foraging…etc.."  April 21, 2021 T. Torres email (USFS), 2-ER-292.  Mr. Torres' email responded to comments from Lynn Boulton, with Plaintiff/Appellant Sierra Club, who had raised serious concerns about the Project's impacts to the Bi-State sage-grouse, stating that: "In my opinion, Lynn Boulton has a right to be concerned.  This project is going to disturb bi-state sage grouse."  Id.

        In light of this uncertainty, the USFS should have prepared an EA, but it did not.  See Ilano, 928 F.3d at 782 ("If the agency 'determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment,' the agency must 'prepare an [environmental assessment].'")(quoting

36 C.F.R. §220.6(c)). Instead, the USFS dismissed uncertainty about significant impacts to the Bi-State sage-grouse because the agency concluded the Project "will not result in any impacts to the species that would affect their viability within the project area or the Inyo National Forest." Decision, 2-ER-93-94.

But that determination employs the wrong standard for extraordinary circumstances, and unlike in Ilano, nowhere does the agency here justify its conclusions with scientific evidence. The Decision's discussion of impacts to the species is literally just one paragraph. It offers a vague and conclusory assumption that impacts to sage-grouse will not be significant because:

> With implementation of these avoidance and minimization measures [set forth in Appendix A], any impacts to species of conservation concern, should they be present, would be minor and temporary. It is likely that any sage grouse and pygmy rabbit in the area would avoid the immediate vicinity of the drill sites during the exploration activities and associated disturbance.
> Nonetheless, there is the potential for such avoidance to result in physiological stress, reduced foraging success, and exposure to higher predation rates due to increased movements to skirt project activities.

Id.

That brief explanation is unconvincing, especially when cross-referenced with evidence in the Record—including because it relies on assumptions refuted by the agency's own experts. The "avoidance and minimization measures" in Appendix A, which the Decision assumes will completely eliminate any potential for significant impacts to the Bi-State sage-grouse, consist primarily of a waivable March 1-June 30 restriction, "Bird anti-perching devices," "acoustic screening devices," and a 15

43

mile per hour speed limit on all roads south of Antelope Springs Road to reduce potential collisions with wildlife. Decision Appx. A, 2-ER-104. These measures will not eliminate the potential for significant effects to sage-grouse which inhabit the Project area year-round, including the area surrounding Lek 8, a well-attended lek adjacent to Antelope Springs Road.

First, the March-June timing restriction can be completely waived by USFS (as it can be eliminated with "prior written approval from" the USFS with no public review). Id. Even if enforced, it only applies during March-June. As USFS and other agencies acknowledged, however, "grouse in Long Valley are non-migratory, spending their entire life cycle in proximity to leks." BSAP at 47, 2-ER-242; *see also* Biological Impact Analysis at 16, 2-ER-162 (Project area contains year-round habitat). As such, the timing limitation will not prevent impacts to sage-grouse because sage-grouse do not simply leave the Project area after June 30th. *See* Bradley Decl. ¶¶8-9 (describing winter location data with attached Maps 3-10, Attachments 003-32), 2-ER-50. *See also* Bi-State Sage-Grouse Committee, maps of sage-grouse brooding, nesting, and active leks in the Project area, 2-ER-272-274; L.A. Dept. of Water and Power, BSSG Adaptive Management Plan, 2-ER-213.

In determining the seasonal restriction would avoid impacts, USFS relied on assumptions about sage-grouse use and occupancy of the area that are flatly wrong. As just one example, USFS denies "that sage-grouse reside in the Project area

during the winter." Fed. Ans. ¶31, 2-ER-86. In truth, as stated by the experts at the CDFW, "Based on radio-telemetry data provided by the U.S. Geological Survey (USGS), the Project area and vicinity is known to provide year-round habitat for the Bi-State sage-grouse." CDFW letter at 2, 2-ER-245. Maps created by Plaintiffs, using GIS data in the Administrative Record provided by USFS that was taken from sage-grouse radio-collars, demonstrates winter use by sage-grouse throughout the Project area, along access roads, and in at least two locations near drill pads. Bradley Decl. ¶¶ 8-9, attached Maps 3-10, 2-ER-50-83.

Second, the relied-upon measures do nothing to address habitat displacement and degradation from construction of the Project's new access roads and drill pads, which will completely remove sagebrush, upon which the species depends. *See generally* KORE PoO at 9-13, 2-ER-120-124 (describing destruction of vegetation). These disturbances will fragment and degrade sagebrush habitats. *See aslo* CDFW letter at 3, 2-ER-246 ("Sagebrush loss and disturbance resulting from construction of drill pads and temporary access routes would remove traditional nesting habitat and fragment sage-grouse foraging and brooding habitat."). USFS recognized that impacts to "[b]ig sagebrush shrubland within the drill pads and temporary access roads" will be "a direct impact to sage grouse." USFS comments on consultant's Biological Impact Analysis, 2-ER-263. Indeed, USFS staff (initials SK and NE) contradicted KORE's consultant's (initials TM) assertion that sagebrush destruction

"is not a direct impact to sage grouse."  <u>Id</u>.  In response to "TM's" comment, Erin Noesser, USFS' Environmental Coordinator, said "I agree with Kary [USFS] that there really are direct impacts.  Birds will likely be flushed."  <u>Id</u>.

Displacement from these habitats will harm sage-grouse.  The Decision presumes that being displaced from essential habitats will mean that sage-grouse and other species of conservation concern will "likely" avoid disturbance:  "It is likely that any sage grouse and pygmy rabbit in the area would avoid the immediate vicinity during the exploration activities and associated disturbance."  Decision at 4, 2-ER-93.  Yet, that rationale runs directly counter to the USFS' own recognition that if sage-grouse avoid the Project area, that is *itself* a negative impact.  The USFS Environmental Coordinator stated:  "[I]f a sage grouse is hanging out at one of the pad sites, and a drill rig drives up, that sage grouse will have to move to a different location for weeks or months. That is an impact."  2-ER-268.  The Decision admits that "there is a potential for such avoidance to result in physiological stress, reduced foraging success, and exposure to higher predation rates due to increased movements to skirt project activities."  Decision at 4-5, 2-ER-93-94.

Third, the "acoustic screens" and bird "anti-perching" devices around the drill sites do nothing to alleviate the impacts caused by the ongoing and repeated disturbance from trucks and heavy equipment travelling through sage-grouse habitat.  *See* PoO at 14, 2-ER-125 (discussing Project-related trips to drill sites).  As

CDFW commented, "the primary access roads (Owens River Road and Antelope Springs Road) to the Project pass within proximity to four known sage-grouse leks. The Antelope Springs Road passes within approximately 150 meters to the south of lek 8, which in 2021 comprised the second largest concentration of breeding male sage-grouse in the Long Valley PMU." CDFW letter at 3, 2-ER-246. According to the USFS biologist, "Lek 8 is a highly active lek and perhaps the largest (high count of 40+ lekking birds in 2019) in the Long Valley planned management unit (PMU)." Jan. 8, 2021 T. Torres email, 2-ER-303. Thus, "[n]oise and other forms of human intrusion could result in disturbance to sage-grouse breeding, foraging, nesting and brood rearing activities." CDFW letter at 3, 2-ER-246.

Fourth, the 15-mile-per-hour speed limit the USFS relies upon will not mitigate these impacts from the access roads because it only applies *south* of Antelope Springs Road, **not** on Antelope Springs road itself. This limited measure will not protect sage-grouse using the critical Lek 8 and nearby areas. These birds will be vulnerable to being struck or disturbed by mining trucks traveling at higher speeds. CDFW letter at 2-3, 2-ER-245-246.

Thus, it cannot be true that these mitigation measures eliminate any uncertainty about whether the Project may cause a significant effect on the environment and the Bi-State sage grouse. The scoping comments raised uncertainty about whether there could be significant impacts to the Bi-state sage-

47

grouse, and the record reflects that the impacts will "disturb" the species, including by causing physiological stress, reduced foraging success, and exposure to higher predation rates due to increased movements to skirt project activities." Decision at 4-5, 2-ER-93-94. *See* April 21, 2021 T. Torres email (USFS), 2-ER-292; CDFW letter at 3, 2-ER-246. Accordingly, USFS could not rationally conclude that the Project "will not impact negatively" on the Bi-State sage-grouse.

Even if species-level harm is the test for extraordinary circumstances, USFS' Decision fails on this record. Since the entire Long Valley population centers around only eight long-term leks, impacts to breeding behavior and potential lek abandonment associated with the four leks close to the Project's access roads alone could impact half of all active leks in the Long Valley population. The Long Valley population is the heart of the South Mono PMU, contributing 92 percent of its population. CDFW letter at 2, 2-ER-245. *See also* 2020 USGS study, Coates et al. at 52, 2-ER-212. Mammoth Lakes and Mono County alerted USFS that the Project would affect three sage-grouse leks explicitly protected by the BSAP: "The number of leks, three of which are specifically identified within the BSAP as warranting special consideration to reduce human disturbance, in habitat within three miles of the Project site constitutes an extraordinary circumstance." May 12, 2020 Mammoth Lakes letter, 2-ER-305. "[KORE's Exploration Plan of Operation] does not address the need to reduce human disturbance on public lands in the

48

vicinity of Lek 1, 5 and 8, as set forth in the 2012 Bi-State Action Plan, Action HIR1-1-SM." May 18, 2021 Mono County letter, 2-ER-288. *See* BSAP at 95, 2-ER-243 (noting the need "to reduce human disturbance on public lands in the vicinity of Lek 1, Lek 5, and Lek 8…."). The Project could very well have population level effects to the Bi-state sage-grouse. In a population that already has 40 percent chance of extirpation within the next 20 years, the Forest Service must do more to substantiate its conclusion that such widespread impacts have no potential to be significant. *See* Coates et al. 2020 at 52, 2-ER-212.

The USFS' cursory justification for invoking a CE cannot pass muster on these facts. In rejecting the federal agency's reliance on a different CE [CX] (for cattle grazing) for projects that might harm sage-grouse, the District Court in Oregon held:

> Contrary to Defendants' argument, the Court gives only limited deference to an agency's conclusory opinion that is unsupported by meaningful analysis. *See Garcia v. Holder*, 659 F.3d 1261, 1267 (9th Cir. 2011) ("Where the [the agency's] decision does not give thorough reasoning, but instead is conclusory or lacks meaningful analysis, we give that decision only limited deference."); *Guevara v. Holder*, 649 F.3d 1086, 1091 (9th Cir. 2011) (giving only "some deference" to an agency opinion that "lacks a thorough and meaningful analysis"). Plaintiffs have shown a likelihood of success on the merits on their claim that BLM's issuance of the CX violated NEPA.

Western Watersheds Project v. Bernhardt, 392 F. Supp. 3d 1225, 1251 (D. Oregon

2019).[6]   The record documents that the Project will likely, and certainly "may," have significant impacts to sage-grouse in the Project area.   Like in <u>Bernhardt</u>, those impacts warrant examination in more than just a cursory CE.

B.   <u>Harm to the Endangered Owens Tui Chub Is an Extraordinary Circumstance.</u>

Regarding the endangered Owens tui chub, as determined by the U.S. Fish and Wildlife Service, the Project may significantly affect this protected species:

> The Owens tui chub (*Siphateles bicolor snyderi*), a species federally listed as endangered, occurs in Little Hot Creek and the Hot Creek Headwater Spring, which are located within one mile of the project area.

May 13, 2021 USFWS letter at 1, 2-ER-250; *see also* CDFW letter, 2-ER-247 (same).   Again, this meets part 1 of <u>Ilano</u>.

The expert state and federal wildlife agencies alerted the USFS in scoping to uncertainty about the Project's effects on the chub.   36 C.F.R. §220.6(c).   According to the USFWS, "Dependent on groundwater discharge, these populations may be impacted by loss of water quantity, impacts to water quality and alterations of water chemistry.   In review of this project scoping materials, we were unclear if these concerns were considered or evaluated."   May 13, 2021 USFWS letter at 1, 2-ER-250.   CDFW expressed concerns about impacts to the local springs, which provide

---

[6] In subsequent briefing on summary judgment, the court vacated the agency's decisions on other grounds and did not discuss this issue further. <u>See W. Watersheds Proj. v. Bernhardt</u>, 428 F. Supp. 3d 327 (D. Or. 2019).

water for both Hot Creek (a state-designated Wild Trout Water) and the Upper

Owens River, a trophy trout fishery and water supply for the city of Los Angeles.

CDFW letter at 4, 2-ER-247.

Despite these concerns, USFS based its "no extraordinary circumstances"

position on KORE's consultant's view that there was **no potential** that the Project's

drilling could hit groundwater, and thus no potential impacts to the chub.  The USFS

had asked:  "Is this consistent with hydrology reports or change in water table from

drilling?  Same for dace and frog."  2-ER-278 (Edits to consultant-produced

Biological Impact Analysis).  In response, TM [KORE consultant] writes "It is our

understanding that the project will not affect the ground water, and indirectly impact

the aforementioned species."  Id.

That is factually wrong.  The record shows that the Project's drilling *will*

potentially, and indeed likely, intercept the groundwater.  The drilling will puncture

the regional groundwater aquifer, as "Depths to water ranged from 69 to 425 feet"

below the surface.  June 1, 2021 KORE Tech. Memo. at 5, 2-ER-167.  As KORE

admits, its drilling will reach well into these waters, as "Total depths of the borings

will range from approximately 580 feet to 1,424 feet below ground surface."  PoO at

13, 2-ER-124.  That could result in severe impacts to both water quality and

quantity:  "Based on the technical report as well as USGS Publications on the Long

Valley Geothermal Aquifer … the test holes will reach both the cold water

51

(unconfined, surface aquifer) and geothermal (confined aquifer) in Long Valley."

CDFW letter at 4, 2-ER-247. *See also* May 13, 2021 USFWS letter at 1, 2-ER-250.

Further, as detailed above, the USGS previously noted the problems with

uncontrolled artesian flow at the surface from previous drilling in the area. May 21,

2021 email from J. Howle (USGS), 2-ER-284.

Thus, the record contradicts USFS' determination that the Project poses no

threat to the groundwater and the endangered Owens tui chub. As with the Bi-State

sage-grouse, the USFS may not rely upon conclusory statements to justify using a

CE in the face of documented potential impacts to protected species to avoid the

required NEPA review.

## IV.   USFS Violated NEPA By Failing to Adequately Consider the Project's Impacts, and the Cumulative Impacts of Other Activities in the Area.

USFS also overlooked the potentially significant direct, indirect and

cumulative environmental effects from the Project, especially in light of the ongoing

and proposed activities in the area. USFS' NEPA regulations provide that if "it is

uncertain whether the proposed action may have a significant effect on the

environment, prepare an EA. If the responsible official determines, based on

scoping, that the proposed action may have a significant environmental effect,

prepare an EIS." 36 C.F.R. 220.6(c). *See also* USFS Handbook Chapter 30, §31.3

(same) (Addendum).

52

As the USFS NEPA Handbook requires, when the agency reviews a proposal, such as KORE's exploration and reclamation plan, it undergoes a "scoping" process. "Scoping should… reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects." Handbook §1909.15, Ch. 31.3 (Addendum). The Handbook depicts the decisionmaking process for approval through a CE, showing that the critical and threshold "Are Effects Significant?" determination requires the consideration of "any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects." <u>Id</u>. As shown in the Handbook:

///

///

///

///

///

///

///

///



FSH, 1909.15 §11.6. (Addendum).

This "significance" determination is central to the question of whether the agency can use a CE. "[A]ll that is required to render the CE [Categorical Exclusion] inappropriate is the possibility of significant effects." Citizens for a Better Forestry v. Dept. of Agriculture, 481 F.Supp.2d 1059, 1088 (N.D. Cal. 2007).

This was the specific holding by the District Court in Arizona in the very similar USFS mineral exploration case discussed above:

> In determining whether a proposed action has 'significant' environmental effects, an agency should consider whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

Defenders, Order at 13-14, 2-ER-43-44 (USFS' failure to consider cumulative impacts in approving mineral exploration project under CE-8 violated NEPA).

In a slightly different context, the District of Oregon held that the NEPA regulations and agency Handbook required these impacts to be reviewed both in applying an existing CE category to a specific project (the case here), as well when developing a new category (the case there). Hells Canyon Preservation Council v. Connaughton, No. 3:11-cv-00023-PK, 2013 WL 665134, at *8 (D. Or. Feb. 22, 2013) ("although there is no categorically different form of cumulative impacts analysis for applying an already established CE, the extent and form of the information needed to properly analyze cumulative impacts will vary on a case-by-case basis."). The court also noted that under Alaska Center for Environment v. U.S. Forest Service, 189 F.3d 851, 859 (9th Cir. 1999), "the agency must consider several relevant factors, including cumulative impacts, to determine whether an action will significantly impact the environment." Hells Canyon, 2013 WL 665134, at *7.

Here, USFS failed to analyze the direct, indirect, and cumulative and impacts to Bi-State sage-grouse, Owens tui chub, water, and other critical public resources resulting from the Project, combined with those of nearby current and reasonably

foreseeable mining/mineral, agriculture, water withdrawals/use, grazing, traffic, energy development, and all other activities in the area (including along/near access and truck routes).

The USFS Botanist noted "all the stuff going on in this area" that needed to be "tracked." Aug. 12, 2021 B. Engelhardt email, 2-ER-257 (listing, among other projects in addition to the KORE Exploration, "Geothermal Lease nomination," CD-IV geothermal construction, and SCE [South California Edison] Long Valley Pole Replacement"). But none of the impacts from these activities were analyzed.

For example, the entire Project area is permitted for livestock grazing, and the effects of livestock grazing on vegetation, water, and habitat undoubtedly impact the sage-grouse that use the area. The agency allows "399 cow/calf pairs" on USFS lands and a total of "458 cow/calf pairs" when adjacent private lands are considered. June, 3, 2020 USFS letter to Wood Livestock, Inc., 2-ER-275. Yet the record is devoid of any analysis of the cumulative impacts of grazing on sage-grouse when coupled with KORE's drilling, road construction, and other operations.

In addition, according to CDFW, recreation in the area is also a significant disturbance that may be a factor in the decline of the Long Valley sage-grouse population, but USFS never considered this either. CDFW letter at 2, 2-ER-245.

The agency also failed to review the potential for geothermal energy development – which would undoubtedly impact the region's environment,

especially ground and surface waters and habitat dependent on groundwater recharge to local streams and springs. USFS notified KORE that proposed geothermal leasing in the area overlaps with KORE's exploration project, stating that "we wanted to notify Kore Mining Ltd of the overlapping study area with the Kore mining claims. The two Parcels that were nominated are currently nominated for Geothermal Leasing are actively undergoing a NEPA Environmental Review." Jan. 29, 2021 C. Garcia (USFS) email to KORE, 2-ER-299. USFS provided KORE with maps of the overlapping geothermal leases with KORE's mining claims in the Project area. 2-ER-300-301.[7] In objecting to the impact that such development would have on use of its mining claims, KORE stressed that operations under geothermal leases would be a "cumulative impact" under NEPA with its Long Valley Exploration Project that must be fully analyzed. Mar. 5, 2021 KORE letter to USFS at 4, 2-ER-295.

Overall, regarding the Bi-State sage-grouse specifically, USFS recognized the likely cumulative impacts to the species in the BSAP, where the federal and state agencies, including the Forest Service, highlighted the various threats from activities such as "infrastructure (fences, powerlines, and roads), mining, energy development, grazing, invasive and exotic species, pinyon-juniper encroachment, recreation,

---

[7] During summary judgment briefing, the agency stated that its NEPA review of the geothermal leasing had been withdrawn.

wildfire, and the likely effects of climate change [which] were the major threats to current and future destruction, modification, or curtailment of habitat in the Bi-State area."  BSAP at 3, 2-ER-240.  "Cumulatively, … these threats interact in such a way as to fragment and isolate populations."  Id.

But despite recognizing these cumulative threats, the USFS failed to consider whether impacts of the Project when combined with other activities would be cumulatively significant, barring approval of the Project using a CE.  This violated NEPA.

## V.     This Court Should Vacate the Unlawful Agency Action.

"[T]he APA instructs courts to 'set aside' (*i.e.*, to vacate) agency actions held to be unlawful."  In re Clean Water Act Rulemaking, 60 F.4th 583, 594 (9th Cir. 2023); *see also* 5 U.S.C. § 706(2)(A).  If an agency's decision "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [the agency] for further consideration." Camp v. Pitts, 411 U.S. 138, 143 (1973).  *See also* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413–14 (1971) ("[i]n all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").  If a court finds an agency action unlawful, vacatur thus becomes the presumptive, statutory remedy under the APA.

Because vacatur "is the ordinary remedy," the agency "bears the burden of demonstrating vacatur is inappropriate." Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency, No. 3:12-cv-01751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018); see also Ctr. for Envtl. Health v. Vilsack, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("Given that vacatur is the presumptive remedy for a procedural violation […], it is Defendants' burden to show that vacatur is unwarranted."); Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs, 466 F. Supp. 3d 1217, 1219 (W.D. Wash. 2020)("Because the APA creates a 'presumption of vacatur' if an agency acts unlawfully, the presumption must be overcome by the party seeking remand without vacatur.").

The Ninth Circuit has authorized remand without vacatur only in "limited" or "rare" circumstances, and only when the agency opposing vacatur can show that "equity demands" a departure from the presumptive APA remedy. Pollinator Stewardship Council v. Vilsack, 806 F.3d 520, 532 (9th Cir. 2015)("limited circumstances"); Humane Soc'y of the U.S. v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)("rare circumstances"). See also Oregon Natural Desert Ass'n v. Jewell, 840 F.3d 562, 575 (9th Cir. 2016)(directing district court to determine whether this is one of the "rare circumstances" when the agency action should remain in force until reconsidered or replaced).

None of the "rare circumstances" arguing against vacatur exist here. USFS' violation of the NEPA and Organic Act review and approval requirements cannot be countenanced under federal law. In environmental cases, the "rare circumstance" supporting non-vacatur occurs when leaving the unlawful agency action in place will prevent serious environmental harm—the opposite of the situation here. *See* Idaho Farm Bureau Federation v. Babbitt, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (leaving unlawful ESA listing rule in place to protect imperiled snail until new listing rule is completed); Klamath Siskiyou Wildlands Ctr. v. Grantham, 642 Fed. Appx. 742, 745 (9th Cir. 2016) (leaving decision in effect while agency completed a new NEPA analysis where vacatur of the challenged decision to issue grazing permits would result in reinstating prior permits containing terms less protective of National Forest).

Courts regularly vacate federal agency project reviews and approvals that violate the public and agency review mandates under NEPA. *See* Idaho Conservation League v. U.S. Forest Service, 1:18-CV-504-BLW, 2020 WL 2115436, **2-3 (D. Idaho May 4, 2020) (vacating USFS approval of mineral exploration drilling project where USFS failed to adequately analyze baseline groundwater conditions that could be affected by the drilling). This is true even if there may be adverse economic effects of vacatur on private parties. *See* Great Basin Res. Watch v. BLM, 844 F.3d 1095, 1111–12 (9th Cir. 2016)(vacating

60

approval of mining project upon finding NEPA analysis unlawful); Ctr. for Biological Diversity v. BLM, 698 F.3d 1101, 1128 (9th Cir. 2012)(vacating decision authorizing gas pipeline).

Moreover, vacatur of an unlawful NEPA decision is vital because it forces the agency to make a new decision, after a new NEPA public notice and comment process, properly informed by an accurate understanding of the environmental effects of the proposed project, and "done under circumstances that ensure an objective evaluation free of the previous taint." Metcalf v. Daley, 214 F.3d 1135, 1146 (9th Cir. 2000)(setting aside decision due to NEPA violations, and ordering agency to re-start the NEPA process and prepare a new environmental assessment before issuing a new decision).

By contrast, leaving an unlawful decision in place allows an agency to engage in a new review simply "'to rationalize or justify decisions already made.'" Save the Yaak Comm., 840 F.2d at 718 (*quoting* 40 C.F.R. § 1502.5). *See also* Metcalf, 214 F.3d at 1146 (requiring a fresh decision because any NEPA analysis done under a pre-supposed approval risked "a classic Wonderland case of first-the-verdict, then-the-trial").

For these reasons, the USFS Decision should be vacated.

## <u>CONCLUSION</u>

Because the Forest Service's actions reviewing and approving the Long Valley Exploration Drilling Project are arbitrary and capricious, and violate applicable federal laws, Friends respectfully request that this Court vacate and set aside the challenged Decision, pursuant to its authority under the APA.

Respectfully submitted this 19th day of May, 2023.

*/s/ Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*/s/ Talasi Brooks*
Talasi B. Brooks
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

*/s/ Justin Augustine*
Justin Augustine
Lisa Belenky
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
lbelenky@biologicaldiversity.org
jaugustine@biologicaldiversity.org

## CERTIFICATION OF COMPLIANCE PURSUANT
## TO FED. R. APP. P. 32 (a)(7)(C) AND CIRCUIT RULE 32-1

I certify that:  Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is:

Proportionately spaced, has a typeface of 14 points or more and contains 13,764 words.

*/s/ Talasi Brooks*

## CERTIFICATE OF SERVICE OF ELECTRONIC FILING OF BRIEF

I also certify that on May 19, 2023, I electronically filed the foregoing brief, along with the Excerpts of Record (ER) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all of participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Talasi Brooks*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6(b), Appellants state that there are no related cases before this Court.

# ATTACHMENT A:

## ADDENDUM TO PLAINTIFFS-APPELLANTS' OPENING BRIEF

## TABLE OF CONTENTS

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706...................................... 1

28 U.S.C. § 1291................................................................................................ 4

1872 Mining Law, 30 U.S.C. §§ 21-42 .................................................................. 6

National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4335.................. 20

Forest Service Organic Act of 1897, 16 U.S.C. §§ 475, 478, 551........................... 25

Forest Service NEPA Regulations, 36 C.F.R. §§220.4, 220.6 ................................ 26

Forest Service Mining Regulations, 36 C.F.R. §§ 228.1-228.15............................. 46

Forest Service Regulations, Land Uses, 36 C.F.R. §§ 251.50, 251.53..................... 59

CEQ NEPA Regulations, 40 C.F.R. §§ 1500-1508 ................................................. 63

88 Fed. Reg. 25613 (April 27, 2023), Endangered and Threatened
Wildlife and Plants; Threatened Status for the Bi-State Distinct
Population Segment of Greater Sage-Grouse With Section 4(d) Rule
and Designation of Critical Habitat ...................................................................... 94

Forest Service NEPA Handbook, 1909.15 §§ 11, 11.6 ........................................... 98

Forest Service NEPA Handbook, 1909.15 §§ 31.1-31.3 ....................................... 106

Forest Service Manual 2800-90-1, Minerals and Geology..................................... 111

rnsentatives" for "the committees on the Judiciary of the Senate and the House of Representatives. the Select Committee on Small Business of the Senate. and the Committee on Small Business of the House of Representatives". was executed by making the substitution for "tile Committees on the ,Judiciary of the 8enate and House of Representatives, the Select Committee on Small Business of the Senate. and the Committee on Small Business of the House of Representatives" to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104-121. §243(b)(2). substituted "his or her views with respect to compliance with this ,hapter, the adequacy of the rulemaking record with respect to small entities and the" for "his views with respect to the".

CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress. June 29, 2001.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104-121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996 see section 245 of Pub. L. 104-121, set out as a note under section 601 of this title.

## CHAPTER 7-JUDICIAL REVIEW

Sec.
701.    Application; definitions.
702.    Right of review.
703.    Form and venue of proceeding.
704.    Actions reviewable.
705.    Relief pending review.
706.    Scope of review.

SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89-554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

§701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that-
    (ll statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter-
    (1) "agency" means each authority of the Government of the United States. whether or not it is within or subject to review by another agency, but does not include-
        (A) the Congress;
        (B) the courts of the United States;
        (C) the governments of the territories or possessions of the United States;
        (D) the government of the District of Columbia;
        (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
        (F) courts martial and military commissions;
        (G) military authority exercised in the field in time of war or in occupied territory; or

        (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12, subchapter II of chapter 171 of title 49, or sections 1884, 1891—1902, and former section 1641(b)(2), of title 50, appendix; and

    (2) "person", "rule", "order·.. "license". "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

(Pub. L. 89-551, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103—272, §5(a), July 5, 1991, 108 Stat. 1373; Pub. L. 111-350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) ............. | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause). 60 Stat. 243. |

In subsection (a), the words "This chapter applies. according to the provisions t,hereof." are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702-706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended. which is carried into section 551 of this title.

In subsection (b)/l)(G), the words "or naval" are omitted as included in "military".

In subsection (b)(l)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter. or before July 1 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix. is retained notwithstanding its repeal by §lll(a)(l) of the Act of Sept. 21. 1961. Pub. L. 87-256, 75 Stat. 538. since §lll(c) of the Act provides that a reference in other Acts to a provision of law repealed by §lll<a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87-256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

REFERENCES IN TEXT

Sections 1891-1902 of title 50, appendix, referred to in subsec. (b)(l)(H), were omitted from the Code as executed.

AMENDMENTS

2011-Subsec. (b)(l)(H]. Pub. L. 111-350 struck out "chapter 2 of title 41;" after "title 12;".
1994-Subsec. (b)(l)(H). Pub. L. 103-272 substituted "subchapter II of chapter 471 of title 49, or sections" for "or sections 1622,".

§702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

§ 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a


(2) Cases certified to the Court of Appeals for the Armed Forces by the Judge Advocate General under section 867(a)(2) of title 10.

(3) Cases in which the Court of Appeals for the Armed Forces granted a petition for review under section 867(a)(3) of title 10.

(4) Cases, other than those described in paragraphs (1), (2), and (3) of this subsection, in which the Court of Appeals for the Armed Forces granted relief.

(Added Pub. L. 98–209, §10(a)(1), Dec. 6, 1983, 97 Stat. 1405; amended Pub. L. 101–189, div. A, title XIII, §1304(b)(3), Nov. 29, 1989, 103 Stat. 1577; Pub. L. 103–337, div. A, title IX, §924(d)(1)(C), (2)(A), Oct. 5, 1994, 108 Stat. 2832.)

### Editorial Notes

#### Amendments

1994—Pub. L. 103–337 substituted ''Court of Appeals for the Armed Forces'' for ''Court of Military Appeals'' in section catchline and wherever appearing in text.

1989—Pub. L. 101–189 substituted ''section 867(a)(1)'' for ''section 867(b)(1)'' in par. (1), ''section 867(a)(2)'' for ''section 867(b)(2)'' in par. (2), and ''section 867(a)(3)'' for ''section 867(b)(3)'' in par. (3).

### Statutory Notes and Related Subsidiaries

#### Effective Date

Section effective on the first day of the eighth calendar month beginning after Dec. 6, 1983, see section 12(a)(1) of Pub. L. 98–209, set out as an Effective Date of 1983 Amendment note under section 801 of Title 10, Armed Forces.

### § 1260. Supreme Court of the Virgin Islands; certiorari

Final judgments or decrees rendered by the Supreme Court of the Virgin Islands may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Virgin Islands is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

(Added Pub. L. 112–226, §2(a), Dec. 28, 2012, 126 Stat. 1606.)

### Statutory Notes and Related Subsidiaries

#### Effective Date

Pub. L. 112–226, §3, Dec. 28, 2012, 126 Stat. 1607, provided that: ''The amendments made by this Act [enacting this section and amending section 1613 of Title 48, Territories and Insular Possessions] apply to cases commenced on or after the date of the enactment of this Act [Dec. 28, 2012].''

## CHAPTER 83—COURTS OF APPEALS

Sec.
1291.  Final decisions of district courts.
1292.  Interlocutory decisions.
[1293.  Repealed.]
1294.  Circuits in which decisions reviewable.
1295.  Jurisdiction of the United States Court of Appeals for the Federal Circuit.
1296.  Review of certain agency actions.

### Editorial Notes

#### Amendments

1996—Pub. L. 104–331, §3(a)(2), Oct. 26, 1996, 110 Stat. 4069, added item 1296.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 ''Precedence of cases in the United States Court of Appeals for the Federal Circuit''.

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, ''Bankruptcy appeals'', which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 ''Final decisions of Puerto Rico and Hawaii Supreme Courts''.

### § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

#### Historical and Revision Notes

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs ''First'', ''Second'', and ''Third'' of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term ''district courts of the United States.'' (See definitive section 451 of this title.)

Paragraph ''Fourth'' of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words ''Fifth. In the United States Court for China, in all cases'' in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### Editorial Notes

#### AMENDMENTS

1982—Pub. L. 97–164, § 124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

#### EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

#### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

## § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion,

ness or other organizations, corporations, associations, universities, scientific societies, and individuals, upon such terms and conditions as he may prescribe.

(Dec. 18, 1942, ch. 764, §2, 56 Stat. 1057.)

### Statutory Notes and Related Subsidiaries

#### TRANSFER OF FUNCTIONS

For provisions relating to closure and transfer of functions of the United States Bureau of Mines, see note set out under section 1 of this title.

## § 15. Repealed. Pub. L. 86–533, § 1(17), June 29, 1960, 74 Stat. 248

Section, act Dec. 18, 1942, ch. 764, §3, 56 Stat. 1057, related to reports to Congress of expenditures and donations to laboratory established under sections 13 to 16 of this title.

## § 16. Research laboratory for utilization of anthracite coal; establishment of advisory committee; composition; functions; appointment

The Secretary of the Interior, acting through the United States Bureau of Mines, may, in his discretion, create and establish an advisory committee composed of not more than six members to exercise consultative functions, when required by the Secretary, in connection with the administration of sections 13 to 16 of this title. The said committee shall be composed of representatives of anthracite coal mine owners, of representatives of anthracite coal mine workers and the public in equal number. The members of said committee shall be appointed by the Secretary of the Interior without regard to the civil-service laws.

(Dec. 18, 1942, ch. 764, §4, 56 Stat. 1057.)

### Statutory Notes and Related Subsidiaries

#### TRANSFER OF FUNCTIONS

For provisions relating to closure and transfer of functions of the United States Bureau of Mines, see note set out under section 1 of this title.

#### TERMINATION OF ADVISORY COMMITTEES

Advisory committees in existence on Jan. 5, 1973, to terminate not later than the expiration of the 2-year period following Jan. 5, 1973, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

## CHAPTER 2—MINERAL LANDS AND REGULATIONS IN GENERAL

Sec.
21. Mineral lands reserved.
21a. National mining and minerals policy; "minerals" defined; execution of policy under other authorized programs.
22. Lands open to purchase by citizens.
23. Length of claims on veins or lodes.
24. Proof of citizenship.
25. Affidavit of citizenship.
26. Locators' rights of possession and enjoyment.
27. Mining tunnels; right to possession of veins on line with; abandonment of right.
28. Mining district regulations by miners: location, recordation, and amount of work; marking of location on ground; records; annual labor or improvements on claims pending issue of patent; co-owner's succession in interest upon delinquency in contributing proportion of expenditures; tunnel as lode expenditure.
28–1. Inclusion of certain surveys in labor requirements of mining claims; conditions and restrictions.
28–2. Definitions.
28a. Omitted.
28b. Annual assessment work on mining claims; temporary deferment; conditions.
28c. Length and termination of deferment.
28d. Performance of deferred work.
28e. Recordation of deferment.
28f. Fee.
28g. Location fee.
28h. Co-ownership.
28i. Failure to pay.
28j. Other requirements.
28k. Regulations.
28f. Collection of mining law administration fees.
29. Patents; procurement procedure; filing: application under oath, plat and field notes, notices, and affidavits; posting plat and notice on claim; publication and posting notice in office; certificate; adverse claims; payment per acre; objections; nonresident claimant's agent for execution of application and affidavits.
30. Adverse claims; oath of claimants; requisites; waiver; stay of land office proceedings; judicial determination of right of possession; successful claimants' filing of judgment roll, certificate of labor, and description of claim in land office, and acreage and fee payments; issuance of patents for entire or partial claims upon certification of land office proceedings and judgment roll; alienation of patent title.
31. Oath: agent or attorney in fact, beyond district of claim.
32. Findings by jury; costs.
33. Existing rights.
34. Description of vein claims on surveyed and unsurveyed lands; monuments on ground to govern conflicting calls.
35. Placer claims; entry and proceedings for patent under provisions applicable to vein or lode claims; conforming entry to legal subdivisions and surveys; limitation of claims; homestead entry of segregated agricultural land.
36. Subdivisions of 10-acre tracts; maximum of placer locations; homestead claims of agricultural lands; sale of improvements.
37. Proceedings for patent where boundaries contain vein or lode; application; statement including vein or lode; issuance of patent: acreage payments for vein or lode and placer claim; costs of proceedings; knowledge affecting construction of application and scope of patent.
38. Evidence of possession and work to establish right to patent.
39. Surveyors of mining claims.

Sec.
40.   Verification of affidavits.
41.   Intersecting or crossing veins.
42.   Patents for nonmineral lands: application, survey, notice, acreage limitation, payment.
43.   Conditions of sale by local legislature.
44, 45.   Omitted.
46.   Additional land districts and officers.
47.   Impairment of rights or interests in certain mining property.
48.   Lands in Michigan, Wisconsin, and Minnesota; sale and disposal as public lands.
49.   Lands in Missouri and Kansas; disposal as agricultural lands.
49a.   Mining laws of United States extended to Alaska; exploration and mining for precious metals; regulations; conflict of laws; permits; dumping tailings; pumping from sea; reservation of roadway; title to land below line of high tide or high-water mark; transfer of title to future State.
49b.   Mining laws relating to placer claims extended to Alaska.
49c.   Recording notices of location of Alaskan mining claims.
49d.   Miners' regulations for recording notices in Alaska; certain records legalized.
49e.   Annual labor or improvements on Alaskan mining claims; affidavits; burden of proof; forfeitures; location anew of claims; perjury.
49f.   Fees of recorders in Alaska for filing proofs of work and improvements.
50.   Grants to States or corporations not to include mineral lands.
51.   Water users' vested and accrued rights; enumeration of uses; protection of interest; rights-of-way for canals and ditches; liability for injury or damage to settlers' possession.
52.   Patents or homesteads subject to vested and accrued water rights.
53.   Possessory actions for recovery of mining titles or for damages to such title.
54.   Liability for damages to stock raising and homestead entries by mining activities.

## § 21. Mineral lands reserved

In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law.

(R.S. § 2318.)

### Editorial Notes

CODIFICATION

R.S. § 2318 derived from act July 4, 1866, ch. 166, § 5, 14 Stat. 86.

## § 21a. National mining and minerals policy; "minerals" defined; execution of policy under other authorized programs

The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.

For the purpose of this section "minerals" shall include all minerals and mineral fuels including oil, gas, coal, oil shale and uranium.

It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

(Pub. L. 91–631, title I, § 101, formerly § 2, Dec. 31, 1970, 84 Stat. 1876; Pub. L. 104–66, title I, § 1081(b), Dec. 21, 1995, 109 Stat. 721; renumbered title I, § 101, Pub. L. 104–325, § 2(1), (2), Oct. 19, 1996, 110 Stat. 3994.)

### Editorial Notes

AMENDMENTS

1995—Pub. L. 104–66 in last par. struck out at end "For this purpose the Secretary of the Interior shall include in his annual report to the Congress a report on the state of the domestic mining, minerals, and mineral reclamation industries, including a statement of the trend in utilization and depletion of these resources, together with such recommendations for legislative programs as may be necessary to implement the policy of this section."

### Statutory Notes and Related Subsidiaries

SHORT TITLE

Pub. L. 91–631, § 1, Dec. 31, 1970, 84 Stat. 1876, provided: "That this Act [enacting this section] may be cited as the 'Mining and Minerals Policy Act of 1970'."

## § 22. Lands open to purchase by citizens

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

(R.S. § 2319.)

### Editorial Notes

CODIFICATION

R.S. § 2319 derived from act May 10, 1872, ch. 152, § 1, 17 Stat. 91.

Words "Except as otherwise provided," were editorially supplied on authority of act Feb. 25, 1920, ch. 85, 41 Stat. 437, popularly known as the Mineral Lands Leasing Act, which is classified to chapter 3A (§ 181 et seq.) of this title.

### Statutory Notes and Related Subsidiaries

SHORT TITLE

Sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 43, and 47 of this title are based on sections of the Revised

Statutes which are derived from act May 10, 1872, ch. 152, 17 Stat. 91, popularly known as the ''General Mining Act of 1872'' and as the ''Mining Law of 1872''.

### § 23. Length of claims on veins or lodes

Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, located prior to May 10, 1872, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their location. A mining claim located after the 10th day of May 1872, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the 10th day of May 1872 render such limitation necessary. The end lines of each claim shall be parallel to each other.

(R.S. § 2320.)

#### Editorial Notes

##### Codification

R.S. § 2320 derived from act May 10, 1872, ch. 152, § 2, 17 Stat. 91.

### § 24. Proof of citizenship

Proof of citizenship, under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, may consist, in the case of an individual, of his own affidavit thereof; in the case of an association of persons unincorporated, of the affidavit of their authorized agent, made on his own knowledge, or upon information and belief; and in the case of a corporation organized under the laws of the United States, or of any State or Territory thereof, by the filing of a certified copy of their charter or certificate of incorporation.

(R.S. § 2321.)

#### Editorial Notes

##### References in Text

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original ''this chapter'', meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

##### Codification

R.S. § 2321 derived from act May 10, 1872, ch. 152, § 7, 17 Stat. 94.

### § 25. Affidavit of citizenship

Applicants for mineral patents, if residing beyond the limits of the district wherein the claim is situated, may make any oath or affidavit required for proof of citizenship before the clerk of any court of record or before any notary public of any State or Territory.

(Apr. 26, 1882, ch. 106, § 2, 22 Stat. 49.)

### § 26. Locators' rights of possession and enjoyment

The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. Nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another.

(R.S. § 2322.)

#### Editorial Notes

##### Codification

R.S. § 2322 derived from act May 10, 1872, ch. 152, § 3, 17 Stat. 91.

### § 27. Mining tunnels; right to possession of veins on line with; abandonment of right

Where a tunnel is run for the development of a vein or lode, or for the discovery of mines, the owners of such tunnel shall have the right of possession of all veins or lodes within three thousand feet from the face of such tunnel on the line thereof, not previously known to exist, discovered in such tunnel, to the same extent as if discovered from the surface; and locations on the line of such tunnel of veins or lodes not appearing on the surface, made by other parties after the commencement of the tunnel, and while the same is being prosecuted with reasonable diligence, shall be invalid; but failure to prosecute the work on the tunnel for six months shall be considered as an abandonment of the right to all undiscovered veins on the line of such tunnel.

(R.S. § 2323.)

#### Editorial Notes

##### Codification

R.S. § 2323 derived from act May 10, 1872, ch. 152, § 4, 17 Stat. 92.

##### Short Title

This section is popularly known as the Tunnel Site Act.

### § 28. Mining district regulations by miners: location, recordation, and amount of work; marking of location on ground; records; annual labor or improvements on claims pending issue of patent; co-owner's succession in interest upon delinquency in contributing proportion of expenditures; tunnel as lode expenditure

The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims made after May 10, 1872, shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the 10th day of May 1872, that is granted a waiver under section 28f of this title, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. On all claims located prior to the 10th day of May 1872, $10 worth of labor shall be performed or improvements made each year, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. Upon the failure of any one of several coowners to contribute his proportion of the expenditures required hereby, the coowners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion of the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures. The period within which the work required to be done annually on all unpatented mining claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12:01 ante meridian on the first day of September succeeding the date of location of such claim.

Where a person or company has or may run a tunnel for the purposes of developing a lode or lodes, owned by said person or company, the money so expended in said tunnel shall be taken and considered as expended on said lode or lodes, whether located prior to or since May 10, 1872; and such person or company shall not be required to perform work on the surface of said lode or lodes in order to hold the same as required by this section. On all such valid claims the annual period ending December 31, 1921, shall continue to 12 o'clock meridian July 1, 1922.

(R.S. § 2324; Feb. 11, 1875, ch. 41, 18 Stat. 315; Jan. 22, 1880, ch. 9, § 2, 21 Stat. 61; Aug. 24, 1921, ch. 84, 42 Stat. 186; Pub. L. 85–736, § 1, Aug. 23, 1958, 72 Stat. 829; Pub. L. 103–66, title X, § 10105(b), Aug. 10, 1993, 107 Stat. 406; Pub. L. 110–161, div. F, title I, (1), Dec. 26, 2007, 121 Stat. 2101.)

#### Editorial Notes

##### CODIFICATION

R.S. § 2324 derived from act May 10, 1872, ch. 152, § 5, 17 Stat. 92.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, ''in section 28'', was executed by making the amendment to R.S. § 2324, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

##### AMENDMENTS

2007—Pub. L. 110–161 substituted ''shall commence at 12:01 ante meridian on the first day of September'' for ''shall commence at 12 o'clock meridian on the 1st day of September''. See Codification note above.

1993—Pub. L. 103–66 inserted ''that is granted a waiver under section 28f of this title,'' after ''On each claim located after the 10th day of May 1872,''.

1958—Pub. L. 85–736 changed period for doing annual assessment work on unpatented mineral claims, substituting ''1st day of September'' for ''1st day of July''.

#### Statutory Notes and Related Subsidiaries

##### ASSESSMENT WORK YEARS, 1957–58 AND 1958–59

Pub. L. 85–736, § 2, Aug. 23, 1958, 72 Stat. 829, provided that the period commencing in 1957 for the performance of annual assessment work under this section shall end at 12 o'clock meridian on the 1st day of July 1958, and the period commencing in 1958 for the performance of such annual assessment work shall commence at 12 o'clock meridian on the 1st day of July 1958, and shall continue to 12 o'clock meridian on Sept. 1, 1959.

#### Executive Documents

##### ADMISSION OF ALASKA AS STATE

Admission of Alaska into the Union was accomplished Jan. 3, 1959, on issuance of Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as notes preceding section 21 of Title 48, Territories and Insular Possessions.

### § 28–1. Inclusion of certain surveys in labor requirements of mining claims; conditions and restrictions

The term ''labor'', as used in the third sentence of section 28 of this title, shall include, without being limited to, geological, geochemical and geophysical surveys conducted by qualified experts and verified by a detailed report filed in the county office in which the claim is located which sets forth fully (a) the location of the work performed in relation to the point of discovery and boundaries of the claim, (b) the nature, extent, and cost thereof, (c) the basic findings therefrom, and (d) the name, address,

and professional background of the person or persons conducting the work. Such surveys, however, may not be applied as labor for more than two consecutive years or for more than a total of five years on any one mining claim, and each such survey shall be nonrepetitive of any previous survey on the same claim.

(Pub. L. 85–876, §1, Sept. 2, 1958, 72 Stat. 1701.)

## § 28–2. Definitions

As used in section 28–1 of this title,

(a) The term "geological surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of geology as they relate to the search for and discovery of mineral deposits;

(b) The term "geochemical surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of chemistry as they relate to the search for and discovery of mineral deposits;

(c) The term "geophysical surveys" means surveys on the ground for mineral deposits through the employment of generally recognized equipment and methods for measuring physical differences between rock types or discontinuities in geological formations;

(d) The term "qualified expert" means an individual qualified by education or experience to conduct geological, geochemical or geophysical surveys, as the case may be.

(Pub. L. 85–876, §2, Sept. 2, 1958, 72 Stat. 1701.)

## § 28a. Omitted

EDITORIAL NOTES

CODIFICATION

Section, act June 29, 1950, ch. 404, 64 Stat. 275, provided for extension of time of annual assessment work, on mining claims in the United States, including Alaska, for period commencing July 1, 1949, until 12 o'clock noon Oct. 1, 1950, and also provided for commencement of assessment work or improvements required for year ending 12 o'clock noon July 1, 1951, immediately following 12 o'clock noon July 1, 1950. See sections 28b to 28e of this title.

## § 28b. Annual assessment work on mining claims; temporary deferment; conditions

The performance of not less than $100 worth of labor or the making of improvements aggregating such amount, which labor or improvements are required under the provisions of section 28 of this title to be made during each year, may be deferred by the Secretary of the Interior as to any mining claim or group of claims in the United States upon the submission by the claimant of evidence satisfactory to the Secretary that such mining claim or group of claims is surrounded by lands over which a right-of-way for the performance of such assessment work has been denied or is in litigation or is in the process of acquisition under State law or that other legal impediments exist which affect the right of the claimant to enter upon the surface of such claim or group of claims or to gain access to the boundaries thereof.

(June 21, 1949, ch. 232, §1, 63 Stat. 214.)

## § 28c. Length and termination of deferment

The period for which said deferment may be granted shall end when the conditions justifying deferment have been removed: *Provided*, That the initial period shall not exceed one year but may be renewed for a further period of one year if justifiable conditions exist: *Provided further*, That the relief available under sections 28b to 28e of this title is in addition to any relief available under any other Act of Congress with respect to mining claims.

(June 21, 1949, ch. 232, §2, 63 Stat. 215.)

## § 28d. Performance of deferred work

All deferred assessment work shall be performed not later than the end of the assessment year next subsequent to the removal or cessation of the causes for deferment or the expiration of any deferments granted under sections 28b to 28e of this title and shall be in addition to the annual assessment work required by law in such year.

(June 21, 1949, ch. 232, §3, 63 Stat. 215.)

## § 28e. Recordation of deferment

Claimant shall file or record or cause to be filed or recorded in the office where the notice or certificate of location of such claim or group of claims is filed or recorded, a notice to the public of claimant's petition to the Secretary of the Interior for deferment under sections 28b to 28e of this title, and of the order or decision disposing of such petition.

(June 21, 1949, ch. 232, §4, 63 Stat. 215.)

## § 28f. Fee

### (a) Claim maintenance fee

#### (1) Lode mining claims, mill sites, and tunnel sites

The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in appropriations Acts, a claim maintenance fee of $100 per claim or site, respectively. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28–28e)[1] and the related filing requirements contained in section 1744(a) and (c) of title 43.

#### (2) Placer mining claims

The holder of each unpatented placer mining claim located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, the claim maintenance fee described in subsection (a)(1), for each 20 acres of the placer claim or portion thereof. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28 to 28e)[1] and the re-

[1] See References in Text note below.

lated filing requirements contained in section 1744(a) and (c) of title 43.

**(b) Time of payment**

The claim main tenance[2] fee under subsection (a) shall be paid for the year in which the location is made, at the time the location notice is recorded with the Bureau of Land Management. The location fee imposed under section 28g of this title shall be payable not later than 90 days after the date of location.

**(c) Oil shale claims subject to claim maintenance fees under Energy Policy Act of 1992**

This section shall not apply to any oil shale claims for which a fee is required to be paid under section 2511(e)(2) of the Energy Policy Act of 1992 (Public Law 102–486; 106 Stat. 3111; 30 U.S.C. 242).

**(d) Waiver**

(1) The claim maintenance fee required under this section may be waived for a claimant who certifies in writing to the Secretary that on the date the payment was due, the claimant and all related parties—

(A) held not more than 10 mining claims, mill sites, or tunnel sites, or any combination thereof, on public lands; and

(B) have performed assessment work required under the Mining Law of 1872 (30 U.S.C. 28–28e)[1] to maintain the mining claims held by the claimant and such related parties for the assessment year ending on noon of September 1 of the calendar year in which payment of the claim maintenance fee was due.

(2) For purposes of paragraph (1), with respect to any claimant, the term "related party" means—

(A) the spouse and dependent children (as defined in section 152 of title 26), of the claimant; and

(B) a person who controls, is controlled by, or is under common control with the claimant.

For purposes of this section, the term control includes actual control, legal control, and the power to exercise control, through or by common directors, officers, stockholders, a voting trust, or a holding company or investment company, or any other means.

(3) If a small miner waiver application is determined to be defective for any reason, the claimant shall have a period of 60 days after receipt of written notification of the defect or defects by the Bureau of Land Management to: (A) cure such defect or defects, or (B) pay the $100 claim maintenance fee due for such period.

(Pub. L. 103–66, title X, §10101, Aug. 10, 1993, 107 Stat. 405; Pub. L. 105–240, §116, Sept. 25, 1998, 112 Stat. 1570; Pub. L. 105–277, div. A, §101(e) [title I], Oct. 21, 1998, 112 Stat. 2681–231, 2681–235; Pub. L. 107–63, title I, (1), Nov. 5, 2001, 115 Stat. 418; Pub. L. 108–108, title I, (1), Nov. 10, 2003, 117 Stat. 1245; Pub. L. 110–161, div. F, title I, (2), Dec. 26, 2007, 121 Stat. 2101; Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907; Pub. L. 112–74, div. E, title IV, §430, Dec. 23, 2011, 125 Stat. 1047; Pub.

L. 113–6, div. F, title IV, §1403, Mar. 26, 2013, 127 Stat. 419.)

### Editorial Notes

#### References in Text

The Mining Law of 1872 (30 U.S.C. 28–28e), referred to in subsecs. (a) and (d)(1)(B), probably means act May 10, 1872, ch. 152, 17 Stat. 91. That act was incorporated into the Revised Statutes as R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of this title. For complete classification of R.S. §§2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

#### Codification

Pub. L. 111–88, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, "in section 28f(a)," was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

Pub. L. 108–108, which directed the amendment of section 28 of title 30, United States Code, "in section 28f(a)," was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2003 Amendment note below.

Pub. L. 107–63, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2001 Amendment note below.

Pub. L. 105–277, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment notes below.

Pub. L. 105–240, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment note below.

#### Amendments

2013—Subsec. (a)(1). Pub. L. 113–6, §1403(1), substituted "before, on, or after August 10, 1993" for "on or after August 10, 1993".

Subsec. (a)(2). Pub. L. 113–6, §1403(2), struck out "located" after "United States", substituted "subsection (a)(1)" for "subsection (a)", and inserted at end "Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28 to 28e) and the related filing requirements contained in section 1744(a) and (c) of title 43."

2011—Subsec. (a)(1). Pub. L. 112–74, §430(1)(A), designated existing provisions as par. (1) and substituted "The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in appropriations Acts, a claim maintenance fee of $100 per claim or site, respectively." for "The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before, on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in Appropriations Acts, a claim maintenance fee of $100 per claim or site".

[2] So in original. Probably should be "maintenance".

Subsec. (a)(2). Pub. L. 112–74, §430(1)(B), added par. (2).

Subsec. (b). Pub. L. 112–74, §430(2), substituted "The claim main tenance fee under subsection (a) shall be paid for the year in which the location is made, at the time the location notice is recorded with the Bureau of Land Management." for "The claim maintenance fee payable pursuant to subsection (a) of this section for any assessment year shall be paid before the commencement of the assessment year, except that for the initial assessment year in which the location is made, the locator shall pay the claim maintenance fee at the time the location notice is recorded with the Bureau of Land Management."

2009—Subsec. (a). Pub. L. 111–88 substituted ", to the extent provided in advance in Appropriations Acts," for "for years 2004 through 2008,". See Codification note above.

Pub. L. 111–8, which directed the removal of the modifications made by Pub. L. 110–161, was executed by inserting "for years 2004 through 2008" after "before September 1 of each year". See 2007 Amendment note below.

2007—Subsec. (a). Pub. L. 110–161 struck out "for years 2004 through 2008" after "before September 1 of each year". See Codification note above.

2003—Subsec. (a). Pub. L. 108–108 substituted "for years 2004 through 2008" for "for years 2002 through 2003". See Codification note above.

2001—Subsec. (a). Pub. L. 107–63 substituted "The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before, on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year for years 2002 through 2003, a claim maintenance fee of $100 per claim or site" for "The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year for years 1999 through 2001, a claim maintenance fee of $100 per claim or site." See Codification note above.

1998—Subsec. (a). Pub. L. 105–277 added first sentence and struck out former first sentence which read as follows: "The holder of each unpatented mining claim, mill, or tunnel site located pursuant to the mining laws of the United States before October 1, 1998 shall pay the Secretary of the Interior, on or before September 1, 1999 a claim maintenance fee of $100 per claim site." See Codification note above.

Pub. L. 105–240 substituted "The holder of each unpatented mining claim, mill, or tunnel site located pursuant to the mining laws of the United States before October 1, 1998 shall pay the Secretary of the Interior, on or before September 1, 1999 a claim maintenance fee of $100 per claim site." for "The holder of each unpatented mining claim, mill or tunnel site located pursuant to the Mining Laws of the United States, whether located before or after August 10, 1993, shall pay to the Secretary of the Interior, on or before August 31 of each year, for years 1994 through 1998, a claim maintenance fee of $100 per claim." See Codification note above.

Subsec. (d)(3). Pub. L. 105–277 added par. (3). See Codification note above.

**Statutory Notes and Related Subsidiaries**

Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28g. Location fee

Notwithstanding any other provision of law, for every unpatented mining claim, mill or tunnel site located after August 10, 1993, to the extent provided in advance in Appropriations Acts, pursuant to the Mining Laws of the United States, the locator shall, at the time the location notice is recorded with the Bureau of Land Management, pay to the Secretary of the Interior a location fee, in addition to the claim maintenance fee required by section 28f of this title, of $25.00 per claim.

(Pub. L. 103–66, title X, §10102, Aug. 10, 1993, 107 Stat. 406; Pub. L. 105–277, div. A, §101(e) [title I], Oct. 21, 1998, 112 Stat. 2681–231, 2681–235; Pub. L. 107–63, title I, (2), Nov. 5, 2001, 115 Stat. 419; Pub. L. 108–108, title I, (2), Nov. 10, 2003, 117 Stat. 1245; Pub. L. 110–161, div. F, title I, (3), Dec. 26, 2007, 121 Stat. 2101; Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907.)

**Editorial Notes**

Codification

Pub. L. 111–88, which directed the amendment of section 28g of title 30, United States Code, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, "in section 28g", was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

Pub. L. 108–108, which directed the amendment of section 28 of title 30, United States Code, "in section 28g", was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2003 Amendment note below.

Pub. L. 107–63, which directed the amendment of section 28f(a) of title 30, United States Code, in section 28g, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2001 Amendment note below.

Pub. L. 105–277, which directed the amendment of section 28g of title 30, United States Code, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment note below.

Amendments

2009—Pub. L. 111–88 substituted ", to the extent provided in advance in Appropriations Acts," for "and before September 30, 2008,". See Codification note above.

Pub. L. 111–8, which directed the removal of the modifications made by Pub. L. 110–161, was executed by inserting "and before September 30, 2008," before "pursuant to". See 2007 Amendment note below.

2007—Pub. L. 110–161 struck out "and before September 30, 2008," before "pursuant to". See Codification note above.

2003—Pub. L. 108–108 substituted "2008" for "2003". See Codification note above.

2001—Pub. L. 107–63 substituted "2003" for "2001". See Codification note above.

1998—Pub. L. 105–277 substituted "2001" for "1998". See Codification note above.

**Statutory Notes and Related Subsidiaries**

Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28h. Co-ownership

The co-ownership provisions of the Mining Law of 1872 (30 U.S.C. 28)[1] shall remain in effect, except that in applying such provisions, the annual claim maintenance fee required under this Act shall, where applicable, replace applicable assessment requirements and expenditures.

(Pub. L. 103–66, title X, § 10103, Aug. 10, 1993, 107 Stat. 406.)

### Editorial Notes
#### REFERENCES IN TEXT

The Mining Law of 1872 (30 U.S.C. 28), referred to in text, probably means act May 10, 1872, ch. 152, 17 Stat. 91, as amended. That act was incorporated into the Revised Statutes as R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of this title. For complete classification of R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

This Act, referred to in text, is Pub. L. 103–66, Aug. 10, 1993, 107 Stat. 312, known as the Omnibus Budget Reconciliation Act of 1993. The annual claim maintenance fee required under this Act probably refers to the fee required under section 28f of this title. For complete classification of this Act to the Code, see Tables.

### Statutory Notes and Related Subsidiaries
#### SIMILAR PROVISIONS

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28i. Failure to pay

Failure to pay the claim maintenance fee or the location fee as required by sections 28f to 28l of this title shall conclusively constitute a forfeiture of the unpatented mining claim, mill or tunnel site by the claimant and the claim shall be deemed null and void by operation of law.

(Pub. L. 103–66, title X, § 10104, Aug. 10, 1993, 107 Stat. 406; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2908.)

### Editorial Notes
#### CODIFICATION

Pub. L. 111–88, which directed the amendment of section 28i of title 30, United States Code, was executed by making the amendment to section 10104 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

#### AMENDMENTS

2009—Pub. L. 111–88 substituted "28l" for "28k". See Codification note above.

### Statutory Notes and Related Subsidiaries
#### SIMILAR PROVISIONS

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28j. Other requirements

### (a) Federal Land Policy and Management Act requirements

Nothing in sections 28f to 28k of this title shall change or modify the requirements of section

[1] See References in Text note below.

314(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(b)), or the requirements of section 314(c) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(c)) related to filings required by section 314(b), and such requirements shall remain in effect with respect to claims, and mill or tunnel sites for which fees are required to be paid under this section.

### (b) Omitted

### (c) Fee adjustments

(1) The Secretary of the Interior shall adjust the fees required by sections 28f to 28k of this title to reflect changes in the Consumer Price Index published by the Bureau of Labor Statistics of the Department of Labor every 5 years after August 10, 1993, or more frequently if the Secretary determines an adjustment to be reasonable.

(2) The Secretary shall provide claimants notice of any adjustment made under this subsection not later than July 1 of any year in which the adjustment is made.

(3) A fee adjustment under this subsection shall begin to apply the first assessment year which begins after adjustment is made.

(Pub. L. 103–66, title X, § 10105, Aug. 10, 1993, 107 Stat. 406.)

### Editorial Notes
#### CODIFICATION

Section is comprised of section 10105 of Pub. L. 103–66. Subsec. (b) of section 10105 of Pub. L. 103–66 amended section 28 of this title.

### Statutory Notes and Related Subsidiaries
#### SIMILAR PROVISIONS

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28k. Regulations

The Secretary of the Interior shall promulgate rules and regulations to carry out the terms and conditions of sections 28f to 28k of this title as soon as practicable after August 10, 1993.

(Pub. L. 103–66, title X, § 10106, Aug. 10, 1993, 107 Stat. 407.)

### Statutory Notes and Related Subsidiaries
#### SIMILAR PROVISIONS

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28l. Collection of mining law administration fees

In fiscal year 2009 and each fiscal year thereafter, the Bureau of Land Management shall collect from mining claim holders the mining claim maintenance fees and location fees; such fees shall be collected in the same manner as authorized by sections 28f and 28g of this title only to the extent provided in advance in appropriations Acts.

(Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907.)

Editorial Notes

AMENDMENTS

2009—Pub. L. 111–88 substituted ''from mining claim holders the mining claim maintenance fees and location'' for ''mining law administration'' and struck out ''those'' before ''authorized''.

## § 29. Patents; procurement procedure; filing: application under oath, plat and field notes, notices, and affidavits; posting plat and notice on claim; publication and posting notice in office; certificate; adverse claims; payment per acre; objections; nonresident claimant's agent for execution of application and affidavits

A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person, association, or corporation authorized to locate a claim under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, having claimed and located a piece of land for such purposes, who has, or have, complied with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43, may file in the proper land office an application for a patent, under oath, showing such compliance, together with a plat and field notes of the claim or claims in common, made by or under the direction of the Director of the Bureau of Land Management, showing accurately the boundaries of the claim or claims, which shall be distinctly marked by monuments on the ground, and shall post a copy of such plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat previous to the filing of the application for a patent, and shall file an affidavit of at least two persons that such notice has been duly posted, and shall file a copy of the notice in such land office, and shall thereupon be entitled to a patent for the land, in the manner following: The register of the land office, upon the filing of such application, plat, field notes, notices, and affidavits, shall publish a notice that such application has been made, for the period of sixty days, in a newspaper to be by him designated as published nearest to such claim; and he shall also post such notice in his office for the same period. The claimant at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the Director of the Bureau of Land Management that $500 worth of labor has been expended or improvements made upon the claim by himself or grantors; that the plat is correct, with such further description by such reference to natural objects or permanent monuments as shall identify the claim, and furnish an accurate description, to be incorporated in the patent. At the expiration of the sixty days of publication the claimant shall file his affidavit, showing that the plat and notice have been posted in a conspicuous place on the claim during such period of publication. If no adverse claim shall have been filed with the register of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of $5 per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43. Where the claimant for a patent is not a resident of or within the land district wherein the vein, lode, ledge, or deposit sought to be patented is located, the application for patent and the affidavits required to be made in this section by the claimant for such patent may be made by his, her, or its authorized agent, where said agent is conversant with the facts sought to be established by said affidavits.

(R.S. § 2325; Jan. 22, 1880, ch. 9, § 1, 21 Stat. 61; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

Editorial Notes

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original ''this chapter'', meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2325 derived from act May 10, 1872, ch. 152, § 6, 17 Stat. 92.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words, in first sentence of text, now reading ''United States supervisor of surveys,'' and words, in next to last sentence of text, now reading ''register of the proper land office.'' Those words formerly read ''United States surveyor general'' and ''register and receiver of the proper land office,'' respectively. This act abolished the office of surveyor general, and transferred to and consolidated with the Field Surveying Service, under the jurisdiction of the U.S. Supervisor of Surveys, the administration, equipment, etc., of such office, and consolidated the offices and functions of the register and receiver.

### Executive Documents

TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys wherever appearing. In the establishment of The Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg.

Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

See also Transfer of Functions note set out under section 1 of this title.

### § 30. Adverse claims; oath of claimants; requisites; waiver; stay of land office proceedings; judicial determination of right of possession; successful claimants' filing of judgment roll, certificate of labor, and description of claim in land office, and acreage and fee payments; issuance of patents for entire or partial claims upon certification of land office proceedings and judgment roll; alienation of patent title

Where an adverse claim is filed during the period of publication, it shall be upon oath of the person or persons making the same, and shall show the nature, boundaries, and extent of such adverse claim, and all proceedings, except the publication of notice and making and filing of the affidavit thereof, shall be stayed until the controversy shall have been settled or decided by a court of competent jurisdiction, or the adverse claim waived. It shall be the duty of the adverse claimant, within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction, to determine the question of the right of possession, and prosecute the same with reasonable diligence to final judgment; and a failure so to do shall be a waiver of his adverse claim. After such judgment shall have been rendered, the party entitled to the possession of the claim, or any portion thereof, may, without giving further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the Director of the Bureau of Land Management that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases, and shall pay to the register $5 per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the Director of the Bureau of Land Management, and a patent shall issue thereon for the claim, or such portion thereof as the applicant shall appear, from the decision of the court, to rightly possess. If it appears from the decision of the court that several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees, and file the certificate and description by the Director of the Bureau of Land Management whereupon the register shall certify the proceedings and judgment roll to the Director of the Bureau of Land Management, as in the preceding case, and patents shall issue to the several parties according to their respective rights. Nothing herein contained shall be construed to prevent the alienation of the title conveyed through a patent for a mining claim to any person whatever.

(R.S. § 2326; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

**Editorial Notes**

CODIFICATION

R.S. § 2326 derived from act May 10, 1872, ch. 152, § 7, 17 Stat. 93.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words, in third and fourth sentences of text, now reading "United States supervisor of surveys", and words, in third sentence of text, now reading "pay to the register $5 per acre." Such words formerly read "surveyor-general", and "pay to the receiver five dollars per acre", respectively. Such act is treated more fully in notes under section 29 of this title.

**Executive Documents**

TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys following the words "certificate of the" in sentence beginning "After such judgment" and following the words "description by the" in sentence beginning "If it appears". In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

"Director of the Bureau of Land Management" was substituted for "Commissioner of the General Land Office" following the words "register to the" in sentence beginning "After such judgment" and in sentence beginning "If it appears" following the words "judgment roll to the" on authority of Reorg. Plan No. 3 of 1946, set § 403, set out in the Appendix to Title 5. Section 403 of Reorg. Plan No. 3 of 1946, abolished the office of the Commissioner of the General Land Office and consolidated the functions of the General Land Office with the Grazing Service to form the Bureau of Land Management.

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

### § 31. Oath: agent or attorney in fact, beyond district of claim

The adverse claim required by section 30 of this title may be verified by the oath of any duly authorized agent or attorney in fact of the adverse claimant cognizant of the facts stated; and the adverse claimant, if residing or at the time being beyond the limits of the district wherein the claim is situated, may make oath to the adverse claim before the clerk of any court of record of the United States or of the State or Territory where the adverse claimant may then be, or before any notary public of such State or Territory.

(Apr. 26, 1882, ch. 106, § 1, 22 Stat. 49.)

## § 32. Findings by jury; costs

If, in any action brought pursuant to section 30 of this title, title to the ground in controversy shall not be established by either party, the jury shall so find, and judgment shall be entered according to the verdict. In such case costs shall not be allowed to either party, and the claimant shall not proceed in the land office or be entitled to a patent for the ground in controversy until he shall have perfected his title.

(Mar. 3, 1881, ch. 140, 21 Stat. 505.)

## § 33. Existing rights

All patents for mining claims upon veins or lodes issued prior to May 10, 1872, shall convey all the rights and privileges conferred by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 where no adverse rights existed on the 10th day of May, 1872.

(R.S. § 2328.)

### Editorial Notes

#### References in Text

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

#### Codification

R.S. § 2328 derived from act May 10, 1872, ch. 152, § 9, 17 Stat. 94.

Provision of this section respecting prosecution of applications for patents for mining claims in General Land Office, pending May 10, 1872, was omitted from the Code.

## § 34. Description of vein claims on surveyed and unsurveyed lands; monuments on ground to govern conflicting calls

The description of vein or lode claims upon surveyed lands shall designate the location of the claims with reference to the lines of the public survey, but need not conform therewith; but where patents have been or shall be issued for claims upon unsurveyed lands, the Director of the Bureau of Land Management in extending the public survey, shall adjust the same to the boundaries of said patented claims so as in no case to interfere with or change the true location of such claims as they are officially established upon the ground. Where patents have issued for mineral lands, those lands only shall be segregated and shall be deemed to be patented which are bounded by the lines actually marked, defined, and established upon the ground by the monuments of the official survey upon which the patent grant is based, and the Director of the Bureau of Land Management in executing subsequent patent surveys, whether upon surveyed or unsurveyed lands, shall be governed accordingly. The said monuments shall at all times constitute the highest authority as to what land is patented, and in case of any conflict between the said monuments of such patented claims and the descriptions of said claims in the patents issued therefor the monuments on the ground shall govern, and erroneous or incon-

sistent descriptions or calls in the patent descriptions shall give way thereto.

(R.S. § 2327; Apr. 28, 1904, ch. 1796, 33 Stat. 545; Mar. 3, 1925, ch. 462, 43 Stat. 1144; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

### Editorial Notes

#### Codification

R.S. § 2327 derived from act May 10, 1872, ch. 152, § 8, 17 Stat. 94.

#### Amendments

1925—Act Mar. 3, 1925, affected words now reading "United States supervisor of surveys" in first and second sentences of text. These words formerly read "the surveyor-general." This act abolished the office of surveyor general, and transferred to and consolidated with the Field Surveying Service, under the jurisdiction of the U.S. Supervisor of Surveys, the administration, equipment, etc., of such office.

### Executive Documents

#### Transfer of Functions

Director of the Bureau of Land Management, substituted for United States Supervisor of Surveys wherever appearing. In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

See also note set out under section 1 of this title.

## § 35. Placer claims; entry and proceedings for patent under provisions applicable to vein or lode claims; conforming entry to legal subdivisions and surveys; limitation of claims; homestead entry of segregated agricultural land

Claims usually called "placers," including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; but where the lands have been previously surveyed by the United States, the entry in its exterior limits shall conform to the legal subdivisions of the public lands. And where placer claims are upon surveyed lands, and conform to legal subdivisions, no further survey or plat shall be required, and all placer-mining claims located after the 10th day of May 1872, shall conform as near as practicable with the United States system of public-land surveys, and the rectangular subdivisions of such surveys, and no such location shall include more than twenty acres for each individual claimant; but where placer claims cannot be conformed to legal subdivi-

sions, survey and plat shall be made as on unsurveyed lands; and where by the segregation of mineral land in any legal subdivision a quantity of agricultural land less than forty acres remains, such fractional portion of agricultural land may be entered by any party qualified by law, for homestead purposes.

(R.S. §§ 2329, 2331; Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097.)

#### Editorial Notes

##### Codification

R.S. § 2329 derived from act July 9, 1870, ch. 235, § 12, 16 Stat. 217.

R.S. § 2331 derived from act May 10, 1872, ch. 152, § 10, 17 Stat. 94.

#### Statutory Notes and Related Subsidiaries

##### Submerged Lands Act

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

### § 36. Subdivisions of 10-acre tracts; maximum of placer locations; homestead claims of agricultural lands; sale of improvements

Legal subdivisions of forty acres may be subdivided into ten-acre tracts; and two or more persons, or associations of persons, having contiguous claims of any size, although such claims may be less than ten acres each, may make joint entry thereof; but no location of a placer claim, made after the 9th day of July 1870, shall exceed one hundred and sixty acres for any one person or association of persons, which location shall conform to the United States surveys; and nothing in this section contained shall defeat or impair any bona fide homestead claim upon agricultural lands, or authorize the sale of the improvements of any bona fide settler to any purchaser.

(R.S. § 2330; Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097.)

#### Editorial Notes

##### Codification

R.S. § 2330 derived from act July 9, 1870, ch. 235, § 12, 16 Stat. 217.

#### Statutory Notes and Related Subsidiaries

##### Submerged Lands Act

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

### § 37. Proceedings for patent where boundaries contain vein or lode; application; statement including vein or lode; issuance of patent: acreage payments for vein or lode and placer claim; costs of proceedings; knowledge affecting construction of application and scope of patent

Where the same person, association, or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such

case a patent shall issue for the placer claim, subject to the provisions of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, including such vein or lode, upon the payment of $5 per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim, shall be paid for at the rate of $2.50 per acre, together with all costs of proceedings; and where a vein or lode, such as is described in section 23 of this title, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof.

(R.S. § 2333.)

#### Editorial Notes

##### References in Text

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

##### Codification

R.S. § 2333 derived from act May 10, 1872, ch. 152, § 11, 17 Stat. 94.

### § 38. Evidence of possession and work to establish right to patent

Where such person or association, they and their grantors, have held and worked their claims for a period equal to the time prescribed by the statute of limitations for mining claims of the State or Territory where the same may be situated, evidence of such possession and working of the claims for such period shall be sufficient to establish a right to a patent thereto under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, in the absence of any adverse claim; but nothing in such sections shall be deemed to impair any lien which may have attached in any way whatever to any mining claim or property thereto attached prior to the issuance of a patent.

(R.S. § 2332.)

#### Editorial Notes

##### References in Text

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

##### Codification

R.S. § 2332 derived from act July 9, 1870, ch. 235, § 13, 16 Stat. 217.

Statutory Notes and Related Subsidiaries

SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

## § 39. Surveyors of mining claims

The Director of the Bureau of Land Management may appoint in each land district containing mineral lands as many competent surveyors as shall apply for appointment to survey mining claims. The expenses of the survey of vein or lode claims, and the survey and subdivision of placer claims into smaller quantities than one hundred and sixty acres, together with the cost of publication of notices, shall be paid by the applicants, and they shall be at liberty to obtain the same at the most reasonable rates, and they shall also be at liberty to employ any United States deputy surveyor to make the survey. The Director of the Bureau of Land Management shall also have power to establish the maximum charges for surveys and publication of notices under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43; and, in case of excessive charges for publication, he may designate any newspaper published in a land district where mines are situated for the publication of mining notices in such district, and fix the rates to be charged by such paper; and, to the end that the Director may be fully informed on the subject, each applicant shall file with the register a sworn statement of all charges and fees paid by such applicant for publication and surveys, together with all fees and money paid the register of the land office, which statement shall be transmitted, with the other papers in the case, to the Director of the Bureau of Land Management.

(R.S. § 2334; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

### Editorial Notes

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2334 derived from act May 10, 1872, ch. 152, § 12, 17 Stat. 95.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words in first sentence of text, now reading "The United States supervisor of surveys," and words in third sentence of text, now reading "money paid the register of the Land Office." Such words formerly read "the surveyor-general of the United States," and "and money paid the register and the receiver of the land-office." Such act is treated more fully in note under section 29 of this title.

### Executive Documents

TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys in sentence beginning "The Director of the Bureau of Land Management may appoint". In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

In sentence beginning "The Director of the Bureau of Land Management shall also have power", "Director of the Bureau of Land Management" substituted for "Commissioner of the General Land Office" in two instances and "Director" for "Commissioner" on authority of Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5. Section 403 of Reorg. Plan No. 3 of 1946, abolished the office of the Commissioner of the General Land Office and consolidated the functions of the General Land Office with the Grazing Service to form the Bureau of Land Management.

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

See also note set out under section 1 of this title.

## § 40. Verification of affidavits

All affidavits required to be made under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43 may be verified before any officer authorized to administer oaths within the land district where the claims may be situated, and all testimony and proofs may be taken before any such officer, and, when duly certified by the officer taking the same, shall have the same force and effect as if taken before the register of the land office. In cases of contest as to the mineral or agricultural character of land, the testimony and proofs may be taken as herein provided on personal notice of at least ten days to the opposing party; or if such party cannot be found, then by publication of at least once a week for thirty days in a newspaper, to be designated by the register of the land office as published nearest to the location of such land; and the register shall require proof that such notice has been given.

(R.S. § 2335; Mar. 3, 1925, ch. 462, 43 Stat. 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

### Editorial Notes

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2335 derived from act May 10, 1872, ch. 152, § 13, 17 Stat. 95.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words in first sentence of text, now reading "before the register of the land office." Such words formerly read "before the register and receiver of the land-office." Such act is treated more fully in note under section 29 of this title.

Executive Documents

TRANSFER OF FUNCTIONS

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees.

See also note set out under section 1 of this title.

§ 41. Intersecting or crossing veins

Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right-of-way through the space of intersection for the purposes of the convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection.

(R.S. § 2336.)

Editorial Notes

CODIFICATION

R.S. § 2336 derived from act May 10, 1872, ch. 152, § 14, 17 Stat. 96.

§ 42. Patents for nonmineral lands: application, survey, notice, acreage limitation, payment

(a) Vein or lode and mill site owners eligible

Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith, subject to the same preliminary requirements as to survey and notice as are applicable to veins or lodes; but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres, and payment for the same must be made at the same rate as fixed by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 for the superficies of the lode. The owner of a quartz mill or reduction works, not owning a mine in connection therewith, may also receive a patent for his mill site, as provided in this section.

(b) Placer claim owners eligible

Where nonmineral land is needed by the proprietor of a placer claim for mining, milling, processing, beneficiation, or other operations in connection with such claim, and is used or occupied by the proprietor for such purposes, such land may be included in an application for a patent for such claim, and may be patented therewith subject to the same requirements as to sur-

vey and notice as are applicable to placers. No location made of such nonmineral land shall exceed five acres and payment for the same shall be made at the rate applicable to placer claims which do not include a vein or lode.

(R.S. § 2337; Pub. L. 86–390, Mar. 18, 1960, 74 Stat. 7.)

Editorial Notes

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in subsec. (a), were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2337 derived from act May 10, 1872, ch. 152, § 15, 17 Stat. 96.

AMENDMENTS

1960—Pub. L. 86–390 designated existing provisions as subsec. (a) and added subsec. (b).

§ 43. Conditions of sale by local legislature

As a condition of sale, in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development; and those conditions shall be fully expressed in the patent.

(R.S. § 2338.)

Editorial Notes

CODIFICATION

R.S. § 2338 derived from act July 26, 1866, ch. 262, § 5, 14 Stat. 252.

Statutory Notes and Related Subsidiaries

SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

§§ 44, 45. Omitted

Editorial Notes

CODIFICATION

Section 44, R.S. § 2341; act Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097, provided for extension of provisions of Homestead laws to citizens of United States who had prior to 1874 located on lands designated prior to 1866 as mineral lands, and improved them for agricultural purposes, provided no valuable mineral deposits had been discovered thereon.

Section 45, R.S. § 2342; act Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097, provided for setting apart the lands as agricultural.

§ 46. Additional land districts and officers

The President is authorized to establish additional land districts, and to appoint the necessary officers under existing laws, wherever he may deem the same necessary for the public convenience in executing the provisions of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43.



Sec.

SUBCHAPTER I—POLICIES AND GOALS

4331.   Congressional declaration of national environmental policy.
4332.   Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.
4333.   Conformity of administrative procedures to national environmental policy.
4334.   Other statutory obligations of agencies.
4335.   Efforts supplemental to existing authorizations.

SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

4341.   Omitted.
4342.   Establishment; membership; Chairman; appointments.
4343.   Employment of personnel, experts and consultants.
4344.   Duties and functions.
4345.   Consultation with Citizens' Advisory Committee on Environmental Quality and other representatives.
4346.   Tenure and compensation of members.
4346a.  Travel reimbursement by private organizations and Federal, State, and local governments.
4346b.  Expenditures in support of international activities.
4347.   Authorization of appropriations.

SUBCHAPTER III—MISCELLANEOUS PROVISIONS

4361, 4361a. Repealed.
4361b.  Implementation by Administrator of Environmental Protection Agency of recommendations of "CHESS" Investigative Report; waiver; inclusion of status of implementation requirements in annual revisions of plan for research, development, and demonstration.
4361c.  Staff management.
4362.   Interagency cooperation on prevention of environmental cancer and heart and lung disease.
4362a.  Membership of Task Force on Environmental Cancer and Heart and Lung Disease.
4363.   Continuing and long-term environmental research and development.
4363a.  Pollution control technologies demonstrations.
4364.   Expenditure of funds for research and development related to regulatory program activities.
4365.   Science Advisory Board.
4366.   Identification and coordination of research, development, and demonstration activities.
4366a.  Omitted.
4367.   Reporting requirements of financial interests of officers and employees of Environmental Protection Agency.
4368.   Grants to qualified citizens groups.
4368a.  Utilization of talents of older Americans in projects of pollution prevention, abatement, and control.
4368b.  General assistance program.
4369.   Miscellaneous reports.
4369a.  Reports on environmental research and development activities of Agency.
4370.   Reimbursement for use of facilities.
4370a.  Assistant Administrators of Environmental Protection Agency; appointment; duties.
4370b.  Availability of fees and charges to carry out Agency programs.
4370c.  Environmental Protection Agency fees.
4370d.  Percentage of Federal funding for organizations owned by socially and economically disadvantaged individuals.
4370e.  Working capital fund in Treasury.
4370f.  Availability of funds after expiration of period for liquidating obligations.
4370g.  Availability of funds for uniforms and certain services.
4370h.  Availability of funds for facilities.

## § 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

(Pub. L. 91–190, § 2, Jan. 1, 1970, 83 Stat. 852.)

SHORT TITLE

Section 1 Pub. L. 91–190 provided: "That this Act [enacting this chapter] may be cited as the 'National Environmental Policy Act of 1969'."

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with system activities requiring coordination and approval under this chapter, and enforcement functions of Secretary or other official in Department of Agriculture, insofar as they involve lands and programs under jurisdiction of that Department, related to compliance with this chapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(e), (f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to Administrator of Environmental Protection Agency, see Parts 1, 2, and 16 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

MODIFICATION OR REPLACEMENT OF EXECUTIVE ORDER NO. 13423

Pub. L. 111–117, div. C, title VII, § 742(b), Dec. 16, 2009, 123 Stat. 3216, provided that: "Hereafter, the President may modify or replace Executive Order No. 13423 [set out as a note under this section] if the President determines that a revised or new executive order will achieve equal or better environmental or energy efficiency results."

Pub. L. 111–8, div. D, title VII, § 748, Mar. 11, 2009, 123 Stat. 693, which provided that Ex. Ord. No. 13423 (set out as a note under this section) would remain in effect on and after Mar. 11, 2009, except as otherwise provided by law after Mar. 11, 2009, was repealed by Pub. L.

subsection. To the maximum extent practicable. and without compromising national security, each agency shall strive to comply with the purposes, goals, and implementation steps in this order.

(e) The head of an agency may submit to the President, through the CEQ Chair, a request for an exemption of an agency activity, and related personnel, resources, and facilities, from this order.

SEC. 19. *Definitions.* As used in this order:

(a) "absolute greenhouse gas emissions" means total greenhouse gas emissions without normalization for activity levels and includes any allowable consideration of sequestration;

(b) "agency" means an executive agency as defined in section 105 of title 5, United States Code, excluding the Government Accountability Office;

(c) "alternative fuel vehicle" means vehicles defined by section 301 of the Energy Policy Act of 1992, as amended (42 U.S.C. 13211), and otherwise includes electric fueled vehicles, hybrid electric vehicles, plug-in hybrid electric vehicles, dedicated alternative fuel vehicles, dual fueled alternative fuel vehicles, qualified fuel cell motor vehicles, advanced lean burn technology motor vehicles, self-propelled vehicles such as bicycles and any other alternative fuel vehicles that are defined by statute;

(d) "construction and demolition materials and debris" means materials and debris generated during construction, renovation, demolition, or dismantling of all structures and buildings and associated infrastructure;

(e) "divert" and "diverting" means redirecting materials that might otherwise be placed in the waste stream to recycling or recovery, excluding diversion to waste-to-energy facilities;

(f) "energy intensity" means energy consumption per square foot of building space, including industrial or laboratory facilities;

(g) "environmental" means environmental aspects of internal agency operations and activities, including those aspects related to energy and transportation functions;

(h) "excluded vehicles and equipment" means any vehicle, vessel, aircraft, or non-road equipment owned or operated by an agency of the Federal Government that is used in:

(i) combat support, combat service support, tactical or relief operations, or training for such operations;

(ii) Federal law enforcement (including protective service and investigation);

(iii) emergency response (including fire and rescue); or

(iv) spaceflight vehicles (including associated ground-support equipment);

(i) "greenhouse gases" means carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride;

(j) "renewable energy" means energy produced by solar, wind, biomass, landfill gas, ocean (including tidal, wave, current, and thermal), geothermal, municipal solid waste, or new hydroelectric generation capacity achieved from increased efficiency or additions of new capacity at an existing hydroelectric project;

(k) "scope 1, 2, and 3" mean;

(i) scope 1: direct greenhouse gas emissions from sources that are owned or controlled by the Federal agency;

(ii) scope 2: direct greenhouse gas emissions resulting from the generation of electricity, heat, or steam purchased by a Federal agency; and

(iii) scope 3: greenhouse gas emissions from sources not owned or directly controlled by a Federal agency but related to agency activities such as vendor supply chains, delivery services, and employee travel and commuting;

(l) "sustainability" and "sustainable" mean to create and maintain conditions, under which humans and nature can exist in productive harmony, that permit fulfilling the social, economic, and other requirements of present and future generations;

(m) "United States" means the fifty States, the District of Columbia, the Commonwealth of Puerto Rico,

Guam, American Samoa, the United States Virgin Islands, and the Northern Mariana Islands, and associated territorial waters and airspace;

(n) "water consumption intensity" means water consumption per square foot of building space; and

(o) "zero-net-energy building" means a building that is designed, constructed, and operated to require a greatly reduced quantity of energy to operate, meet the balance of energy needs from sources of energy that do not produce greenhouse gases, and therefore result in no net emissions of greenhouse gases and be economically viable.

SEC. 20. *General Provisions.*

(a) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(b) Nothing in this order shall be construed to impair or otherwise affect the functions of the OMB Director relating to budgetary, administrative, or legislative proposals.

(c) This order is intended only to improve the internal management of the Federal Government and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and

maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, §101, Jan. 1, 1970, 83 Stat. 852.)

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at Federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

## § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

"(1) the Department of the Army has issued a permit for the activity; and

"(2) the Army Corps of Engineers has found that the activity has no significant impact."

---

[1] So in original. The period probably should be a semicolon.

EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose*. The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition*. As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, admin-

istrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

### § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

### § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

### § 4341. Omitted

#### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

### § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

(Pub. L. 91–190, title II, § 202, Jan. 1, 1970, 83 Stat. 854.)

#### COUNCIL ON ENVIRONMENTAL QUALITY; REDUCTION OF MEMBERS

Provisions stating that notwithstanding this section, the Council was to consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as chairman and exercising all powers, functions, and duties of the Council, were contained in the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. 109–54, title III, Aug. 2, 2005, 119 Stat. 543, and were repeated in provisions of subsequent appropriations acts which are not set out in the Code. Similar provisions were also contained in the following prior appropriations acts:

Pub. L. 108–447, div. I, title III, Dec. 8, 2004, 118 Stat. 3332.
Pub. L. 108–199, div. G, title III, Jan. 23, 2004, 118 Stat. 408.
Pub. L. 108–7, div. K, title III, Feb. 20, 2003, 117 Stat. 514.
Pub. L. 107–73, title III, Nov. 26, 2001, 115 Stat. 686.
Pub. L. 106–377, § 1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–45.
Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1084.
Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2500.
Pub. L. 105–65, title III, Oct. 27, 1997, 111 Stat. 1375.

### § 4343. Employment of personnel, experts and consultants

(a) The Council may employ such officers and employees as may be necessary to carry out its functions under this chapter. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this chapter, in accordance with section 3109 of title 5 (but without regard to the last sentence thereof).

(b) Notwithstanding section 1342 of title 31, the Council may accept and employ voluntary and uncompensated services in furtherance of the purposes of the Council.

(Pub. L. 91–190, title II, § 203, Jan. 1, 1970, 83 Stat. 855; Pub. L. 94–52, § 2, July 3, 1975, 89 Stat. 258.)

#### REFERENCES IN TEXT

The last sentence of section 3109 of title 5, referred to in subsec. (a), probably means the last sentence of section 3109(b) of title 5, which was the last sentence of that section when the reference was enacted. Since then, section 3109 of title 5 has been amended to add subsecs. (c) to (e) at the end.

#### CODIFICATION

In subsec. (b), "section 1342 of title 31" substituted for "section 3679(b) of the Revised Statutes (31 U.S.C. 665(b))" on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

#### AMENDMENTS

1975—Pub. L. 94–52 designated existing provisions as subsec. (a) and added subsec. (b).

### § 4344. Duties and functions

It shall be the duty and function of the Council—

(1) to assist and advise the President in the preparation of the Environmental Quality Report required by section 4341 [1] of this title;

---
[1] See References in Text note below.

**Forest Service Organic Act of 1897, 16 U.S.C. §§475, 478, 551**

**§ 475. Purposes for which national forests may be established and administered**
All public lands designated and reserved prior to June 4, 1897, by the President of the United States under the provisions of section 471[1] of this title, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as national forests under said section, shall be as far as practicable controlled and administered in accordance with the following provisions. No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of said section, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes.

CREDIT(S)

(June 4, 1897, c. 2, § 1, 30 Stat. 34.)

**§ 478. Egress or ingress of actual settlers; prospecting**

Nothing in sections 473 to 478, 479 to 482 and 551 of this title shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. Nor shall anything in such sections prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests.

CREDIT(S)

(June 4, 1897, c. 2, § 1, 30 Stat. 36; Feb. 1, 1905, c. 288, § 1, 33 Stat. 628.)

**§ 551. Protection of national forests; rules and regulations**

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the

forests thereon from destruction; and any violation of the provisions of this section, sections 473 to 478 and 479 to 482 of this title or such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any person charged with the violation of such rules and regulations may be tried and sentenced by any United States magistrate judge specially designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided for in section 3401(b) to (e) of Title 18.

**CREDIT(S)**

(June 4, 1897, c. 2, § 1, 30 Stat. 35; Feb. 1, 1905, c. 288, § 1, 33 Stat. 628; Pub.L. 87-869, § 6, Oct. 23, 1962, 76 Stat. 1157; Pub.L. 88-537, Aug. 31, 1964, 78 Stat. 745; Pub.L. 90-578, Title IV, § 402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

## Forest Service NEPA Regulations, 36 C.F.R. §§220.4, 220.6

### § 220.4 General requirements.

(a) ***Proposed actions subject to the NEPA requirements.*** As required by 42 U.S.C. 4321 *et seq.,* a Forest Service proposal is subject to the NEPA requirements when all of the following apply:

(1) The Forest Service has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated (*see* 40 CFR 1508.23);

(2) The proposed action is subject to Forest Service control and responsibility (*see* 40 CFR 1508.18);

(3) The proposed action would cause effects on the natural and physical environment and the relationship of people with that environment (*see* 40 CFR 1508.14); and

(4) The proposed action is not statutorily exempt from the requirements of section 102(2)(C) of the NEPA (42 U.S.C. 4332(2)(C)).

(b) ***Emergency responses.*** When the responsible official determines that an emergency exists that makes it necessary to take urgently needed actions before

preparing a NEPA analysis and any required documentation in accordance with the provisions in §§ 220.5, 220.6, and 220.7 of this part, then the following provisions apply.

(1) The responsible official may take actions necessary to control the immediate impacts of the emergency and are urgently needed to mitigate harm to life, property, or important natural or cultural resources. When taking such actions, the responsible official shall take into account the probable environmental consequences of the emergency action and mitigate foreseeable adverse environmental effects to the extent practical.

(2) If the responsible official proposes emergency actions other than those actions described in paragraph (b)(1) of this section, and such actions are not likely to have significant environmental impacts, the responsible official shall document that determination in an EA and FONSI prepared in accord with these regulations. If the responsible official finds that the nature and scope of proposed emergency actions are such that they must be undertaken prior to preparing any NEPA analysis and documentation associated with a CE or an EA and FONSI, the responsible official shall consult with the Washington Office about alternative arrangements for NEPA compliance. The Chief or Associate Chief of the Forest Service may grant emergency alternative arrangements under NEPA for environmental assessments, findings of no significant impact and categorical exclusions (FSM 1950.41a). Consultation with the Washington Office shall be coordinated through the appropriate regional office.

(3) If the responsible official proposes emergency actions other than those actions described in paragraph (b)(1) of this section and such actions are likely to have significant environmental impacts, then the responsible official shall consult with CEQ, through the appropriate regional office and the Washington Office, about alternative arrangements in accordance with CEQ regulations at 40 CFR 1506.11 as soon as possible.

(c) *Agency decisionmaking.* For each Forest Service proposal (§ 220.4(a)), the responsible official shall coordinate and integrate NEPA review and relevant environmental documents with agency decisionmaking by:

(1) Completing the environmental document review before making a decision on the proposal;

(2) Considering environmental documents, public and agency comments (if any) on those documents, and agency responses to those comments;

(3) Including environmental documents, comments, and responses in the administrative record;

(4) Considering the alternatives analyzed in environmental document(s) before rendering a decision on the proposal; and

(5) Making a decision encompassed within the range of alternatives analyzed in the environmental documents.

(d) *Schedule of proposed actions (SOPA).* The responsible official shall ensure the SOPA is updated and notify the public of the availability of the SOPA.

(e) *Scoping (40 CFR 1501.7).*

(1) Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§ 220.6).

(2) Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7. Because the nature and complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed.

(3) The SOPA shall not to be used as the sole scoping mechanism for a proposed action.

(f) *Cumulative effects considerations of past actions.* Cumulative effects analysis shall be carried out in accordance with 40 CFR 1508.7 and in accordance with "The Council on Environmental Quality Guidance Memorandum on Consideration of Past Actions in Cumulative Effects Analysis" dated June 24, 2005. The analysis of cumulative effects begins with consideration of the direct and indirect effects on the environment that are expected or likely to result from the alternative proposals for agency action. Agencies then look for present effects of past actions that are, in the judgment of the agency, relevant and useful because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives. CEQ regulations do not require the consideration of the individual effects of all past actions to determine the present effects of past actions. Once the agency has identified those present effects of past actions that warrant consideration, the agency assesses the extent that the effects of the proposal for agency action or its alternatives will add to, modify, or mitigate those effects. The final analysis documents an agency assessment of the

cumulative effects of the actions considered (including past, present, and reasonable foreseeable future actions) on the affected environment. With respect to past actions, during the scoping process and subsequent preparation of the analysis, the agency must determine what information regarding past actions is useful and relevant to the required analysis of cumulative effects. Cataloging past actions and specific information about the direct and indirect effects of their design and implementation could in some contexts be useful to predict the cumulative effects of the proposal. The CEQ regulations, however, do not require agencies to catalogue or exhaustively list and analyze all individual past actions. Simply because information about past actions may be available or obtained with reasonable effort does not mean that it is relevant and necessary to inform decisionmaking. (40 CFR 1508.7)

(g) *Classified information.* To the extent practicable, the responsible official shall segregate any information that has been classified pursuant to Executive order or statute. The responsible official shall maintain the confidentiality of such information in a manner required for the information involved. Such information may not be included in any publicly disclosed documents. If such material cannot be reasonably segregated, or if segregation would leave essentially meaningless material, the responsible official must withhold the entire analysis document from the public; however, the responsible official shall otherwise prepare the analysis documentation in accord with applicable regulations. (40 CFR 1507.3(c))

(h) *Incorporation by reference.* Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document. (40 CFR 1502.21)

(i) *Applicants.* The responsible official shall make policies or staff available to advise potential applicants of studies or other information foreseeably required for acceptance of their applications. Upon acceptance of an application as provided by 36 CFR 251.54(g) the responsible official shall initiate the NEPA process.

(j) *Determination of NEPA Adequacy (DNA).*

(1) An existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations may be used in its entirety for a new proposed action if the Responsible Official determines that the existing NEPA analysis adequately assesses the environmental effects of the proposed

action and reasonable alternatives. The responsible official must determine and document that each of the following elements is met:

(i) The new proposed action is substantially the same as a previously analyzed proposed action or alternative analyzed in detail in the existing NEPA analysis.

(ii) The range of alternatives analyzed in the existing NEPA document(s) is appropriate with respect to the new proposed action.

(iii) Any new information or circumstances relevant to environmental concerns would not substantially change the analysis in an existing NEPA document(s).

(iv) The environmental effects that would result from implementation of the new proposed action are similar to those analyzed in the existing NEPA document(s).

(2) A DNA for a new proposed action shall be included in the project record for the new proposed action. Proposed actions undergoing a DNA review shall:

(i) Be included on the SOPA;

(ii) Be subject to scoping;

(iii) Be subject to pre-decisional administrative review, if applicable; and

(iv) Include issuance of a new decision document (decision memo, decision notice, or record of decision) when approved.

[73 FR 43093, July 24, 2008, as amended at 85 FR 73630, Nov. 19, 2020]

## § 220.6 Categorical exclusions.

(a) *General.* A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:

(1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or

(2) The proposed action is within a category listed in § 220.6(d) and (e).

(b) *Resource conditions.*

(1) Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:

(i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;

(ii) Flood plains, wetlands, or municipal watersheds;

(iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;

(iv) Inventoried roadless area or potential wilderness area;

(v) Research natural areas;

(vi) American Indians and Alaska Native religious or cultural sites; and

(vii) Archaeological sites, or historic properties or areas.

(2) The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

(c) *Scoping.* If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA. If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.

(d) *Categories of actions for which a project or case file and decision memo are not required.* A supporting record and a decision memo are not required, but at the discretion of the responsible official, may be prepared for the following categories:

(1) Orders issued pursuant to 36 CFR part 261—Prohibitions to provide short-term resource protection or to protect public health and safety. Examples include but are not limited to:

(i) Closing a road to protect bighorn sheep during lambing season, and

(ii) Closing an area during a period of extreme fire danger.

(2) Rules, regulations, or policies to establish servicewide administrative procedures, program processes, or instructions. Examples include but are not limited to:

(i) Adjusting special use or recreation fees using an existing formula;

(ii) Proposing a technical or scientific method or procedure for screening effects of emissions on air quality related values in Class I wildernesses;

(iii) Proposing a policy to defer payments on certain permits or contracts to reduce the risk of default;

(iv) Proposing changes in contract terms and conditions or terms and conditions of special use authorizations;

(v) Establishing a servicewide process for responding to offers to exchange land and for agreeing on land values; and

(vi) Establishing procedures for amending or revising forest land and resource management plans.

(3) Repair and maintenance of administrative sites. Examples include but are not limited to:

(i) Mowing lawns at a district office;

(ii) Replacing a roof or storage shed;

(iii) Painting a building; and

(iv) Applying registered pesticides for rodent or vegetation control.

(4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:

(i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;

(ii) Grading a road and clearing the roadside of brush without the use of herbicides;

(iii) Resurfacing a road to its original condition;

(iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

(v) Surveying, painting, and posting landline boundaries.

(5) Repair and maintenance of recreation sites and facilities. Examples include but are not limited to:

(i) Applying registered herbicides to control poison ivy on infested sites in a campground;

(ii) Applying registered insecticides by compressed air sprayer to control insects at a recreation site complex;

(iii) Repaving a parking lot; and

(iv) Applying registered pesticides for rodent or vegetation control.

(6) Acquisition of land or interest in land. Examples include but are not limited to:

(i) Accepting the donation of lands or interests in land to the NFS, and

(ii) Purchasing fee, conservation easement, reserved interest deed, or other interests in lands.

(7) Sale or exchange of land or interest in land and resources where resulting land uses remain essentially the same. Examples include but are not limited to:

(i) Selling or exchanging land pursuant to the Small Tracts Act;

(ii) Exchanging NFS lands or interests with a State agency, local government, or other non-Federal party (individual or organization) with similar resource management objectives and practices;

(iii) Authorizing the Bureau of Land Management to issue leases on producing wells when mineral rights revert to the United States from private ownership and there is no change in activity; and

(iv) Exchange of administrative sites involving other than NFS lands.

(8) Approval, modification, or continuation of minor, short-term (1 year or less) special uses of NFS lands. Examples include, but are not limited to:

(i) Approving, on an annual basis, the intermittent use and occupancy by a State-licensed outfitter or guide;

(ii) Approving the use of NFS land for apiaries; and

(iii) Approving the gathering of forest products for personal use.

(9) Issuance of a new permit for up to the maximum tenure allowable under the National Forest Ski Area Permit Act of 1986 (16 U.S.C. 497b) for an existing ski area when such issuance is a purely ministerial action to account for administrative changes, such as a change in ownership of ski area improvements, expiration of the current permit, or a change in the statutory authority applicable to the current permit. Examples include, but are not limited to:

(i) Issuing a permit to a new owner of ski area improvements within an existing ski area with no changes to the master development plan, including no changes to the facilities or activities for that ski area;

(ii) Upon expiration of a ski area permit, issuing a new permit to the holder of the previous permit where the holder is not requesting any changes to the master development plan, including changes to the facilities or activities; and

(iii) Issuing a new permit under the National Forest Ski Area Permit Act of 1986 to the holder of a permit issued under the Term Permit and Organic Acts, where there are no changes in the type or scope of activities authorized and no other changes in the master development plan.

(10) [Reserved]

(11) Issuance of a new special use authorization to replace an existing or expired special use authorization, when such issuance is to account only for administrative changes, such as a change in ownership of authorized

improvements or expiration of the current authorization, and where there are no changes to the authorized facilities or increases in the scope or magnitude of authorized activities. The applicant or holder must be in compliance with all the terms and conditions of the existing or expired special use authorization. Subject to the foregoing conditions, examples include but are not limited to:

(i) Issuing a new authorization to replace a powerline facility authorization that is at the end of its term;

(ii) Issuing a new permit to replace an expired permit for a road that continues to be used as access to non-NFS lands; and

(iii) Converting a transitional priority use outfitting and guiding permit to a priority use outfitting and guiding permit.

(12) Issuance of a new authorization or amendment of an existing authorization for recreation special uses that occur on existing roads or trails, in existing facilities, in existing recreation sites, or in areas where such activities are allowed. Subject to the foregoing condition, examples include but are not limited to:

(i) Issuance of an outfitting and guiding permit for mountain biking on NFS trails that are not closed to mountain biking;

(ii) Issuance of a permit to host a competitive motorcycle event;

(iii) Issuance of an outfitting and guiding permit for backcountry skiing;

(iv) Issuance of a permit for a one-time use of existing facilities for other recreational events; and

(v) Issuance of a campground concession permit for an existing campground that has previously been operated by the Forest Service.

(e) ***Categories of actions for which a project or case file and decision memo are required.*** A supporting record is required and the decision to proceed must be documented in a decision memo for the categories of action in paragraphs (e)(1) through (25) of this section. As a minimum, the project or case file should include any records prepared, such as: The names of interested and affected people, groups, and agencies contacted; the determination that no extraordinary circumstances exist; a copy of the decision memo; and a list of the people notified

of the decision. If the proposed action is approval of a land management plan, plan amendment, or plan revision, the plan approval document required by 36 CFR part 219 satisfies the decision memo requirements of this section.

(1) Construction and reconstruction of trails. Examples include, but are not limited to:

(i) Constructing or reconstructing a trail to a scenic overlook, and

(ii) Reconstructing an existing trail to allow use by handicapped individuals.

(2) Additional construction or reconstruction of existing telephone or utility lines in a designated corridor. Examples include, but are not limited to:

(i) Replacing an underground cable trunk and adding additional phone lines, and

(ii) Reconstructing a power line by replacing poles and wires.

(3) Approval, modification, or continuation of special uses that require less than 20 acres of NFS lands. Subject to the preceding condition, examples include but are not limited to:

(i) Approving the construction of a meteorological sampling site;

(ii) Approving the use of land for a one-time group event;

(iii) Approving the construction of temporary facilities for filming of staged or natural events or studies of natural or cultural history;

(iv) Approving the use of land for a utility corridor that crosses a national forest;

(v) Approving the installation of a driveway or other facilities incidental to use of a private residence; and

(vi) Approving new or additional communication facilities, associated improvements, or communication uses at a site already identified as available for these purposes.

(4) [Reserved]

(5) Regeneration of an area to native tree species, including site preparation that does not involve the use of herbicides or result in vegetation type conversion. Examples include, but are not limited to:

    (i) Planting seedlings of superior trees in a progeny test site to evaluate genetic worth, and

    (ii) Planting trees or mechanical seed dispersal of native tree species following a fire, flood, or landslide.

(6) Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

    (i) Girdling trees to create snags;

    (ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

    (iii) Prescribed burning to control understory hardwoods in stands of southern pine; and

    (iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

(7) Modification or maintenance of stream or lake aquatic habitat improvement structures using native materials or normal practices. Examples include, but are not limited to:

    (i) Reconstructing a gabion with stone from a nearby source;

    (ii) Adding brush to lake fish beds; and

    (iii) Cleaning and resurfacing a fish ladder at a hydroelectric dam.

(8) Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads. Examples include, but are not limited to:

(i) Authorizing geophysical investigations which use existing roads that may require incidental repair to reach sites for drilling core holes, temperature gradient holes, or seismic shot holes;

(ii) Gathering geophysical data using shot hole, vibroseis, or surface charge methods;

(iii) Trenching to obtain evidence of mineralization;

(iv) Clearing vegetation for sight paths or from areas used for investigation or support facilities;

(v) Redesigning or rearranging surface facilities within an approved site;

(vi) Approving interim and final site restoration measures; and

(vii) Approving a plan for exploration which authorizes repair of an existing road and the construction of 1⁄3 mile of temporary road; clearing vegetation from an acre of land for trenches, drill pads, or support facilities.

(9) Implementation or modification of minor management practices to improve allotment condition or animal distribution when an allotment management plan is not yet in place. Examples include, but are not limited to:

(i) Rebuilding a fence to improve animal distribution;

(ii) Adding a stock watering facility to an existing water line; and

(iii) Spot seeding native species of grass or applying lime to maintain forage condition.

(10) [Reserved]

(11) Post-fire rehabilitation activities, not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds), to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire. Such activities:

(i) Shall be conducted consistent with Agency and Departmental procedures and applicable land and resource management plans;

(ii) Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and

(iii) Shall be completed within 3 years following a wildland fire.

(12) Harvest of live trees not to exceed 70 acres, requiring no more than $1/2$ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

(i) Removal of individual trees for sawlogs, specialty products, or fuelwood, and

(ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(13) Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than $1/2$ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

(i) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and

(ii) Harvest of fire-damaged trees.

(14) Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than $1/2$ mile of temporary road construction, including removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

(i) Felling and harvest of trees infested with southern pine beetles and immediately adjacent uninfested trees to control expanding spot infestations, and

(ii) Removal and/or destruction of infested trees affected by a new exotic insect or disease, such as emerald ash borer, Asian long horned beetle, and sudden oak death pathogen.

(15) [Reserved]

(16) Land management plans, plan amendments, and plan revisions developed in accordance with 36 CFR part 219 *et seq.* that provide broad guidance and information for project and activity decisionmaking in a NFS unit. Proposals for actions that approve projects and activities, or that command anyone to refrain from undertaking projects and activities, or that grant, withhold or modify contracts, permits or other formal legal instruments, are outside the scope of this category and shall be considered separately under Forest Service NEPA procedures.

(17) Approval of a Surface Use Plan of Operations for oil and natural gas exploration and initial development activities, associated with or adjacent to a new oil and/or gas field or area, so long as the approval will not authorize activities in excess of any of the following:

  (i) One mile of new road construction;

  (ii) One mile of road reconstruction;

  (iii) Three miles of individual or co-located pipelines and/or utilities disturbance; or

  (iv) Four drill sites.

(18) Restoring wetlands, streams, riparian areas or other water bodies by removing, replacing, or modifying water control structures such as, but not limited to, dams, levees, dikes, ditches, culverts, pipes, drainage tiles, valves, gates, and fencing, to allow waters to flow into natural channels and floodplains and restore natural flow regimes to the extent practicable where valid existing rights or special use authorizations are not unilaterally altered or canceled. Examples include but are not limited to:

  (i) Repairing an existing water control structure that is no longer functioning properly with minimal dredging, excavation, or placement of fill, and does not involve releasing hazardous substances;

(ii) Installing a newly-designed structure that replaces an existing culvert to improve aquatic organism passage and prevent resource and property damage where the road or trail maintenance level does not change;

(iii) Removing a culvert and installing a bridge to improve aquatic and/or terrestrial organism passage or prevent resource or property damage where the road or trail maintenance level does not change; and

(iv) Removing a small earthen and rock fill dam with a low hazard potential classification that is no longer needed.

(19) Removing and/or relocating debris and sediment following disturbance events (such as floods, hurricanes, tornados, mechanical/engineering failures, etc.) to restore uplands, wetlands, or riparian systems to pre-disturbance conditions, to the extent practicable, such that site conditions will not impede or negatively alter natural processes. Examples include but are not limited to:

(i) Removing an unstable debris jam on a river following a flood event and relocating it back in the floodplain and stream channel to restore water flow and local bank stability;

(ii) Clean-up and removal of infrastructure flood debris, such as, benches, tables, outhouses, concrete, culverts, and asphalt following a hurricane from a stream reach and adjacent wetland area; and

(iii) Stabilizing stream banks and associated stabilization structures to reduce erosion through bioengineering techniques following a flood event, including the use of living and nonliving plant materials in combination with natural and synthetic support materials, such as rocks, riprap, geo-textiles, for slope stabilization, erosion reduction, and vegetative establishment and establishment of appropriate plant communities (bank shaping and planting, brush mattresses, log, root wad, and boulder stabilization methods).

(20) Activities that restore, rehabilitate, or stabilize lands occupied by roads and trails, including unauthorized roads and trails and National Forest System roads and National Forest System trails, to a more natural condition that may include removing, replacing, or modifying drainage structures and ditches, reestablishing vegetation, reshaping natural contours and slopes, reestablishing drainage-ways, or other activities that would restore site productivity and reduce environmental impacts. Examples include but are not limited to:

(i) Decommissioning a road to a more natural state by restoring natural contours and removing construction fills, loosening compacted soils, revegetating the roadbed and removing ditches and culverts to reestablish natural drainage patterns;

(ii) Restoring a trail to a natural state by reestablishing natural drainage patterns, stabilizing slopes, reestablishing vegetation, and installing water bars; and

(iii) Installing boulders, logs, and berms on a road segment to promote naturally regenerated grass, shrub, and tree growth.

(21) Construction, reconstruction, decommissioning, relocation, or disposal of buildings, infrastructure, or other improvements at an existing administrative site, as that term is defined in section 502(1) of Public Law 109–54 (119 Stat. 559; 16 U.S.C. 580d note). Examples include but are not limited to:

(i) Relocating an administrative facility to another existing administrative site;

(ii) Construction, reconstruction, or expansion of an office, a warehouse, a lab, a greenhouse, or a fire-fighting facility;

(iii) Surface or underground installation or decommissioning of water or waste disposal system infrastructure;

(iv) Disposal of an administrative building; and

(v) Construction or reconstruction of communications infrastructure.

(22) Construction, reconstruction, decommissioning, or disposal of buildings, infrastructure, or improvements at an existing recreation site, including infrastructure or improvements that are adjacent or connected to an existing recreation site and provide access or utilities for that site. Recreation sites include but are not limited to campgrounds and camping areas, picnic areas, day use areas, fishing sites, interpretive sites, visitor centers, trailheads, ski areas, and observation sites. Activities within this category are intended to apply to facilities located at recreation sites managed by the Forest Service and those managed by concessioners under a special use authorization. Examples include but are not limited to:

(i) Constructing, reconstructing, or expanding a toilet or shower facility;

**Addendum Page 42**

(ii) Constructing or reconstructing a fishing pier, wildlife viewing platform, dock, or other constructed feature at a recreation site;

(iii) Installing or reconstructing a water or waste disposal system;

(iv) Constructing or reconstructing campsites;

(v) Disposal of facilities at a recreation site;

(vi) Constructing or reconstructing a boat landing;

(vii) Replacing a chair lift at a ski area;

(viii) Constructing or reconstructing a parking area or trailhead; and

(ix) Reconstructing or expanding a recreation rental cabin.

(23) Road management activities on up to 8 miles of NFS roads and associated parking areas. Activities under this category cannot include construction or realignment. Examples include but are not limited to:

(i) Rehabilitating an NFS road or parking area where management activities go beyond repair and maintenance;

(ii) Shoulder-widening or other safety improvements within the right-of-way for an NFS road; and

(iii) Replacing a bridge along an NFS road.

(24) Construction and realignment of up to 2 miles of NFS roads and associated parking areas. Examples include but are not limited to:

(i) Constructing an NFS road to improve access to a trailhead or parking area;

(ii) Rerouting an NFS road to minimize resource impacts; and

(iii) Improving or upgrading the surface of an NFS road to expand its capacity.

(25) Forest and grassland management activities with a primary purpose of meeting restoration objectives or increasing resilience. Activities to improve ecosystem health, resilience, and other watershed and habitat conditions may not exceed 2,800 acres.

(i) Activities to meet restoration and resilience objectives may include, but are not limited to:

(A) Stream restoration, aquatic organism passage rehabilitation, or erosion control;

(B) Invasive species control and reestablishment of native species;

(C) Prescribed burning;

(D) Reforestation;

(E) Road and/or trail decommissioning (system and non-system);

(F) Pruning;

(G) Vegetation thinning; and

(H) Timber harvesting.

(ii) The following requirements or limitations apply to this category:

(A) Projects shall be developed or refined through a collaborative process that includes multiple interested persons representing diverse interests;

(B) Vegetation thinning or timber harvesting activities shall be designed to achieve ecological restoration objectives, but shall not include salvage harvesting as defined in Agency policy; and

(C) Construction and reconstruction of permanent roads is limited to 0.5 miles. Construction of temporary roads is limited to 2.5 miles, and all temporary roads shall be decommissioned no later than 3 years after the date the project is completed. Projects may include repair and maintenance of NFS roads and trails to prevent or address resource impacts; repair and maintenance of NFS roads and trails is not subject to the above mileage limits.

(f) *Decision memos.* The responsible official shall notify interested or affected parties of the availability of the decision memo as soon as practical after signing. While sections may be combined or rearranged in the interest of clarity and brevity, decision memos must include the following content:

(1) A heading, which must identify:

   (i) Title of document: Decision Memo;

   (ii) Agency and administrative unit;

   (iii) Title of the proposed action; and

   (iv) Location of the proposed action, including administrative unit, county, and State.

(2) Decision to be implemented and the reasons for categorically excluding the proposed action including:

   (i) The category of the proposed action;

   (ii) The rationale for using the category and, if more than one category could have been used, why the specific category was chosen;

   (iii) A finding that no extraordinary circumstances exist;

(3) Any interested and affected agencies, organizations, and persons contacted;

(4) Findings required by other laws such as, but not limited to findings of consistency with the forest land and resource management plan as required by the National Forest Management Act; or a public interest determination (36 CFR 254.3(c));

(5) The date when the responsible official intends to implement the decision and any conditions related to implementation;

(6) Whether the decision is subject to review or appeal, the applicable regulations, and when and where to file a request for review or appeal;

(7) Name, address, and phone number of a contact person who can supply further information about the decision; and

(8) The responsible official's signature and date when the decision is made.

[73 FR 43093, July 24, 2008, as amended at 78 FR 56163, Sept. 12, 2013; 85 FR 73631, Nov. 19, 2020]

**U.S. Forest Service Mining Regulations, 36 C.F.R. §§228.1-228.15**

**Subpart A—Locatable Minerals**
**§ 228.1 Purpose.**

It is the purpose of these regulations to set forth rules and procedures through which use of the surface of National Forest System lands in connection with operations authorized by the United States mining laws (30 U.S.C. 21–54), which confer a statutory right to enter upon the public lands to search for minerals, shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources. It is not the purpose of these regulations to provide for the management of mineral resources; the responsibility for managing such resources is in the Secretary of the Interior.

**§ 228.2 Scope.**

These regulations apply to operations hereafter conducted under the United States mining laws of May 10, 1872, as amended (30 U.S.C. 22 *et seq.*), as they affect surface resources on all National Forest System lands under the jurisdiction of the Secretary of Agriculture to which such laws are applicable: *Provided, however,* That any area of National Forest lands covered by a special Act of Congress (16 U.S.C. 482a–482q) is subject to the provisions of this part and the provisions of the special act, and in the case of conflict the provisions of the special act shall apply.

**§ 228.3 Definitions.**

For the purposes of this part the following terms, respectively, shall mean:

(a) *Operations.* All functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, including roads and other means of access on lands subject to the regulations in this part, regardless of whether said operations take place on or off mining claims.

(b) *Operator.* A person conducting or proposing to conduct operations.

(c) *Person.* Any individual, partnership, corporation, association, or other legal entity.

(d) *Mining claim.* Any unpatented mining claim or unpatented millsite authorized by the United States mining laws of May 10, 1872, as amended (30 U.S.C. 22 *et seq.*).

(e) *Authorized officer.* The Forest Service officer to whom authority to review and approve operating plans has been delegated.

## § 228.4 Plan of operations—notice of intent—requirements.

(a) Except as provided in paragraph (a)(1) of this section, a notice of intent to operate is required from any person proposing to conduct operations which might cause significant disturbance of surface resources. Such notice of intent to operate shall be submitted to the District Ranger having jurisdiction over the area in which the operations will be conducted. Each notice of intent to operate shall provide information sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations, and the method of transport.

(1) A notice of intent to operate is not required for:

(i) Operations which will be limited to the use of vehicles on existing public roads or roads used and maintained for National Forest System purposes;

(ii) Prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and occasionally removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using battery operated dry washers, and collecting of mineral specimens using hand tools;

(iii) Marking and monumenting a mining claim;

(iv) Underground operations which will not cause significant surface resource disturbance;

(v) Operations, which in their totality, will not cause surface resource disturbance which is substantially different than that caused by other users of the National Forest System who are not required to obtain a Forest Service special use authorization, contract, or other written authorization;

(vi) Operations which will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, unless those operations otherwise might cause a significant disturbance of surface resources; or

(vii) Operations for which a proposed plan of operations is submitted for approval;

(2) The District Ranger will, within 15 days of receipt of a notice of intent to operate, notify the operator if approval of a plan of operations is required before the operations may begin.

(3) An operator shall submit a proposed plan of operations to the District Ranger having jurisdiction over the area in which operations will be conducted in lieu of a notice of intent to operate if the proposed operations will likely cause a significant disturbance of surface resources. An operator also shall submit a proposed plan of operations, or a proposed supplemental plan of operations consistent with § 228.4(d), to the District Ranger having jurisdiction over the area in which operations are being conducted if those operations are causing a significant disturbance of surface resources but are not covered by a current approved plan of operations. The requirement to submit a plan of operations shall not apply to the operations listed in paragraphs (a)(1)(i) through (v). The requirement to submit a plan of operations also shall not apply to operations which will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, unless those operations otherwise will likely cause a significant disturbance of surface resources.

(4) If the District Ranger determines that any operation is causing or will likely cause significant disturbance of surface resources, the District Ranger shall notify the operator that the operator must submit a proposed plan of operations for approval and that the operations can not be conducted until a plan of operations is approved.

(b) Any person conducting operations on the effective date of these regulations, who would have been required to submit a plan of operations under § 228.4(a), may continue operations but shall within 120 days thereafter submit a plan of operations to the District Ranger having jurisdiction over the area within which operations are being conducted: *Provided, however,* That upon a showing of good cause the authorized officer will grant an extension of time for submission of a plan of operations, not to exceed an additional 6 months. Operations may continue

according to the submitted plan during its review, unless the authorized officer determines that the operations are unnecessarily or unreasonably causing irreparable damage to surface resources and advises the operator of those measures needed to avoid such damage. Upon approval of a plan of operations, operations shall be conducted in accordance with the approved plan. The requirement to submit a plan of operations shall not apply:

(1) To operations excepted in § 228.4(a) or

(2) to operations concluded prior to the effective date of the regulations in this part.

(c) The plan of operations shall include:

(1) The name and legal mailing address of the operators (and claimants if they are not the operators) and their lessees, assigns, or designees.

(2) A map or sketch showing information sufficient to locate the proposed area of operations on the ground, existing and/or proposed roads or access routes to be used in connection with the operations as set forth in § 228.12 and the approximate location and size of areas where surface resources will be disturbed.

(3) Information sufficient to describe or identify the type of operations proposed and how they would be conducted, the type and standard of existing and proposed roads or access routes, the means of transportation used or to be used as set forth in § 228.12, the period during which the proposed activity will take place, and measures to be taken to meet the requirements for environmental protection in § 228.8.

(d) The plan of operations shall cover the requirements set forth in paragraph (c) of this section, as foreseen for the entire operation for the full estimated period of activity: *Provided, however,* That if the development of a plan for an entire operation is not possible at the time of preparation of a plan, the operator shall file an initial plan setting forth his proposed operation to the degree reasonably foreseeable at that time, and shall thereafter file a supplemental plan or plans whenever it is proposed to undertake any significant surface disturbance not covered by the initial plan.

(e) At any time during operations under an approved plan of operations, the authorized officer may ask the operator to furnish a proposed modification of the plan detailing the means of minimizing unforeseen significant disturbance of

surface resources. If the operator does not furnish a proposed modification within a time deemed reasonable by the authorized officer, the authorized officer may recommend to his immediate superior that the operator be required to submit a proposed modification of the plan. The recommendation of the authorized officer shall be accompanied by a statement setting forth in detail the supporting facts and reasons for his recommendations. In acting upon such recommendation, the immediate superior of the authorized officer shall determine:

(1) Whether all reasonable measures were taken by the authorized officer to predict the environmental impacts of the proposed operations prior to approving the operating plan,

(2) Whether the disturbance is or probably will become of such significance as to require modification of the operating plan in order to meet the requirements for environmental protection specified in § 228.8 and

(3) Whether the disturbance can be minimized using reasonable means. Lacking such determination that unforeseen significant disturbance of surface resources is occurring or probable and that the disturbance can be minimized using reasonable means, no operator shall be required to submit a proposed modification of an approved plan of operations. Operations may continue in accordance with the approved plan until a modified plan is approved, unless the immediate superior of the authorized officer determines that the operations are unnecessarily or unreasonably causing irreparable injury, loss or damage to surface resources and advises the operator of those measures needed to avoid such damage.

(f) Upon completion of an environmental analysis in connection with each proposed operating plan, the authorized officer will determine whether an environmental statement is required. Not every plan of operations, supplemental plan or modification will involve the preparation of an environmental statement. Environmental impacts will vary substantially depending on whether the nature of operations is prospecting, exploration, development, or processing, and on the scope of operations (such as size of operations, construction required, length of operations and equipment required), resulting in varying degrees of disturbance to vegetative resources, soil, water, air, or wildlife. The Forest Service will prepare any environmental statements that may be required.

(g) The information required to be included in a notice of intent or a plan of operations, or supplement or modification thereto, has been assigned Office of

Management and Budget Control #0596–0022. The public reporting burden for this collection of information is estimated to vary from a few minutes for an activity involving little or no surface disturbance to several months for activities involving heavy capital investments and significant surface disturbance, with an average of 2 hours per individual response. This includes time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Chief (2800), Forest Service, USDA, P.O. Box 96090, Washington, DC 20090–6090 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

[39 FR 31317, Aug. 28, 1974. Redesignated at 46 FR 36142, July 14, 1981, and amended at 54 FR 6893, Feb. 15, 1989; 69 FR 41430, July 9, 2004; 70 FR 32731, June 6, 2005]

## § 228.5 Plan of operations—approval.

(a) Operations shall be conducted in accordance with an approved plan of operations, except as provided in paragraph (b) of this section and in § 228.4 (a), (b), and (e). A proposed plan of operation shall be submitted to the District Ranger, who shall promptly acknowledge receipt thereof to the operator. The authorized officer shall, within thirty (30) days of such receipt, analyze the proposal, considering the economics of the operation along with the other factors in determining the reasonableness of the requirements for surface resource protection, and;

(1) Notify the operator that he has approved the plan of operations; or

(2) Notify the operator that the proposed operations are such as not to require an operating plan; or

(3) Notify the operator of any changes in, or additions to, the plan of operations deemed necessary to meet the purpose of the regulations in this part; or

(4) Notify the operator that the plan is being reviewed, but that more time, not to exceed an additional sixty (60) days, is necessary to complete such review, setting forth the reasons why additional time is needed: *Provided, however,* That days during which the area of operations is inaccessible for inspection shall not be included when computing the sixty (60) day period; or

(5) Notify the operator that the plan cannot be approved until a final environmental statement has been prepared and filed with the Council on Environmental Quality as provided in § 228.4(f).

(b) Pending final approval of the plan of operations, the authorized officer will approve such operations as may be necessary for timely compliance with the requirements of Federal and State laws, so long as such operations are conducted so as to minimize environmental impacts as prescribed by the authorized officer in accordance with the standards contained in § 228.8.

(c) A supplemental plan or plans of operations provided for in § 228.4(d) and a modification of an approved operating plan as provided for in § 228.4(e) shall be subject to approval by the authorized officer in the same manner as the initial plan of operations: *Provided, however,* That a modification of an approved plan of operations under § 228.4(e) shall be subject to approval by the immediate superior of the authorized officer in cases where it has been determined that a modification is required.

(d) In the provisions for review of operating plans, the Forest Service will arrange for consultation with appropriate agencies of the Department of the Interior with respect to significant technical questions concerning the character of unique geologic conditions and special exploration and development systems, techniques, and equipment, and with respect to mineral values, mineral resources, and mineral reserves. Further, the operator may request the Forest Service to arrange for similar consultations with appropriate agencies of the U.S. Department of the Interior for a review of operating plans.

## § 228.6 Availability of information to the public.

Except as provided herein, all information and data submitted by an operator pursuant to the regulations in this part shall be available for examination by the public at the Office of the District Ranger in accordance with the provisions of 7 CFR 1.1–1.6 and 36 CFR 200.5–200.10. Specifically identified information and data submitted by the operator as confidential concerning trade secrets or privileged commercial or financial information will not be available for public examination. Information and data to be withheld from public examination may include, but is not limited to, known or estimated outline of the mineral deposits and their location, attitude, extent, outcrops, and content, and the known or planned location of exploration pits, drill holes, excavations pertaining to location and entry pursuant to

the United States mining laws, and other commercial information which relates to competitive rights of the operator.

### § 228.7 Inspection, noncompliance.

(a) Forest Officers shall periodically inspect operations to determine if the operator is complying with the regulations in this part and an approved plan of operations.

(b) If an operator fails to comply with the regulations or his approved plan of operations and the noncompliance is unnecessarily or unreasonably causing injury, loss or damage to surface resources the authorized officer shall serve a notice of noncompliance upon the operator or his agent in person or by certified mail. Such notice shall describe the noncompliance and shall specify the action to comply and the time within which such action is to be completed, generally not to exceed thirty (30) days: *Provided, however,* That days during which the area of operations is inaccessible shall not be included when computing the number of days allowed for compliance.

### § 228.8 Requirements for environmental protection.

All operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources, including the following requirements:

(a) *Air Quality.* Operator shall comply with applicable Federal and State air quality standards, including the requirements of the Clean Air Act, as amended (42 U.S.C. 1857 *et seq.*).

(b) *Water Quality.* Operator shall comply with applicable Federal and State water quality standards, including regulations issued pursuant to the Federal Water Pollution Control Act, as amended (33 U.S.C. 1151 *et seq.*).

(c) *Solid Wastes.* Operator shall comply with applicable Federal and State standards for the disposal and treatment of solid wastes. All garbage, refuse, or waste, shall either be removed from National Forest lands or disposed of or treated so as to minimize, so far as is practicable, its impact on the environment and the forest surface resources. All tailings, dumpage, deleterious materials, or substances and other waste produced by operations shall be deployed, arranged, disposed of or treated so as to minimize adverse impact upon the environment and forest surface resources.

(d) *Scenic Values.* Operator shall, to the extent practicable, harmonize operations with scenic values through such measures as the design and location of operating facilities, including roads and other means of access, vegetative screening of operations, and construction of structures and improvements which blend with the landscape.

(e) *Fisheries and Wildlife Habitat.* In addition to compliance with water quality and solid waste disposal standards required by this section, operator shall take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations.

(f) *Roads.* Operator shall construct and maintain all roads so as to assure adequate drainage and to minimize or, where practicable, eliminate damage to soil, water, and other resource values. Unless otherwise approved by the authorized officer, roads no longer needed for operations:

(1) Shall be closed to normal vehicular traffic,

(2) Bridges and culverts shall be removed,

(3) Cross drains, dips, or water bars shall be constructed, and

(4) The road surface shall be shaped to as near a natural contour as practicable and be stabilized.

(g) *Reclamation.* Upon exhaustion of the mineral deposit or at the earliest practicable time during operations, or within 1 year of the conclusion of operations, unless a longer time is allowed by the authorized officer, operator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources including:

(1) Control of erosion and landslides;

(2) Control of water runoff;

(3) Isolation, removal or control of toxic materials;

(4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and

(5) Rehabilitation of fisheries and wildlife habitat.

(h) Certification or other approval issued by State agencies or other Federal agencies of compliance with laws and regulations relating to mining operations will be accepted as compliance with similar or parallel requirements of these regulations.

## § 228.9 Maintenance during operations, public safety.

During all operations operator shall maintain his structures, equipment, and other facilities in a safe, neat and workmanlike manner. Hazardous sites or conditions resulting from operations shall be marked by signs, fenced or otherwise identified to protect the public in accordance with Federal and State laws and regulations.

## § 228.10 Cessation of operations, removal of structures and equipment.

Unless otherwise agreed to by the authorized officer, operator shall remove within a reasonable time following cessation of operations all structures, equipment and other facilities and clean up the site of operations. Other than seasonally, where operations have ceased temporarily, an operator shall file a statement with the District Ranger which includes:

(a) Verification of intent to maintain the structures, equipment and other facilities,

(b) The expected reopening date, and

(c) An estimate of extended duration of operations. A statement shall be filed every year in the event operations are not reactivated. Operator shall maintain the operating site, structures, equipment and other facilities in a neat and safe condition during nonoperating periods.

## § 228.11 Prevention and control of fire.

Operator shall comply with all applicable Federal and State fire laws and regulations and shall take all reasonable measures to prevent and suppress fires on the area of operations and shall require his employees, contractors and subcontractors to do likewise.

## § 228.12 Access.

An operator is entitled to access in connection with operations, but no road, trail, bridge, landing area for aircraft, or the like, shall be constructed or improved, nor shall any other means of access, including but not limited to off-road vehicles, be used until the operator has received approval of an operating plan in writing from the authorized officer when required by § 228.4(a). Proposals for construction, improvement or use of such access as part of a plan of operations shall include a description of the type and standard of the proposed means of access, a map showing the proposed route of access, and a description of the means of transportation to be used. Approval of the means of such access as part of a plan of operations shall specify the location of the access route, design standards, means of transportation, and other conditions reasonably necessary to protect the environment and forest surface resources, including measures to protect scenic values and to insure against erosion and water or air pollution.

## § 228.13 Bonds.

(a) Any operator required to file a plan of operations shall, when required by the authorized officer, furnish a bond conditioned upon compliance with § 228.8(g), prior to approval of such plan of operations. In lieu of a bond, the operator may deposit into a Federal depository, as directed by the Forest Service, and maintain therein, cash in an amount equal to the required dollar amount of the bond or negotiable securities of the United States having market value at the time of deposit of not less than the required dollar amount of the bond. A blanket bond covering nationwide or statewide operations may be furnished if the terms and conditions thereof are sufficient to comply with the regulations in this part.

(b) In determining the amount of the bond, consideration will be given to the estimated cost of stabilizing, rehabilitating, and reclaiming the area of operations.

(c) In the event that an approved plan of operations is modified in accordance with § 228.4 (d) and (e), the authorized officer will review the initial bond for adequacy and, if necessary, will adjust the bond to conform to the operations plan as modified.

(d) When reclamation has been completed in accordance with § 228.8(g), the authorized officer will notify the operator that performance under the bond has been completed: *Provided, however,* That when the Forest Service has accepted as completed any portion of the reclamation, the authorized officer shall notify the

operator of such acceptance and reduce proportionally the amount of bond thereafter to be required with respect to the remaining reclamation.

[39 FR 31317, Aug. 28, 1974; 39 FR 32029, Sept. 4, 1974]

**§ 228.14 Appeals.**

Appeal of decisions of an authorized officer made pursuant to this subpart is governed by 36 CFR part 214 or 215.

[78 FR 33724, June 5, 2013]

**§ 228.15 Operations within National Forest Wilderness.**

(a) The United States mining laws shall extend to each National Forest Wilderness for the period specified in the Wilderness Act and subsequent establishing legislation to the same extent they were applicable prior to the date the Wilderness was designated by Congress as a part of the National Wilderness Preservation System. Subject to valid existing rights, no person shall have any right or interest in or to any mineral deposits which may be discovered through prospecting or other information-gathering activity after the legal date on which the United States mining laws cease to apply to the specific Wilderness.

(b) Holders of unpatented mining claims validly established on any National Forest Wilderness prior to inclusion of such unit in the National Wilderness Preservation System shall be accorded the rights provided by the United States mining laws as then applicable to the National Forest land involved. Persons locating mining claims in any National Forest Wilderness on or after the date on which said Wilderness was included in the National Wilderness Preservation System shall be accorded the rights provided by the United States mining laws as applicable to the National Forest land involved and subject to provisions specified in the establishing legislation. Persons conducting operations as defined in § 228.3 in National Forest Wilderness shall comply with the regulations in this part. Operations shall be conducted so as to protect National Forest surface resources in accordance with the general purposes of maintaining the National Wilderness Preservation System unimpaired for future use and enjoyment as wilderness and to preserve its wilderness character, consistent with the use of the land for mineral location, exploration, development, drilling, and production and for transmission lines, water lines, telephone lines, and processing operations, including, where essential, the use of mechanized transport, aircraft or motorized equipment.

(c) Persons with valid mining claims wholly within National Forest Wilderness shall be permitted access to such surrounded claims by means consistent with the preservation of National Forest Wilderness which have been or are being customarily used with respect to other such claims surrounded by National Forest Wilderness. No operator shall construct roads across National Forest Wilderness unless authorized in writing by the Forest Supervisor in accordance with § 228.12.

(d) On all mining claims validly established on lands within the National Wilderness Preservation System, the operator shall take all reasonable measures to remove any structures, equipment and other facilities no longer needed for mining purposes in accordance with the provisions in § 228.10 and restore the surface in accordance with the requirements in § 228.8(g).

(e) The title to timber on patented claims validly established after the land was included within the National Wilderness Preservation System remains in the United States, subject to a right to cut and use timber for mining purposes. So much of the mature timber may be cut and used as is needed in the extraction, removal, and beneficiation of the mineral deposits, if needed timber is not otherwise reasonably available. The cutting shall comply with the requirements for sound principles of forest management as defined by the National Forest rules and regulations and set forth in stipulations to be included in the plan of operations, which as a minimum incorporate the following basic principles of forest management:

    (1) Harvesting operations shall be so conducted as to minimize soil movement and damage from water runoff; and

    (2) Slash shall be disposed of and other precautions shall be taken to minimize damage from forest insects, disease, and fire.

(f) The Chief, Forest Service, shall allow any activity, including prospecting, for the purpose of gathering information about minerals in National Forest Wilderness except that any such activity for gathering information shall be carried on in a manner compatible with the preservation of the wilderness environment as specified in the plan of operations.

**U.S. Forest Service Regulations, Land Uses, 43 C.F.R. §§ 251.50, 251.53**

**§ 251.50 Scope.**

(a) All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing sharing use of roads (§ 212.9); grazing and livestock use (part 222); the sale and disposal of timber and special forest products, such as greens, mushrooms, and medicinal plants (part 223); and minerals (part 228) are designated "special uses." Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer, unless that requirement is waived by paragraphs (c) through (e)(3) of this section.

(b) Nothing in this section prohibits the temporary occupancy of National Forest System lands without a special use authorization when necessary for the protection of life and property in emergencies, if a special use authorization is applied for and obtained at the earliest opportunity, unless waived pursuant to paragraphs (c) through (e)(3) of this section. The authorized officer may, pursuant to § 251.56 of this subpart, impose in that authorization such terms and conditions as are deemed necessary or appropriate and may require changes to the temporary occupancy to conform to those terms and conditions. Those temporarily occupying National Forest System lands without a special use authorization assume liability, and must indemnify the United States, for all injury, loss, or damage arising in connection with the temporary occupancy.

(c) A special use authorization is not required for noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding, or for noncommercial activities involving the expression of views, such as assemblies, meetings, demonstrations, and parades, unless:

(1) The proposed use is a noncommercial group use as defined in § 251.51 of this subpart;

(2) The proposed use is still photography as defined in § 251.51 of this subpart; or

(3) Authorization of that use is required by an order issued under § 261.50 or by a regulation issued under § 261.70 of this chapter.

(d) Travel on any National Forest System road shall comply with all Federal and State laws governing the road to be used and does not require a special use authorization, unless:

(1) The travel is for the purpose of engaging in a noncommercial group use, outfitting or guiding, a recreation event, commercial filming, or still photography, as defined in § 251.51 of this subpart, or for a landowner's ingress or egress across National Forest System lands that requires travel on a National Forest System road that is not authorized for general public use under § 251.110(d) of this part; or

(2) Authorization of that use is required by an order issued under § 261.50 or by a regulation issued under § 261.70 of this chapter.

(e) For proposed uses other than a noncommercial group use, a special use authorization is not required if, based upon review of a proposal, the authorized officer determines that the proposed use has one or more of the following characteristics:

(1) The proposed use will have such nominal effects on National Forest System lands, resources, or programs that it is not necessary to establish terms and conditions in a special use authorization to protect National Forest System lands and resources or to avoid conflict with National Forest System programs or operations;

(2) The proposed use is regulated by a State agency or another Federal agency in a manner that is adequate to protect National Forest System lands and resources and to avoid conflict with National Forest System programs or operations; or

(3) The proposed use is not situated in a congressionally designated wilderness area, and is a routine operation or maintenance activity within the scope of a statutory right-of-way for a highway pursuant to R.S. 2477 (43 U.S.C. 932, repealed Oct. 21, 1976) or for a ditch or canal pursuant to R.S. 2339 (43 U.S.C. 661, as amended), or the proposed use is a routine operation or maintenance activity within the express scope of a documented linear right-of-way.

[69 FR 41964, July 13, 2004]

## § 251.53 Authorities.

Subject to any limitations contained in applicable statutes, the Chief of the Forest Service, or other Agency official to whom such authority is delegated, may issue special use authorizations for National Forest System land under the authorities cited and for the types of use specified in this section as follows:

(a) Permits governing occupancy and use, including group events and distribution of noncommercial printed materials, under the act of June 4, 1897, 30 Stat. 35 (16 U.S.C. 551);

(b) Leases under the Act of February 28, 1899, 30 Stat. 908 (16 U.S.C. 495) for public sanitariums or hotels near or adjacent to mineral springs;

(c) Permits under the Act of June 8, 1906, 34 Stat. 225 (16 U.S.C. 431, *et seq.*), for the examination of ruins, the excavation of archaeological sites, and the gathering of objects of antiquity in conformity with the rules and regulations prescribed by the Secretaries of the Interior, Agriculture, and War, December 28, 1906 (43 CFR part 3);

(d) Term permits under the Act of March 4, 1915, 38 Stat. 1101, as amended, 70 Stat. 708 (16 U.S.C. 497) for periods not over 30 years and

(1) for not over 80 acres for

(i) hotels, resorts, and other structures and facilities for recreation, public convenience, or safety;

(ii) industrial or commercial purposes, and

(iii) education or public activities; and

(2) for not over 5 acres for summer homes and stores;

(e) Permits or easements for a right-of-way for a pipeline for the transportation of oil, gas, or oil or gas products, where no Federal land besides National Forest System lands is required, and permits for the temporary use of additional National Forest System lands necessary for construction, operation, maintenance, or termination of a pipeline or to protect the natural environment or public safety under section 28 of the Mineral Leasing Act, 41 Stat. 449, as amended (30 U.S.C 185);

(f) Permits, term permits, and easements in the National Grasslands and other lands acquired or administered under title III, Act of July 22, 1937, 50 Stat. 525, as amended, (7 U.S.C. 1011(d));

(g) Permits under section 7 of the Act of April 24, 1950, 64 Stat. 84 (16 U.S.C. 580d) for periods not over 30 years for the use of structures or improvements under

the administrative control of the Forest Service and land used in connection therewith;

(h) Permits, term permits, leases, or easements as authorized by the Act of September 3, 1954, 68 Stat. 1146 (43 U.S.C. 931c, 931d), to States, counties, cities, towns, townships, municipal corporations, or other public agencies for periods not over 30 years, at prices representing the fair market value, fixed by the Chief, through appraisal for the purpose of constructing and maintaining on such lands public buildings or other public works;

(i) Permits under the Wilderness Act of September 3, 1964, 78 Stat. 890 (16 U.S.C. 1131–1136) for temporary structures and commercial services and for access to valid mining claims or other valid occupancies and to surrounded State or private land within designated wilderness (see part 293 of this chapter);

(j) Temporary or permanent easements under the Act of October 13, 1964, 78 Stat. 1089 (16 U.S.C. 532–538) for road rights-of-way over lands and interests in land administered by the Forest Service (see § 212.10 of this chapter);

(k) Special recreation permits issued under section 803(h) of the Federal Lands Recreation Enhancement Act (16 U.S.C. 6802(h)), for specialized recreation uses of National Forest System lands, such as group activities, recreation events, and motorized recreational vehicle use.

(l) Permits, leases and easements under the Federal Land Policy and Management Act of 1976, 90 Stat. 2776 (43 U.S.C. 1761–1771) for rights-of-way for:

(1) Reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water;

(2) Pipelines and other systems for the transportation or distribution of liquids and gases, other than water and other than oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom, and for storage and terminal facilities in connection therewith;

(3) Pipelines, slurry and emulsion systems, and conveyor belts for transportation and distribution of solid materials, and facilities for the storage of such materials in connection therewith;

# CHAPTER V—COUNCIL ON ENVIRONMENTAL QUALITY

| Part | | Page |
|------|---|------|
| 1500 | Purpose, policy, and mandate | 835 |
| 1501 | NEPA and agency planning | 837 |
| 1502 | Environmental impact statement | 841 |
| 1503 | Commenting | 848 |
| 1504 | Predecision referrals to the Council of proposed Federal actions determined to be environmentally unsatisfactory | 849 |
| 1505 | NEPA and agency decisionmaking | 851 |
| 1506 | Other requirements of NEPA | 852 |
| 1507 | Agency compliance | 857 |
| 1508 | Terminology and index | 859 |
| | Index to Parts 1500 Through 1508 | 864 |
| 1515 | Freedom of Information Act procedures | 865 |
| 1516 | Privacy Act implementation | 872 |
| 1517 | Public meeting procedures of the Council on Environmental Quality | 874 |
| 1518 | Office of Environmental Quality Management Fund | 878 |

**Addendum Page 63**

# PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514. Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## § 1500.1  Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2  Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## § 1500.3  Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act)

835

except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514. Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore. it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

### § 1500.4  Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o) Combining environmental documents with other documents (§ 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

[43 FR 55990, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1500.5  Reducing delay.

Agencies shall reduce delay by:

**Council on Environmental Quality**

(a) Integrating the NEPA process into early planning (§ 1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§ 1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (§ 1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (§§ 1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (§ 1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (§ 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(i) Combining environmental documents with other documents (§ 1506.4).

(j) Using accelerated procedures for proposals for legislation (§ 1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§ 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

### § 1500.6  Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609. and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

### § 1501.1  Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

§ 1501.2                                                        40 CFR Ch. V (7–1–11 Edition)

§ 1501.2  Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

§ 1501.3  When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

§ 1501.4  Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

838

Addendum Page 67

**Council on Environmental Quality** §1501.6

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3, or

(ii) The nature of the proposed action is one without precedent.

§1501.5  Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency

designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

§1501.6  Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

839

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

§ 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed

840

**Council on Environmental Quality**

action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

### § 1501.8 Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided*, That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1  Purpose.
1502.2  Implementation.
1502.3  Statutory requirements for statements.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover sheet.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  List of preparers.
1502.18  Appendix.
1502.19  Circulation of the environmental impact statement.
1502.20  Tiering.
1502.21  Incorporation by reference.
1502.22  Incomplete or unavailable information.
1502.23  Cost-benefit analysis.
1502.24  Methodology and scientific accuracy.
1502.25  Environmental review and consultation requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

### § 1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the

841

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

## § 1502.2 Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

## § 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such

842

as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§1501.7), tiering (§1502.20), and other methods listed in §§1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

§1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the

public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

§1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.7).

§1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of §1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

§1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

§1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in §1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

§ 1502.10                         40 CFR Ch. V (7–1–11 Edition)

in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

§ 1502.10   Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11 through 1502.18, in any appropriate format.

§ 1502.11   Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

§ 1502.12   Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice

844

**Council on Environmental Quality**                    **§1502.16**

among alternatives). The summary will normally not exceed 15 pages.

### §1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

### §1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### §1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data

and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### §1502.16  Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

845

**Addendum Page 74**

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

**Council on Environmental Quality** §1502.24

may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

§ 1502.22 **Incomplete or unavailable information.**

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

§ 1502.23 **Cost-benefit analysis.**

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

§ 1502.24 **Methodology and scientific accuracy.**

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

847

**§ 1502.25 Environmental review and consultation requirements.**

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING

Sec.
1503.1   Inviting comments.
1503.2   Duty to comment.
1503.3   Specificity of comments.
1503.4   Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

**§ 1503.1 Inviting comments.**

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

**§ 1503.2 Duty to comment.**

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

**§ 1503.3 Specificity of comments.**

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

must be made available to the President, the Council and the public.

[43 FR 55998, Nov. 29, 1978]

### § 1504.2 Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.

(b) Severity.

(c) Geographical scope.

(d) Duration.

(e) Importance as precedents.

(f) Availability of environmentally preferable alternatives.

[43 FR 55998, Nov. 29, 1978]

### § 1504.3 Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

(2) Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.

(3) Identify any essential information that is lacking and request that it be made available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) of this section.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

(ii) Identify any existing environmental requirements or policies which would be violated by the matter,

(iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered

**Council on Environmental Quality** §1504.1

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

### §1503.4 Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§1502.19). The entire document with a new cover sheet shall be filed as the final statement (§1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

### §1504.1  Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews

849

not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Hold public meetings or hearings to obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedure Act).

[43 FR 55998, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

## PART 1505—NEPA AND AGENCY DECISIONMAKING

Sec.
1505.1 Agency decisionmaking procedures.

1505.2 Record of decision in cases requiring environmental impact statements.
1505.3 Implementing the decision.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55999, Nov. 29, 1978, unless otherwise noted.

### § 1505.1 Agency decisionmaking procedures.

Agencies shall adopt procedures (§ 1507.3) to ensure that decisions are made in accordance with the policies and purposes of the Act. Such procedures shall include but not be limited to:

(a) Implementing procedures under section 102(2) to achieve the requirements of sections 101 and 102(1).

(b) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them.

(c) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(d) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that agency officials use the statement in making decisions.

(e) Requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

## § 1505.2 Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision. The record, which may be integrated into any other record prepared by the agency, including that required by OMB Circular A-95 (Revised), part I, sections 6(c) and (d), and part II, section 5(b)(4), shall:

(a) State what the decision was.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

## § 1505.3 Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

# PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

## § 1506.1 Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement,

agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

### § 1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for

cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

### § 1506.3 Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of

853

a judicial action which is not final, the agency shall so specify.

§ 1506.4  **Combining documents.**

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

§ 1506.5  **Agency responsibility.**

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

§ 1506.6  **Public involvement.**

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

**Council on Environmental Quality**

**§ 1506.8**

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

### § 1506.7  Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

### § 1506.8  Proposals for legislation.

(a) The NEPA process for proposals for legislation (§ 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

(2) The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; *Provided,* That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§ 1503.1 and 1506.10.

(i) A Congressional Committee with jurisdiction over the proposal has a

855

rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*) and the Wilderness Act (16 U.S.C. 1131 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

§ 1506.9  Filing requirements.

(a) Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Mail Code 2252–A, Room 7220, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This address is for deliveries by US Postal Service (including USPS Express Mail).

(b) For deliveries in-person or by commercial express mail services, including Federal Express or UPS, the correct address is: US Environmental Protection Agency, Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Room 7220, 1200 Pennsylvania Avenue, NW., Washington, DC 20004.

(c) Statements shall be filed with the EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its re-

sponsibilities under this section and § 1506.10.

[70 FR 41148, July 18, 2005]

§ 1506.10  Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

**Council on Environmental Quality** §1507.2

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see §1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

[43 FR 56000, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

**§1506.11 Emergencies.**

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

**§1506.12 Effective date.**

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under section 102(2)(D) of the Act or under section 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

**PART 1507—AGENCY COMPLIANCE**

Sec.
1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency procedures.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56002, Nov. 29, 1978, unless otherwise noted.

**§1507.1 Compliance.**

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by §1507.3 to the requirements of other applicable laws.

**§1507.2 Agency capability to comply.**

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

857

(a) Fulfill the requirements of section 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by section 102(2)(B) to insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of section 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

§ 1507.3  Agency procedures.

(a) Not later than eight months after publication of these regulations as finally adopted in the FEDERAL REGISTER, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall

confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements

Council on Environmental Quality        § 1508.5

which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in § 1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by § 1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1   Terminology.
1508.2   Act.
1508.3   Affecting.
1508.4   Categorical exclusion.
1508.5   Cooperating agency.
1508.6   Council.
1508.7   Cumulative impact.
1508.8   Effects.
1508.9   Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact statement.
1508.12  Federal agency.
1508.13  Finding of no significant impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

### § 1508.1  Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

### § 1508.2  Act.

*Act* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

### § 1508.3  Affecting.

*Affecting* means will or may have an effect on.

### § 1508.4  Categorical exclusion.

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### § 1508.5  Cooperating agency.

*Cooperating agency* means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in § 1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

**§ 1508.6  Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7  Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8  Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9  Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10  Environmental document.**

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

**§ 1508.11  Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12  Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13  Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

**Council on Environmental Quality** §1508.19

repeat any of the discussion in the assessment but may incorporate it by reference.

**§1508.14  Human environment.**

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

**§1508.15  Jurisdiction by law.**

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

**§1508.16  Lead agency.**

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

**§1508.17  Legislation.**

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

**§1508.18  Major Federal action.**

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

**§1508.19  Matter.**

*Matter* includes for purposes of part 1504:

861

(a) With respect to the Environmental Protection Agency, any proposed legislation. project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

§ 1508.20   Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

§ 1508.21   NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

§ 1508.22   Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

§ 1508.23   Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

§ 1508.24   Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

§ 1508.25   Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

**Council on Environmental Quality**                                    **§ 1508.28**

consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26  Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27  Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28  Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

**Index**                              **40 CFR Ch. V (7–1–11 Edition)**

subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

## Index to Parts 1500 Through 1508

EDITORIAL NOTE: This listing is provided for information purposes only. It is compiled and kept up-to-date by the Council on Environmental Quality, and is revised through July 1, 2011.

INDEX

| | |
|---|---|
| Act | 1508.2. |
| Action | 1508.18, 1508.25. |
| Action-forcing | 1500.1, 1502.1. |
| Adoption | 1500.4(n), 1500.5(h), 1506.3. |
| Affected Environment | 1502.10(f), 1502.15. |
| Affecting | 1502.3, 1508.3. |
| Agency Authority | 1500.6. |
| Agency Capability | 1501.2(a), 1507.2. |
| Agency Compliance | 1507.1. |
| Agency Procedures | 1505.1, 1507.3. |
| Agency Responsibility | 1506.5. |
| Alternatives | 1501.2(c), 1502.2, 1502.10(e), 1502.14, 1505.1(e), 1505.2, 1507.2(d), 1508.25(b). |
| Appendices | 1502.10(k), 1502.18, 1502.24. |
| Applicant | 1501.2(d)(1), 1501.4(b), 1501.8(a), 1502.19(b), 1503.1(a)(3), 1504.3(e), 1506.1(d), 1506.5(a), 1506.5(b). |
| Apply NEPA Early in the Process. | 1501.2. |
| Categorical Exclusion | 1500.4(p), 1500.5(k), 1501.4(a), 1507.3(b), 1508.4. |
| Circulation of Environmental Impact Statement. | 1502.19, 1506.3. |
| Classified Information | 1507.3(c). |
| Clean Air Act | 1504.1(b), 1508.19(a). |
| Combining Documents | 1500.4(o), 1500.5(i), 1506.4. |
| Commenting | 1502.19, 1503.1, 1503.2, 1503.3, 1503.4, 1506.6(f). |
| Consultation Requirement | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25. |
| Context | 1508.27(a). |

INDEX—Continued

| | |
|---|---|
| Cooperating Agency | 1500.5(b), 1501.1(b), 1501.5(c), 1501.5(f), 1501.6, 1503.1(a)(1), 1503.2, 1503.3, 1506.3(c), 1506.5(c), 1508.5. |
| Cost-Benefit | 1502.23. |
| Council on Environmental Quality. | 1500.3, 1501.5(e), 1501.5(f), 1501.6(c), 1502.9(c)(4), 1504.1, 1504.2, 1504.3, 1506.6(f), 1506.9, 1506.10(d), 1506.11, 1507.3, 1508.6, 1508.24. |
| Cover Sheet | 1502.10(a), 1502.11. |
| Cumulative Impact | 1508.7, 1508.25(a), 1508.25(c). |
| Decisionmaking | 1505.1, 1506.1. |
| Decision points | 1505.1(b). |
| Dependent | 1508.25(a). |
| Draft Environmental Impact Statement. | 1502.9(a). |
| Early Application of NEPA | 1501.2. |
| Economic Effects | 1508.8. |
| Effective Date | 1506.12. |
| Effects | 1502.16, 1508.8. |
| Emergencies | 1506.11. |
| Endangered Species Act | 1502.25, 1508.27(b)(9). |
| Energy | 1502.16(e). |
| Environmental Assessment | 1501.3, 1501.4(b), 1501.4(c), 1501.7(b)(3), 1506.2(b)(4), 1506.5(b), 1508.4, 1508.9, 1508.10, 1508.13. |
| Environmental Consequences | 1502.10(g), 1502.16. |
| Environmental Consultation Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Environmental Documents | 1508.10. |
| Environmental Impact Statement. | 1500.4, 1501.4, 1501.7, 1502.1, 1502.2, 1502.3, 1502.4, 1502.5, 1502.6, 1502.7, 1502.8, 1502.9, 1502.10, 1502.11, 1502.12, 1502.13, 1502.14, 1502.15, 1502.16, 1502.17, 1502.18, 1502.19, 1502.20, 1502.21, 1502.22, 1502.23, 1502.24, 1502.25, 1506.2(c), 1506.3, 1506.8, 1508.11. |
| Environmental Protection Agency. | 1502.11(f), 1504.1, 1504.3, 1506.7(c), 1506.9, 1506.10, 1508.19(a). |
| Environmental Review Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Expedite | 1501.8(b)(3). |
| Federal Agency | 1508.12. |
| Filing | 1506.9. |
| Final Environmental Impact Statement. | 1502.9(b), 1503.1, 1503.4(b). |
| Finding of No Significant Impact. | 1500.3, 1500.4(q), 1500.5(l), 1501.4(e), 1508.13. |
| Fish and Wildlife Coordination Act. | 1502.25. |
| Format for Environmental Impact Statement. | 1502.10. |
| Freedom of Information Act | 1506.6(f). |
| Further Guidance | 1506.7. |
| Generic | 1502.4(c)(2). |
| General Services Administration. | 1506.8(b)(2)(iii). |
| Geographic | 1502.4(c)(1). |
| Graphics | 1502.8. |
| Handbook | 1506.7(a). |
| Housing and Community Development Act. | 1506.12, 1508.12. |

**Addendum Page 93**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R8–ES–2023–0052; FF09E21000 FXES1111090FEDR 234]

RIN 1018–BH21

**Endangered and Threatened Wildlife and Plants; Threatened Status for the Bi-State Distinct Population Segment of Greater Sage-Grouse With Section 4(d) Rule and Designation of Critical Habitat**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule; reopening of the comment periods.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), announce that we are reopening the comment periods on our October 28, 2013, proposed rules to list the Bi-State distinct population segment (DPS) of greater sage-grouse (*Centrocercus urophasianus*) (hereafter Bi-State DPS) as threatened under the Endangered Species Act (Act) with a section 4(d) rule and to designate critical habitat for the Bi-State DPS. The District Court for the Northern District of California vacated our March 31, 2020, withdrawal of the October 28, 2013, proposed listing rule, and that action serves to reinstate the proposed listing rule. We will initiate a new status review to determine whether the Bi-State DPS meets the definition of an endangered or threatened species under the Act. We request new information to inform this status review. Comments previously submitted need not be resubmitted, as they will be fully considered in preparing the final determination.

**DATES:** The comment periods are reopened on the proposed rules that published October 28, 2013 (at 78 FR 64358 and 78 FR 64328). So that we can fully consider your comments in our final determination, submit your comments on or before June 26, 2023.

**ADDRESSES:**

*Document availability:* Documents associated with the proposed rule to list the Bi-State DPS and a related proposed rule to designate critical habitat for the DPS are available on the internet at *https://www.regulations.gov* under these dockets: FWS–R8–ES–2013–0072, FWS–R8–ES–2013–0042, FWS–R8–ES–2018–0106, and FWS–R8–ES–2018–0107, as described below in **SUPPLEMENTARY INFORMATION** under *Information Requested.*

*Written comments:* The docket for this reopened comment period is FWS–R8–ES–2023–0052. You may submit written comments by one of the following methods:

(1) *Electronically:* Go to the Federal eRulemaking Portal: *https://www.regulations.gov.* In the Search box, enter FWS–R8–ES–2023–0052. Then, click on the Search button. On the resulting page, in the Search panel on the left side of the screen, under the Document Type heading, click on the Proposed Rules link to locate this document. You may submit a comment by clicking on "Comment."

(2) *By hard copy:* Submit by U.S. mail to: Public Comments Processing, Attn: FWS–R8–ES–2023–0052, U.S. Fish and Wildlife Service, MS: PRB/3W, 5275 Leesburg Pike, Falls Church, VA 22041–3803.

We request that you send comments only by the methods described above. We will post all comments on *https://www.regulations.gov.* This generally means that we will post any personal information you provide us (see *Public Comments,* below, for more information).

**FOR FURTHER INFORMATION CONTACT:**
Justin Barrett, Deputy Field Supervisor, U.S. Fish and Wildlife Service, Reno Fish and Wildlife Office, 1340 Financial Boulevard, Suite 234, Reno, NV 89502; telephone 775–861–6300; or facsimile 775–861–6301. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## Background

On October 28, 2013, we published a proposed rule to list the Bi-State DPS in California and Nevada as a threatened species under the Endangered Species Act of 1973, as amended ("Act"; 16 U.S.C. 1531 *et seq.*), with a rule under section 4(d) of the Act (78 FR 64358). We concurrently published a proposed rule to designate critical habitat for the Bi-State DPS (78 FR 64328). On April 23, 2015, we published a withdrawal of the proposed rule to list the Bi-State DPS as a threatened species, including withdrawal of the section 4(d) and proposed critical habitat rules (80 FR 22828). That decision was based on our conclusion that the threats to the Bi-State DPS as identified in the proposed listing rule were no longer as significant as believed at the time of publication of the proposed rule and that conservation plans were ameliorating threats to the species. Thus, we concluded that the Bi-State DPS did not meet the definition of a threatened or endangered species throughout all or a significant portion of its range.

On March 9, 2016, Desert Survivors, the Center for Biological Diversity, WildEarth Guardians, and Western Watershed Project filed suit in the United States District Court for the Northern District of California. The suit challenged the withdrawal of the proposal to list the Bi-State DPS. On May 5, 2018, the court issued a decision. As the result of the court order, the April 23, 2015 (80 FR 22828), withdrawal was vacated and remanded to the Service for further consideration consistent with the order, and on April 12, 2019, we reopened the comment periods on the 2013 proposed listing and critical habitat rules (84 FR 14909).

After review of the public comments received and other information, on March 31, 2020, we published another withdrawal of the proposed rule to list the Bi-State DPS as a threatened species, including withdrawal of the proposed section 4(d) and critical habitat rules (85 FR 18054). That decision was again based on our conclusion that the threats to the Bi-State DPS as identified in the 2013 proposed listing rule were no longer as significant as believed at the time of publication of the 2013 proposed rule and that conservation plans were ameliorating threats to the species. Thus, we concluded that the Bi-State DPS did not meet the definition of a threatened or endangered species throughout all or a significant portion of its range.

On September 29, 2020, Desert Survivors, the Center for Biological Diversity, WildEarth Guardians, and Western Watershed Project filed suit in the United States District Court for the Northern District of California. The suit again challenged the withdrawal of the proposal to list the Bi-State DPS. On May 16, 2022, the court issued a decision. As the result of the court order, the March 31, 2020 (85 FR 18054), withdrawal was vacated and remanded to the Service for further consideration consistent with the order.

## Current Situation

The court's action returns the rulemaking process to the proposed rule stage, and the status of the Bi-State DPS has reverted to that of a species proposed for listing for the purposes of consultation under section 7 of the Act. The court's action also reinstates the

proposed section 4(d) rule and the proposed critical habitat rule for the Bi-State DPS (78 FR 64358 and 64328; October 28, 2013). Therefore, this document notifies the public that we are reopening the comment periods on the 2013 proposed rules to list the Bi-State DPS as threatened with a section 4(d) rule and designate critical habitat. We also announce that we will be initiating an entirely new species status assessment (SSA) of the Bi-State DPS. The SSA will inform the decision of whether the Bi-State DPS meets the definition of an endangered or threatened species under the Act, or whether the species is not warranted for listing. We are targeting making a new listing determination through publication in the **Federal Register** by May 2024, which could include withdrawal, re-proposal, or a final listing status and critical habitat determination. We will accept written comments and information during this reopened comment period on our proposed rules to list the Bi-State DPS as threatened with a section 4(d) rule and designate critical habitat that were published in the **Federal Register** on October 28, 2013 (78 FR 64358 and 64328; October 28, 2013). Any listing determination we make must be made based on the best available information. To inform this status review, we request new information regarding the Bi-State DPS that has become available since the publication of the 2013 proposed rules.

*Species Information*

Please refer to the March 31, 2020, withdrawal of our proposed listing rule (85 FR 18054) and the 2020 Species Report (Service 2020, entire; available on the internet at *https://www.regulations.gov* under Docket No. FWS–R8–ES–2018–0106) for information about the Bi-State DPS taxonomy, habitat (sagebrush ecosystem), seasonal habitat selection, life-history characteristics, home range, life expectancy and survival rates, historical and current range distribution, population estimates and lek (sage-grouse breeding complex) counts, population trends, and land ownership information. Please also refer to our March 23, 2010, 12-month petition finding (75 FR 13910) for the greater sage-grouse for a detailed evaluation of the Bi-State DPS under our DPS policy, which published in the **Federal Register** on February 7, 1996 (61 FR 4722). For a detailed summary of previous open comment periods, please see our 2015 and 2020 withdrawals of the proposed listing rules (80 FR 22828, April 23, 2015; 85 FR 18054, March 31, 2020).

**Information Requested**

We will accept written comments and information during this reopened comment period on our proposed rules to list the Bi-State DPS as threatened with a section 4(d) rule and designate critical habitat that were published in the **Federal Register** on October 28, 2013 (78 FR 64358 and 78 FR 64328). We will consider information and recommendations from all interested parties. We are particularly interested in comments concerning:

(1) The Bi-State DPS's biology, range, and population trends, including:

(a) Biological or ecological requirements of the species, including habitat requirements for feeding, breeding, and sheltering;

(b) Genetics and taxonomy;

(c) Historical and current range, including distribution patterns and the locations of any additional leks or populations of this species;

(d) Historical and current population levels, and current and projected trends; and

(e) Past and ongoing conservation measures for the Bi-State DPS, its habitat, or both.

(2) Threats and conservation actions affecting the species, including:

(a) Factors that may be affecting the continued existence of the species, which may include habitat modification or destruction, overutilization, disease, predation, the inadequacy of existing regulatory mechanisms, or other natural or manmade factors.

(b) Biological, commercial trade, or other relevant data concerning any threats (or lack thereof) to this species.

(c) Existing regulations or conservation actions that may be addressing threats to this species.

(3) Additional information concerning the historical and current status of the Bi-State DPS.

(4) Information on regulations that may be necessary and advisable to provide for the conservation of the Bi-State DPS and that we can consider in developing a section 4(d) rule for the species. In particular, information concerning the extent to which we should include any of the section 9 prohibitions in the 4(d) rule or whether we should consider any additional exceptions from the prohibitions in the 4(d) rule.

(5) Whether we should add a provision to the proposed 4(d) rule that covers incidental take of the Bi-State DPS in accordance with agricultural or conservation activities consistent with the Act.

(6) Information on effectiveness of ongoing conservation measures and management actions.

(7) Information on current habitat conditions including but not limited to quality of upland and meadow or riparian sites, presence and abundance of annual invasive grasses and weeds or other increasing plants (*e.g.,* conifer trees), and recovery of previously burned sites. This information may include larger landscape-scale assessments or smaller site-specific investigations.

(8) Specific information on:

(a) The amount and distribution of habitat for the Bi-State DPS.

(b) Any additional areas occurring within the range of the species in western Nevada and eastern California that should be included in the critical habitat designation because they (i) are occupied at the time of listing and contain the physical or biological features that are essential to the conservation of the species and that may require special management considerations, or (ii) are unoccupied at the time of listing and are essential for the conservation of the species.

(c) Special management considerations or protection that may be needed in critical habitat areas we are proposing, including managing for the potential effects of climate change.

(d) To evaluate the potential to include areas not occupied at the time of listing, we particularly seek comments regarding whether occupied areas are adequate for the conservation of the species. Additionally, please provide specific information regarding whether or not unoccupied areas would, with reasonable certainty, contribute to the conservation of the species and contain at least one physical or biological feature essential to the conservation of the species. We also seek comments or information regarding whether areas not occupied at the time of listing qualify as critical habitat for the species.

(9) Land use designations and current or planned activities in the subject areas and their possible impacts on proposed critical habitat.

(10) Any probable economic, national security, or other relevant impacts of designating any area that may be included in the final designation, and the related benefits of including or excluding specific areas.

(11) Information on the extent to which the description of probable economic impacts in the draft economic analysis (available on the internet at *https://www.regulations.gov* under Docket No. FWS–R8–ES–2013–0042) is a reasonable estimate of the likely economic impacts and any additional information regarding probable

**Federal Register** / Vol. 88, No. 81 / Thursday, April 27, 2023 / Proposed Rules **25615**

economic impacts that we should consider.

(12) Whether any specific areas we are proposing for critical habitat designation should be considered for exclusion under section 4(b)(2) of the Act, and whether the benefits of potentially excluding any specific area outweigh the benefits of including that area under section 4(b)(2) of the Act. If you think we should exclude any additional areas, please provide information supporting a benefit of exclusion.

(13) Whether we could improve or modify our approach to designating critical habitat in any way to provide for greater public participation and understanding, or to better accommodate public concerns and comments.

Prior information regarding this rulemaking action may be found in these dockets on *https://www.regulations.gov:*

| Docket No. | Rulemaking actions reflected in the docket | Information available in the docket |
|---|---|---|
| FWS–R8–ES–2013–0072 ................ | • Proposed listing rule (78 FR 64358, October 28, 2013).<br>• First withdrawal of the 2013 proposed listing and critical habitat rules (80 FR 22828, April 23, 2015). | • A Hierarchical Integrated Population Model for Greater Sage-Grouse in the Bi-State Distinct Population Segment, California and Nevada, 2014.<br>• Species Status Assessment Maps by Population Management Units, January 2013.<br>• Species Status Assessment Bi-State Distinct Population Segment of Greater Sage-Grouse, 2013.<br>• Bi-State Action Plan, March 2012.<br>• Greater Sage-Grouse Conservation Objectives Team Report, February 2013.<br>• Commitment letters from Federal, State, and local partners.<br>• Policy for Evaluation of Conservation Efforts When Making Listing Decisions (PECE) Evaluation for the Bi-State Distinct Population Segment of Greater Sage-Grouse 2012 Bi-State Action Plan.<br>• Conference Report for the Natural Resources Conservation Service Sage-grouse Initiative, 2010. |
| FWS–R8–ES–2013–0042 ................ | • Proposed critical habitat rule (78 FR 64328, October 28, 2013).<br>• First withdrawal of the 2013 proposed listing and critical habitat rules (80 FR 22828, April 23, 2015). | • Draft Economic Analysis for the Bi-State DPS of Greater Sage-Grouse, 2014.<br>• References cited for proposed critical habitat designation. |
| FWS–R8–ES–2018–0106 ................ | • Reopening of the comment period on the 2013 proposed listing rule (84 FR 14909, April 12, 2019).<br>• Second withdrawal of the 2013 proposed listing and critical habitat rules (85 FR 18054, March 31, 2020). | • Species Report for the Bi-State Distinct Population Segment of Greater Sage-Grouse, January 2020.<br>• References cited in proposed rule withdrawal. |
| FWS–R8–ES–2018–0107 ................ | • Reopening of the comment period on the 2013 proposed critical habitat rule (84 FR 14909, April 12, 2019).<br>• Second withdrawal of the 2013 proposed listing and critical habitat rules (85 FR 18054, March 31, 2020). | • References cited in proposed rule withdrawal. |
| FWS–R8–ES–2023–0052 (This is the docket number for this document, and comments should be submitted to this docket.). | • Reopening of the comment periods on the 2013 proposed listing rule (78 FR 64358, October 28, 2013) and proposed critical habitat rule (78 FR 64328, October 28, 2013). | |

## Public Comments

Please do not resubmit comments or information already provided on the proposed rules (78 FR 64358 and 64328; October 28, 2013) during the initial comment periods in 2013 or any of the subsequent comment periods (in 2014, as the result of several extensions and reopenings of the comment periods, and in 2019). Any such comments are incorporated as part of the public record of this rulemaking proceeding, and we will fully consider them in the preparation of our determination. Please note that submissions merely stating support for, or opposition to, the action under consideration without providing supporting information, although noted, do not provide substantial information necessary to support a determination. Section 4(b)(1)(A) of the Act directs that determinations as to whether any species is an endangered or a threatened species must be made solely on the basis of the best scientific and commercial data available.

You may submit your comments and materials concerning the proposed rule by one of the methods listed in **ADDRESSES**. We request that you send comments only by the methods described in **ADDRESSES**.

Comments and materials we receive will be available for public inspection on *https://www.regulations.gov* at Docket No. FWS–R8–ES–2023–0052. If you submit information via *https://www.regulations.gov,* your entire comment—including any personal identifying information—will be posted on the website. If your submission is made via a hardcopy that includes personal identifying information, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so. We will post all hardcopy submissions on *https://www.regulations.gov.*

Because we will consider all comments and information we receive during the comment period, our final determinations may differ from this proposal. Based on the new information we receive (and any comments on that new information), we may conclude that the species is endangered instead of threatened, or we may conclude that the species does not warrant listing as either an endangered species or a threatened species. For critical habitat, our final designation may not include all areas proposed, may include some additional areas that meet the definition of critical habitat, or may exclude some areas if we find the benefits of exclusion outweigh the benefits of inclusion and exclusion will not result in the extinction of the species. In addition, we may change the parameters of the prohibitions or the exceptions to those prohibitions in the proposed 4(d) rule if we conclude it is appropriate in light of comments and new information received. For example, we may expand the prohibitions to include prohibiting additional activities if we conclude that those additional activities are not compatible with conservation of the species. Conversely,

we may establish additional exceptions to the prohibitions in the final rule if we conclude that the activities would facilitate or are compatible with the conservation and recovery of the species.

**Authors**

The primary author of this document is the Reno Fish and Wildlife Office in Reno, Nevada, in coordination with the Pacific Southwest Regional Office in Sacramento, California.

**Authority**

The Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) is the authority for this action.

**Wendi Weber,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2023–08848 Filed 4–26–23; 8:45 am]

**BILLING CODE 4333–15–P**

**Forest Service Handbook**
**Service Wide (WO)**
**Washington, DC**

**Forest Service Handbook 1909.15 – National Environmental Policy Act Handbook**

**Chapter 10 – Environmental Analysis**

**Amendment Number:** 1909.15-2023-1

**Effective date:** March 3, 2023

**Duration:** This amendment is effective until superseded or removed.

**Previous Directive:** 1909.15-2012-3 to chapter 10, June 25, 2012, 47 pages

**Approved by:** Jacqueline Emanuel, Associate Deputy Chief, NFS

**Date approved:** February 23, 2023

**Responsible Staff:** Ecosystem Management Coordination (EMC)

**Explanation of changes:** Following is an explanation of the changes throughout the directive by section.

**Chapter 10:** Updates to 508 compliant format.

**Section 11.44:** Establishes a new section to incorporate provisions on 36 CFR 220.4(j), Determination of NEPA Adequacy (DNA).

## Table of Contents

11 – Conduct Scoping ................................................................................................................. 4

11.1 – Organize Scoping Effort .............................................................................................. 7

11.2 – Proposed Action, Purpose and Need, and Decision Framework ............................. 7

11.21 – Purpose and Need ................................................................................................ 8

11.22 – Decision Framework ............................................................................................. 8

11.23 – Review of Existing Decisions ............................................................................... 8

11.3 – Identify Responsible Official(s) and Agencies Involved .......................................... 9

11.31 – Lead and Cooperating Agencies ......................................................................... 9

11.31a – Lead Agency ................................................................................................. 10

11.31b – Cooperating With Other Agencies ................................................................ 12

11.32 – Elimination of Duplication With State and Local Procedures ....................... 13

11.32a – Combining Documents to Eliminate Duplication ......................................... 14

11.33 – Federal Agencies With Legal Jurisdiction or Special Expertise ..................... 14

11.34 – Review of Other Agency Environmental Documents ...................................... 14

11.35 – Referrals to Council on Environmental Quality .............................................. 15

11.36 – Review of Forest Service Legislative or Service-Wide Environmental Documents ....... 16

11.4 – Determine if Existing Documents Address Proposed Action .............................. 16

11.41 – Tiering .................................................................................................................. 16

11.42 – Adoption ............................................................................................................. 17

11.43 – Incorporation by Reference ............................................................................... 18

11.44 – Determination of NEPA Adequacy (DNA) ......................................................... 18

11.5 – Look for Preliminary Issues and Identify Public Participation Needs ................ 19

11.51 – Identify Preliminary Issues ................................................................................ 19

11.52 – Identify Public Participation Needs ................................................................... 19

11.6 – Determine If Proposal Can Be Categorically Excluded From Documentation in
Environmental Impact Statement or Environmental Assessment ................................... 22

11.7 – Inform Participants and the Public of Results of Scoping and the Progress of the Analysis 24

12 – Use Interdisciplinary Analysis ...................................................................................... 24

12.1 – Project Initiation ....................................................................................................... 24

12.2 – Interdisciplinary Team Selection ............................................................................ 25

12.21 – Team Leader ....................................................................................................... 25

12.22 – Other Team Members ........................................................................................ 26

12.23 – Selection of Interdisciplinary Analyst(s) in Lieu of a Team ........................... 27

12.24 – Responsibilities When Applicants and Contractors Are Involved ................. 27

12.3 – Develop a Framework for Analysis ......................................................................... 29

12.4 – Identify Issues .......................................................................................................... 30

12.41 – Considering Issues in Preparation of Environmental Impact Statements .... 30

12.42 – Considering Issues in Preparation of Environmental Assessments ............... 31

12.5 – Measures .................................................................................................................. 31

12.6 – Documenting Public Involvement .......................................................................... 32

12.61 – Expand Public Involvement as Appropriate ..................................................... 32

13 – Collect and Interpret Data ............................................................................................ 33

**Addendum Page 99**

14 – Develop Alternatives ........................................................................................... 34
14.1 – Adaptive Management Strategy ...................................................................... 36
14.2 – No-Action Alternative .................................................................................... 38
14.3 – Alternative Documentation Options ............................................................... 39
14.4 – Alternatives Not Considered in Detail ............................................................ 39
15 – Estimate Effects of Each Alternative ................................................................... 40
15.1 – Cumulative Effects ......................................................................................... 42
15.2 – Bounding Effects ........................................................................................... 43
15.2a – Spatial Boundaries .................................................................................. 43
15.2b – Temporal Boundaries .............................................................................. 43
15.3 – Cumulative Effects Framework ...................................................................... 45
16 – Evaluate Alternatives and Identify Preferred Alternative(s) .................................. 45
17 – Determine Type of Environmental Document Needed ........................................... 46
17.1 – Other Planning and Preparation Requirements for Environmental Documents .............. 47
17.1a – Consultation Requirements ...................................................................... 47
18 – Correction, Supplementation, or Revision of Environmental Documents and Reconsideration of
Decisions to Take Action ........................................................................................... 47
18.1 – Review and Documentation of New Information Received After Decision Has Been Made
.......................................................................................................................... 47
18.2 – Reconsideration of Decisions Based on an Environmental Impact Statement.................. 48
18.3 – Reconsideration of Decisions Categorically Excluded From Environmental Documentation
.......................................................................................................................... 49
18.4 – Reconsideration of Decisions Based on Environmental Assessment and Finding of No
Significant Impact ............................................................................................... 49

This chapter is organized by the sequence of events that typically occur in the environmental analysis process, from conducting scoping (sec. 11) to using an interdisciplinary analysis (sec. 12) to developing alternatives (sec. 14) and estimating effects (sec. 15). Once the analysis is underway, the type of environmental documentation can be determined (sec. 17). After a decision is made, changes or new information may be handled as described in section 18. Exhibit 01 in section 11.6 describes the environmental analysis process.

For ease of reference, Council on Environmental Quality (CEQ) regulations for implementing requirements of the National Environmental Policy Act (NEPA) are set out in boldface type and block-indented and Forest Service regulations, that supplement the CEQ regulations are in boldface type, italicized, and block indented.

Under the National Environmental Policy Act (NEPA), the Agency conducts environmental analyses to assess the nature and importance of the physical, biological, social, and economic effects of a proposed action and its reasonable alternatives. Conclusions are reached about the significance of the effects on the human environment. These conclusions about the significance of effects determine the levels of analysis and documentation.

**Forest Service Planning Model**



**11 – Conduct Scoping**

Although the Council on Environmental Quality (CEQ) regulations require scoping only for environmental impact statement (EIS) preparation, the Forest Service has broadened the concept to apply to all proposed actions.

> *Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§220.6).*

(36 CFR 220.4(e)(1))

The process of scoping is an integral part of environmental analysis. Scoping includes refining the proposed action, determining the responsible official and lead and cooperating agencies, identifying preliminary issues, and identifying interested and affected persons. Effective scoping depends on all of the above as well as presenting a coherent proposal. The results of scoping are used to clarify public involvement methods, refine issues, select an interdisciplinary team, establish analysis criteria, and explore possible alternatives and their probable environmental effects.

The methods and degree of the scoping effort undertaken for a given project vary depending on scope and complexity of the project (see the CEQ scoping guidance).

> ***Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7. Because the nature and complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed.***

> (36 CFR 220.4(e)(2))

Selection of scoping techniques should consider appropriate methods to reach interested and affected parties. For example, a project with potential localized effects to a small community might consider posting fliers at locations where they are likely to be seen.

Part of scoping includes other requirements such as putting a notice of intent to prepare an EIS in the Federal Register (see ch. 20).

For projects subject to legal notice of proposed actions, consult an appeal or objections coordinator and applicable appeal or objections regulations for current direction and clarification (see also FSH 1509.12). Just complying with these notice requirements may not be adequate scoping.

Except where required by statute or regulations, the responsible official may adjust or combine the various steps of the process outlined in this chapter to aid in the understanding of the proposed action and identified issues.

The following direction on scoping from the CEQ regulations applies to the preparation of an EIS. The Forest Service applies the concept of scoping to all proposals without regard to whether or not the results of the analysis are to be documented in an EIS, an environmental assessment (EA), or categorically excluded (CE) from these documents.

> **There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping . . .**

(a) As part of the scoping process the lead agency shall:

    (1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under §1507.3(c). An agency may give notice in accordance with §1506.6.

    (2) Determine the scope (§1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

    (3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

    (4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

    (5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

    (6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in §1502.25.

    (7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decision making schedule.

(40 CFR 1501.7)

**11.6 – Determine If Proposal Can Be Categorically Excluded From Documentation in Environmental Impact Statement or Environmental Assessment**

After determining the nature of the proposed action, identifying preliminary issues, identifying the interested and affected agencies, organizations, individuals, and the extent of existing documentation. The responsible official should have sufficient data to determine if the proposed action can be categorically excluded from documentation in an EIS or an EA or, alternatively, to determine the type of document that should be prepared.

The significance of environmental effects of a proposed action determines whether an EIS (zero code, section 05) must be prepared. If the proposed action falls within one of the classes of actions in section 21.2 that normally require preparation of an EIS, or if preliminary analysis indicates that there may be significant effects on the environment, publish a notice of intent to prepare an EIS in the Federal Register. There might be situations where a proposed action normally requiring an EIS is not expected to have significant impacts (see 21.1 and 21.2).

If the proposed action is within one of the categories in the Department of Agriculture policies and procedures (7 CFR 1b.3) listed in section 32.11 or one of the categories established by the Chief listed in sections 32.12 or 32.2, and if the proposed action does not involve any extraordinary circumstances (sec. 31.2), the action may be categorically excluded from documentation in an EIS or EA. See chapter 30 for documentation requirements.

If the proposed action is not within a listed category, and it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA chapter 40.

An overview of the paths that NEPA documentation can take is shown in exhibit 01. Note that notice, comment and appeal provisions are not included in the exhibit.

**11.6 – Exhibit 01 – NEPA Documentation Overview**



**Forest Service Handbook**
**Service Wide (WO)**
**Washington, DC**

**Forest Service Handbook 1909.15 – National Environmental Policy Act Handbook**

**Chapter 30 – Categorical Exclusion from Documentation**

**Amendment Number:** 1909.15-2023-2

**Effective date:** March 3, 2023

**Duration:** This amendment is effective until superseded or removed.

**Previous Directive:** 1909.15-2020-1 to chapter 30, March 16, 2020, 44 pages

**Approved by:** Jacqueline Emanuel, Associate Deputy Chief, NFS

**Date approved:** February 23, 2023

**Responsible Staff:** Ecosystem Management Coordination (EMC)

**Explanation of changes:** Following is an explanation of the changes throughout the directive by section.

**Chapter 30:** Updates to 508 compliant format.

**Section 32.12:** Updates list of "Categories Established by the Chief" to incorporate categorical exclusions and modifications included in the 36 CFR 220 Final Rule on 11/19/2020 (73620 FR Vol. 85, No. 224). Removes Category 36 CFR 220.6(d)(10); this category was incorporated into 36 CFR 220.6(d)(11) when the regulations were updated. Adds 36 CFR 220.6(d)(11) and 36 CFR 220.6(d)(12).

**Section 32.2:** Changes title from "Categories of Actions for Which a Project or Case File and Decision Memo Are Required" to "Categories for Which a Project or Case File and Decision Memo Are Required" and sets forth direction.

**Section 32.2:** Updates list of "Categories for Which a Project or Case File and Decision Memo Are Required" to incorporate categorical exclusions and modifications included in the 36 CFR 220 Final Rule on 11/19/2020 (73620 FR Vol. 85, No. 224). Modifies 36 CFR 220.6(e)(3) to include the acres of National Forest System (NFS) lands. Makes clerical changes to 36 CFR 220.6(e)(10). Removes Category 36 CFR 220.6(e)(15); this category was incorporated into 36 CFR 220.6(d)(11) when the regulations were updated. Makes clarification to 36 CFR 220.6(e)(20). Adds 36 CFR 220.6(e)(21), 36 CFR 220.6(e)(22), 36 CFR 220.6(e)(23), 36 CFR 220.6(e)(24), and 36 CFR 220.6(e)(25).

**Addendum Page 106**

**Section 32.3:** Updates list of "Categories and Exceptions Established by Statute" based on current regulatory requirements. Makes clerical change to category 4 to add year category enacted. Adds categorical exclusion established in section 40806 of the Infrastructure Investment and Jobs Act of 2021 (Pub. L. 117-58).

**Section 32.3:** Makes clerical changes to 4. "Oil and Gas Leases." Incorporates and corrects relevant guidance from exhibits into the section 4 and deletes the "Energy Policy Act of 2005" exhibits. Previous exhibits included: 2011 Letter from Deputy Chief to Regional Foresters entitled "Energy Policy Action of 2005, Adjusted Use of Section 390 Categorical Exclusions for Oil and Gas due to Western Energy Alliance v. Salazar;" and, 2010 Guidance memo from the Deputy Chief entitled "Energy Policy Act of 2005, Use of Section 390 Categorical Exclusions for Oil and Gas."

**Table of Contents**

**31 – Factors to Consider** ................................................................................................ **4**
**31.1 – General** ............................................................................................................. **4**
**31.2 – Extraordinary Circumstances** ....................................................................... **4**
**31.3 – Scoping** ............................................................................................................. **5**
**32 –Categories of Actions Excluded From Documentation** ............................................ **6**
**32.1 – Categories for Which a Project or Case File and Decision Memo Are Not Required** ........... **6**
**32.11 – Categories Established by the Secretary** ..................................................... **6**
**32.12 – Categories Established by the Chief** ............................................................. **7**
**32.2 – Categories for Which a Project or Case File and Decision Memo Are Required** ................ **10**
**32.3 – Categories and Exceptions Established by Statute** ....................................... **19**
**33 – Documentation** ....................................................................................................... **41**
**33.1 – Decision Memo Not Required** ...................................................................... **41**
**33.2 – Decision Memo Required** ............................................................................. **41**
**33.3 – Format and Content of a Decision Memo** .................................................... **42**
**34 – Notice and Distribution Of Decision Memo** .......................................................... **43**

**Addendum Page 108**

The Council of Environmental Quality (CEQ) regulations provide for categorical exclusions (CEs) to implement the National Environmental Policy Act (NEPA) for the purpose of reducing delay and paperwork. CEQ regulations allow Federal agencies to exclude from documentation in an environmental assessment (EA) or environmental impact statement (EIS) categories of actions that do not individually or cumulatively have a significant effect on the human environment. Based on the Agency's experience and knowledge, the responsible official can conclude that if the action fits within an identified category and analysis shows there are no extraordinary circumstances, then the action would not have significant effects. The following guidance on appropriate use of CE must be read in conjunction with applicable sections of this handbook, specifically chapter 10.

For ease of reference, Council on Environmental Quality (CEQ) regulations for implementing requirements of the NEPA are set out in boldface type and block-indented and Forest Service regulations, that supplement the CEQ regulations, are in boldface type and italicized and block-indented.

**31 – Factors to Consider**

**31.1 – General**

> *A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:*
>
> > *(1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or*
> > *(2) The proposed action is within a category listed in sections 220.6 (d) and (e).*

(36 CFR 220.6(a))

**31.2 – Extraordinary Circumstances**

> *Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:*
>
> > *(1) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;*
> > *(2) Flood plains, wetlands, or municipal watersheds;*
> > *(3) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;*
> > *(4) Inventoried roadless areas or potential wilderness areas;*

(5) *Research natural areas;*

(6) *American Indians and Alaska Native religious or cultural sites, and*

(7) *Archaeological sites, or historic properties or areas.*

*The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determine whether extraordinary circumstances exist.*

(36 CFR 220.6(b))

In considering extraordinary circumstances, the responsible official should determine whether or not any of the listed resources are present, and if so, the degree of the potential effects on the listed resources. If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion.

## 31.3 – Scoping

*If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA. If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.*

(36 CFR 220.6(c))

Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded (section 11). Scoping is important to discover information that could point to the need for an EA or EIS versus a CE. Scoping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects. Scoping complexity should be commensurate with project complexity.

The flow chart at section 11.6, exhibit 01, shows how scoping can be applied in the CE process to help determine at an early point whether the use of a CE is appropriate.

FSM 2800 - MINERALS AND GEOLOGY
WO AMENDMENT 2800-90-1
EFFECTIVE 6/1/90

CHAPTER 2840 - RECLAMATION

Contents

2840.1     Authority
2840.2     Objectives
2840.3     Policy
2840.4     Responsibility
2840.5     Definitions

2841       RECLAMATION COMPONENTS FOR PLANS OF OPERATIONS

2842       RECLAMATION PERFORMANCE STANDARDS

2843       RECLAMATION BONDING

2844       RECLAMATION MONITORING

2845       RECLAMATION INFORMATION AND TECHNOLOGY TRANSFER

2846       COOPERATIVE AGREEMENTS

2840.1 - Authority.  Laws and regulations cited in FSM 2801 provide surface management and mineral management authorities.  The following regulations give Forest Officers specific authorities for reclamation:

　　1.  Title 36, Code of Federal Regulations, Part 228, Subpart A, Section 228.8 - Requirements for environmental protection.  These regulations set forth the rules and provisions to minimize adverse environmental impacts on surface resources resulting from locatable mineral activities.

　　2.  Title 36, Code of Federal Regulations, Part 228, Subpart C, Section 228.47 - General terms and conditions of contracts and permits.  These regulations set forth the requirements for reclamation and other provisions on areas disturbed by pit and quarry operations.

Other authorities for mineral management and reclamation are granted to and held by the Department of the Interior.  These authorities represent the context within which Forest Service authorities must be carried out.  Forest Officers must be familiar with or comply with certain provisions of these rules:

　　1.  Title 30, Code of Federal Regulations, Part 700-999 - Office of Surface Mining Reclamation and Enforcement.  These regulations set forth the rules and procedures for the administration of the coal program.

　　2.  Title 43, Code of Federal Regulations, Part 3100 - Oil and gas leasing.  These regulations set forth rules and provisions for onshore oil and gas leasing.

　　3.  Title 43, Code of Federal Regulations, Part 3200 - Geothermal resource leasing.  These regulations establish requirements for developing and utilizing geothermal resources.

　　4.  Title 43, Code of Federal Regulations, Part 3400 - Coal management.  These regulations set forth rules and provisions governing management and disposal of coal.

　　5.  Title 43, Code of Federal Regulations, Part 3500 - Leasing of non-fuel, solid leasable minerals.  These regulations provide for solid leasable mineral activities other than coal and oil shale.

2840.2 - Objectives.  The Forest Service manages the reclamation of lands disturbed by mineral and associated activities in order to:

　　1.  Minimize the environmental impacts resulting from such activities.

　　2.  Ensure that disturbed lands are returned to a use that is consistent with long-term forest land and resource management plans.

2840.3 - Policy

　　1.  Reclamation shall be an integral part of Plans of Operation that propose surface disturbance.

2.  All lands disturbed by mineral activities shall be reclaimed to a condition that is consistent with forest land and resource management plans, including applicable State air and water quality requirements.

3.  All reclamation requirements included in a Plan of Operations shall include measurable performance standards.  Reclamation requirements shall be those reasonable, practicable, and necessary to attain standards.

4.  Reclamation shall be undertaken in a timely fashion and occur sequentially with on-going mineral activities.

5.  Reclamation bonds, sureties, or other financial guarantees shall ordinarily be required for all mineral activities that require a Plan of Operations; dollar amounts of such guarantees shall be sufficient enough to cover the full cost of reclamation.

6.  To the extent practicable, reclaimed National Forest System land shall be free of long-term maintenance requirements.

2840.4 - Responsibility

1.  Forest Supervisors are responsible for approving Plans of Operation.

2.  Regional Foresters are responsible for developing measurable performance standards for common reclamation practices.

3.  Regional Foresters, Station Directors, and the Area Director are responsible for initiating, documenting, and executing internal agreements to cover the transfer of new technical information and facilitate training.

4.  Regional Foresters are responsible for initiating, documenting, and executing cooperative agreements with other state or Federal agencies that have significant regulatory roles on National Forest System land in order to define the roles of each agency (FSM 2846).

2840.5 - Definitions

1.  Mineral Activities.  Any aspect of mineral exploration, development, or production.

2.  Reclamation.  Those actions performed during or after mineral activities to shape, stabilize, revegetate, or otherwise treat the affected lands in order to achieve a safe and ecologically stable condition and land use that is consistent with long-term forest land and resource management plans and local environmental conditions.

3.  Plan of Operations.  A written description of planned, on-the-ground mineral activities, including reclamation, to be conducted by the mineral operator for either locatable, leasable, or common variety minerals.

4. <u>Topsoil</u>.  Those soil materials useful for the establishment, growth, and perpetuation of vegetal cover on disturbed areas.  Such soil materials provide mechanical support for plant root systems and plant nutrients for  establishment and growth; useful soil materials may include selected subsoils.

5. <u>Performance Standard</u>.  The expected site conditions to be achieved upon completion of reclamation activities.

6. <u>Multiple Bonding</u>.  Having more than one bond, surety or other financial guarantee for reclamation on any one mineral operation.

7. <u>Excess Bonding</u>.  Where the total amount of bonds, sureties or other financial guarantees exceeds the cost of reclamation.

8. <u>Interim Shutdown</u>.  The cessation of mineral activities by the operator prior to the expected time described in the Plan of Operations.

9. <u>Disturbed Area</u>.  The surface lands disturbed by mineral or associated activities.

<u>2841</u> - <u>RECLAMATION COMPONENTS FOR PLANS OF OPERATIONS</u>.  Forest Supervisors shall ensure the following administrative and environmental components are adequately addressed in each Plan of Operations when applicable:

1. <u>Administrative Components</u>.

a.  Timing, kind, and amount of reclamation to be accomplished concurrently with mineral activities.

b.  Reclamation requirements for interim shutdown, including seasonal shutdown.

c.  The maximum allowable time in the event of interim shutdown before final reclamation measures will be required.

d.  Concurrent and final reclamation of transportation facilities, such as roads, railways, tramways, power line corridors, and pipelines.

e.  Removal of facilities and reclamation of the site.

f.  Timeframes for periodic review and updating of the Plan of Operations, including reclamation performance requirements and financial guarantees.

g.  Procedures for ensuring interim and final stability of waste embankments, including dumps, tailings dams, or impoundments.

2. <u>Environmental Components</u>.

a.  Final configuration of the disturbed areas, including such items as roads, pits, waste embankments, ponds, leach pads, drill holes, and facility sites.

b.  Revegetation of disturbed areas, including timing, kind, and amount.

c.  Topsoil management, including soil salvage and reapplication (FSM 2550 and FSH 2509.15).

d.  Air quality management during and after operations (FSM 2580 and FSH 2509.19).

e.  Watershed management, including runoff and erosion control, and riparian and wetland protection (FSM 2520 and FSH 2509.15).

f.  Water quality management, including physical and chemical characteristics of surface and subsurface water during and after operations (FSM 2530 and FSH 2509.15).

g.  Visual resource management during and after operations (FSM 2380 and FSH 2309.22).

h.  Potential for the occurrence and control of hazardous or toxic substances, including acid mine drainage, that may contaminate air, water or soil.

i.  Fish and wildlife habitat reclamation or mitigation (FSM 2630 and FSH 2609.11).

j.  Tailings and associated tailings facilities.

k.  Stream diversions, reservoirs, ditches, or canals.

2842 - RECLAMATION PERFORMANCE STANDARDS.  In addition to a consideration of appropriate reclamation components (FSM 2841), a Plan of Operation shall include measurable performance standards for all reclamation requirements in the plan.  Develop performance standards for at least the following.

1.  Revegetation.

2.  Soil and water conservation measures.

3.  Mass stability of overburden or other waste embankments.

4.  Concurrent reclamation.

5.  Post-mining land configuration.

Regions or Forests should develop Region-wide or Forest-wide reclamation performance standards for common reclamation practices.

Use performance standards in determining the amount of the reclamation bond, surety, or other financial guarantee and as criteria for release of these instruments.

2843 - RECLAMATION BONDING.  Tie dollar amounts of bonds or other financial guarantees to specific reclamation activities or standards to facilitate full or partial release of the instruments.

Release bonds or other guarantees as satisfactory reclamation is performed and completed, and the area stabilized.

Avoid multiple or excessive bonding.  See FSM 2846 for direction on bonding when other agencies with bonding authority are involved in the administration of mineral activities on National Forest System lands.

2844 - <u>RECLAMATION MONITORING</u>.  Regional Foresters and Forest Supervisors shall determine those sites that need monitoring to assess the condition and environmental quality of reclaimed sites following release of bonds or other financial guarantees.  Base monitoring priorities on the degree of risk to human health and safety or on long-term environmental effects.

Reclaimed sites or structures that might require monitoring include, but are not limited to, revegetated areas, large waste embankments, tailing dams and impoundments, french-drains, stream diversions, dam structures on permanent water impoundments, and water treatment facilities.

2845 - <u>RECLAMATION INFORMATION AND TECHNOLOGY TRANSFER</u>.  To ensure that the role of the Regions, Stations, and Area in providing reclamation assistance or technology transfer to field units is clear, Regions, Stations, and the Area should develop Memorandums of Understanding among themselves that define the roles of each in the technology transfer process.  The Memorandums should spell out such responsibilities as technical assistance, reclamation training, field contacts, and expenditures.  In devising Memorandums of Understanding look for opportunities for cost savings and improved service to field units (FSM 1320).

2846 - <u>COOPERATIVE AGREEMENTS</u>.  Where more than one agency, Federal and/or State, has jurisdiction over a mineral operation, the role of each agency should be defined in a cooperative agreement.  The cooperative agreement becomes a primary basis for avoiding multiple and excessive bonding and eliminating conflicting reclamation requirements.