No. 23-15492

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

FRIENDS OF THE INYO, a non-profit organization; WESTERN WATERSHEDS
PROJECT, a non-profit organization; CENTER FOR BIOLOGICAL DIVERSITY,
a non-profit organization; and THE SIERRA CLUB, a non-profit organization,
*Plaintiffs/Appellants,*
v.

U.S. FOREST SERVICE; and LEEANN MURPHY, in her official capacity as acting
mammoth district ranger,
*Federal Defendants/Appellees,*

*and*

KORE MINING LIMITED,
*Defendant-Intervenor/Appellee-Intervenor.*

———————————————

Appeal from the United States District Court for the Eastern District of California
No. 2:21-cv-01955 (Hon. Kimberly J. Mueller, Chief U.S. District Judge)

———————————————

**FEDERAL DEFENDANTS-APPELLEES' ANSWERING BRIEF**

———————————————

<div style="margin-left:50%">

TODD KIM
*Assistant Attorney General*

ROBERT P. STOCKMAN
TYLER M. ALEXANDER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
tyler.alexander@usdoj.gov

</div>

Of Counsel:

JAMIE ROSEN
*Attorney*
*U.S. Department of Agriculture*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUES.............................................................................3

STATEMENT OF THE CASE ...............................................................................4

      A.     Statutory and Regulatory Background ...............................................4

           1.     The General Mining Law .......................................................4

           2.     The National Environmental Policy Act (NEPA) ...............5

      B.     Factual Background .........................................................................8

           1.     The Long Valley Exploration Drilling Project .....................8

           2.     Design Features that Protect Sage-grouse...........................11

           3.     Groundwater Resources and Dependent Wildlife .............13

           4.     Environmental Review and Public Participation.................14

      C.     District Court Proceedings ..............................................................15

SUMMARY OF ARGUMENT................................................................................17

STANDARD OF REVIEW .....................................................................................18

ARGUMENT .........................................................................................................20

     I.     The Forest Service reasonably found that the Project falls within CEs 6 and 8...........................................................................20

     II.     The Forest Service reviewed the resource conditions listed at 36 C.F.R. § 220.6(b)(1) and found no extraordinary circumstances..............33

      A.     The Forest Service may rely on a categorical exclusion where the agency concludes that impacts on a resource condition are not significant...................................................................34

B. The Forest Service examined the Project's effects on sage-grouse and reasonably found none were significant......................38

C. The Forest Service considered the Project's potential to affect groundwater and reasonably concluded that the Project would not degrade groundwater quality or quantity.........45

III. The Forest Service's extraordinary circumstances review appropriately does not require a "Cumulative Impacts Analysis."..........48

IV. Outyear revegetation monitoring does not require a Special Use Permit............................................................................................53

V. If the Court finds an error, the Court should remand to the District Court to consider remedy in the first instance............................................54

CONCLUSION ............................................................................................55

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alaska Ctr. for the Env't v. United States Forest Serv.*,
  189 F.3d 851 (9th Cir. 1999) .............................................................. 18, 30, 31, 33, 42, 47

*Allied-Signal, Inc. v. United States Nuclear Regulatroy Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................................54

*Am. Wild Horse Campaign v. Bernhardt*,
  963 F.3d 1001 (9th Cir. 2020) ..................................................................................40

*Balt. Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ............................................................................... 5, 19, 37, 41

*Bicycle Trails Council v. Babbitt*,
  82 F.3d 1445 (9th Cir. 1996) ..................................................................................20

*Cal. Cmtys. Against Toxics v. United States EPA*,
  688 F.3d 989 (9th Cir. 2012) .............................................................................. 54, 55

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,
  885 F.3d 560 (9th Cir. 2018) ..................................................................................19

*California v. Norton*,
  311 F.3d 1162 (9th Cir. 2002) ...................................................................................7

*Cnty. of Del Norte v. United States*,
  732 F.2d 1462 (9th Cir. 1984) ..................................................................................29

*Conservation Cong. v. United States Forest Serv.*,
  No. 2:12–02416 WBS KJN, 2013 WL 2457481 (E.D. Cal. June 6, 2013)........... 36, 49

*Conservation Cong. v. United States Forest Serv.*,
  No. 2:12-02416 WBS KJN, 2016 WL 1162676 (E.D. Cal. Mar. 24, 2016) ......... 36, 41

*Ctr. for Biological Diversity v. Ilano*,
  261 F. Supp. 3d 1063 (E.D. Cal. 2017) .............................................................. 40, 43

*Ctr. for Biological Diversity v. Illano*,
  928 F.3d 774 (9th Cir. 2019) ......................................................... 16, 34, 35, 36, 41, 43

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) ..................................................................................40

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................................................... 2, 6, 49, 50, 52

*Earth Island Inst. v. Elliott*,
290 F. Supp. 3d 1102 (E.D. Cal. 2017) ............................................................ 20

*Earth Island Inst. v. Elliott*,
318 F. Supp. 3d 1155 (E.D. Cal. 2017) .......................................... 20, 24, 32

*Envt Prot. Info. Ctr. v. United States Forest Serv.*,
451 F.3d 1005 (9th Cir. 2006) ......................................................................... 35

*Friends of Endangered Species, Inc. v. Jantzen*,
760 F.2d 976 (9th Cir. 1985) ........................................................................... 37

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ................................................................... 30, 50

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) .......................................................................................... 27

*Guatay Christian Fellowship v. Cnty. of San Diego*,
670 F.3d 957 (9th Cir. 2011) ........................................................................... 19

*Hells Canyon Preservation Council v. Connaughton*,
No. 3:11-cv-00023-PK, 2013 WL 665134 (D. Or. Feb. 22, 2013) .............. 52

*Idaho Wool Growers Ass'n v. Vilsack*,
816 F.3d 1095 (9th Cir. 2016) ......................................................................... 29

*In Def. of Animals v. United States DOI*,
751 F.3d 1054 (9th Cir. 2014) ......................................................................... 48

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) .......................................................................................... 19

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) ......................................................................... 31

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........................................................................... 32

*Lands Council v. Packard*,
No. CV05-210-N-EJL, 2005 WL 1353899 (D. Idaho June 3, 2005) .................. 30, 36

*Los Padres ForestWatch v. United States Forest Serv.*,
25 F.4th 649 (9th Cir. 2022) ............................................................................ 22

iv

*Los Padres Forestwatch v. United States Forest Serv.*,
    776 F. Supp. 2d 1042 (N.D. Cal. 2011) ................................................................31

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ..........................................................................19, 37, 41

*Montana v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022) ............................................................................55

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................19

*Mt. Cmtys. for Fire Safety v. Elliott*,
    25 F.4th 667 (9th Cir. 2022) ................ 17, 20, 23, 24, 25, 26, 28, 32, 33, 48, 49, 51, 52

*Nat'l Tr. for Historic Pres. v. Dole*,
    828 F.2d 776 (D.C. Cir. 1987) ............................................................................42

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) ..............................................................................37

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ............................................................................38

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    957 F.3d 1024 (9th Cir. 2020) ............................................................................18

*Pit River Tribe v. U.S. Forest Serv.*,
    615 F.3d 1069 (9th Cir. 2010) ............................................................................55

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................................................5

*Safari Club Int'l v. Haaland*,
    31 F.4th 1157 (9th Cir. 2022) ............................................................ 10, 20, 39, 41

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ..........................................................10, 37, 41

*Schott v. Comm'r of Internal Rev.*,
    319 F.3d 1203 (9th Cir. 2003) ............................................................................21

*Siera Club v. U.S. Forest Serv.*,
    828 F.3d 402 (6th Cir. 2016) ..............................................................................49

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ............................................................................37

*Tucson Herpetological Soc. v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) ................................................................29

*United States v. Alpine Land & Reservoir Co.*,
    887 F.2d 207 (9th Cir. 1989) ..............................................................38

*United States v. Backlund*,
    689 F.3d 986 (9th Cir. 2012) ..................................................................4

*United States v. Fifty–Three (53) Eclectus Parrots*,
    685 F.2d 1131 (9th Cir. 1982) ...............................................................51

*Uranium Watch v. U.S. Forest Serv.*,
    No. 2:10CV721DAK, 2010 WL 3703807 (D. Utah Sept. 4, 2010) ............20

*Utah Env't Cong. v. Bosworth*,
    443 F.3d 732 (10th Cir. 2006) ...............................................41, 50, 52

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .......................................................................5, 32

*W. Radio Servs. Co. v. Espy*,
    79 F.3d 896 (9th Cir. 1996) ..................................................................51

*Weinberger v. Cath. Action of Haw./Peace Educ. Project*,
    454 U.S. 139 (1981) ...............................................................................5

*West v. Sec'y of Dep't of Transp.*,
    206 F.3d 920 (9th Cir. 2000) ..................................................................6

*Wilderness Soc'y v. Dombeck*,
    168 F.3d 367 (9th Cir. 1999) ..................................................................4

*Wilderness Soc'y v. U.S. Forest Serv.*,
    630 F.3d 1173 (9th Cir. 2011) ...............................................................31

*Wildlands Def. v. Bolling*,
    No. 4:19-CV-00245-CWD, 2020 WL 5042770 (D. Idaho Aug. 25, 2020) ................40

*Wong v. Bush*,
    542 F.3d 732 (9th Cir. 2008) ................................................................50

**Statutes**

1 U.S.C. § 1 ...........................................................................................21

5 U.S.C. § 706 ................................................................................29, 54

5 U.S.C. § 706(2) ....................................................................................3

5 U.S.C. § 706(2)(A) ........................................................................19

16 U.S.C. § 551 ...............................................................................4

28 U.S.C. § 1291 .............................................................................3

28 U.S.C. § 1331 .............................................................................3

30 U.S.C. § 612(b) ..........................................................................4

Pub. L. No. 118-5, 137 Stat. 10 (2023) ..........................................5

**Rules**

Fed. R. App. P. 29(a)(5) ..................................................................1

Fed. R. App. P. 32(a)(5) ..................................................................1

Fed. R. App. P. 32(f) .......................................................................1

**Regulations**

36 C.F.R. § 220 ...............................................................................7

36 C.F.R. § 220.4(a) ........................................................................5

36 C.F.R. § 220.4(e)(1) ...................................................................30

36 C.F.R. § 220.4(e)(2) ...................................................................31

36 C.F.R. § 220.6 ...............................................................7, 20, 51

36 C.F.R. § 220.6(a) ...............................................................7, 20

36 C.F.R. § 220.6(b) .............................................................7, 18, 50

36 C.F.R. § 220.6(b)(1) ...................................................................33

36 C.F.R. § 220.6(b)(2) ...........................................................33, 35

36 C.F.R. § 220.6(c) ........................................................................30

36 C.F.R. § 220.6(d)-(e) .........................................................21, 24

36 C.F.R. § 220.6(e) .................................................14, 21, 24, 49

36 C.F.R. § 220.6(e)(6) ...........................................................14, 17, 24

36 C.F.R. § 220.6(e)(6) ....................................................................1

36 C.F.R. § 220.6(e)(8) .............................................1, 17, 22, 23

36 C.F.R. § 220.6(e)(8) (CE-8) .....................................................14

36 C.F.R. § 220.6(e)(8),(6) ........................................................................8

36 C.F.R. § 228 ................................................................................. 4, 18

36 C.F.R. § 228.8 1-ER-27-28 ...................................................... 17, 53

36 C.F.R. § 228.8(e) ..........................................................................53

36 C.F.R. § 251 ...................................................................................4

36 C.F.R. § 251.50(a) ..................................................................... 2, 54

40 C.F.R. § 1500.1(a) .........................................................................29

40 C.F.R. § 1500.3 ...............................................................................5

40 C.F.R. § 1500.4(a) ...........................................................................6

40 C.F.R. § 1501.3 ............................................................................ 5, 6

40 C.F.R. § 1501.4(a) ...........................................................................6

40 C.F.R. § 1501.4(b) ...........................................................................7

40 C.F.R. § 1501.9 .............................................................................31

40 C.F.R. § 1506.13 ........................................................................ 5, 48

40 C.F.R. § 1507.3(e) ...........................................................................7

40 C.F.R. § 1508.27 (2019) .........................................................16, 48, 51

40 C.F.R. § 1508.27(b)(7) (2019) .......................................................48

40 C.F.R. § 1508.4 (2019) ................................................................ 6, 49

40 C.F.R. § 1508.4 (2019) ...................................................................22

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) ...................................................5

48 Fed. Reg. 34,263 (July 28, 1983) ....................................................6

51 Fed. Reg. 15,618 (Apr. 25, 1986) ....................................................5

75 Fed. Reg. 75628 (Dec. 6, 2010) .....................................................30

87 Fed. Reg. 25,453 (May 20, 2022) ....................................................5

## INTRODUCTION

As approved, the Long Valley Exploration Drilling Project—which will directly disturb less than 1 acre of land—allows KORE Mining Ltd. to exercise its statutorily-conferred right to develop its mining claims while minimizing attendant environmental impacts. The record shows that the Forest Service appropriately considered the environmental effects of KORE's proposed Plan of Operations before approving the Project and also complied with regulations implementing the Forest Service Organic Act. This Court should affirm the District Court's grant of summary judgment for the Forest Service.

Under the General Mining Law, claimants like KORE have a right to locate and develop mineral resources on the public lands at issue on the Inyo National Forest. The Forest Service, in turn, has authority to minimize adverse environmental impacts. Before approval, the Forest Service reviewed the Project under the National Environmental Policy Act (NEPA). The Forest Service found that the Project's mineral investigation, incidental support activities, and immediate reclamation fit within the agency's regulatory categorical exclusion for short-term mineral investigations, which generally obviates the need for preparation of a longer analysis. 36 C.F.R. § 220.6(e)(8) (2021). The Forest Service also found that the Project's post-exploration monitoring and revegetation activities fit within the Forest Service's categorical exclusion for wildlife habitat improvement projects. *Id.* § 220.6(e)(6). After considering potential impacts to various resources, including sage-grouse,

1

groundwater, and the Owens tui chub, the Service concluded—and the district court agreed—that the Project did not present any extraordinary circumstances precluding reliance on the categorical exclusions. Indeed, sage-grouse and other wildlife would benefit from the Project's post exploration monitoring and revegetation work.

Contrary to Plaintiffs' argument, NEPA did not require the Forest Service to consider "cumulative effects" for the categorically excluded activities. In *Center for Biological Diversity v. Salazar*, this Court explained that the requirement to consider "'connected actions,' and 'indirect' and 'cumulative' environmental 'impacts' . . . . applies only to environmental impact statements," and not to categorical exclusions. 706 F.3d 1085, 1096-97 (9th Cir. 2013). Nor is a special use permit required for a Project authorized under the Forest Service's mineral regulations because the regulation governing special uses explicitly excepts projects authorized under the mining regulations. *See* 36 C.F.R. § 251.50(a) ("All uses of National Forest System lands, improvements, and resources, *except those authorized by the regulations governing . . . minerals (part 228)* are designated 'special uses.'" (emphasis added)).

For these reasons, this Court should affirm the District Court's decision rejecting plaintiffs' arguments. Should this Court instead reverse on any ground, the proper course would be to remand to the District Court for further proceedings on remedy.

2

## STATEMENT OF JURISDICTION

(a)     Plaintiffs challenge final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). The district court had subject-matter jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction).

(b)     The district court's judgment was final because it disposed of all claims against all defendants. *See* 1-ER-4-28; *see also* 1-ER-3 (Judgment). This Court has subject-matter jurisdiction to review that order under 28 U.S.C. § 1291.

(c)     The district court issued its decision on March 9, 2023. 1-ER-4-28. Plaintiffs filed their notice of appeal on March 28, 2023. 1-SER-2-3. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Was the Forest Service's reliance on two categorical exclusions to approve this Project authorizing mineral investigation and habitat improvement arbitrary and capricious under the APA when the activities authorized fall within the plain language of the exclusions?

2.     Were the Forest Service's conclusions that the Project's limited effects on sage-grouse and groundwater resources did not present extraordinary circumstances arbitrary and capricious under the APA?

3.     Does NEPA require the Forest Service to consider alleged cumulative effects of other activities when authorizing a project under categorical exclusions?

3

4.     Do either the Forest Service Organic Act or the Forest Service's special use regulations at 36 C.F.R. Part 251 require a Special Use Permit for a Project authorized under the Forest Service's mineral regulations, 36 C.F.R. Part 228?

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

#### 1.     The General Mining Law

Under the General Mining Law, mining claimants—like KORE—have a right to locate and develop mineral resources on those public lands open to mineral exploration. *See United States v. Backlund*, 689 F.3d 986, 991-92 (9th Cir. 2012) (discussing the Mining Law of 1872, the Multiple Use Act of 1955, and the Organic Administration Act of 1897). National Forests are open to the location of claims under the General Mining Law. *Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 374 (9th Cir. 1999). The Forest Service Organic Act reserves to the Forest Service the right to regulate mining on the National Forests, 16 U.S.C. § 551, but not to "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(b).

The Forest Service regulates mineral exploration on National Forest System lands under its mineral regulations codified at 36 C.F.R. Part 228. The regulations preserve the Forest Service's right to "minimize adverse environmental impacts on National Forest System surface resources." *Id.* § 228.1 (2021); *see also id.* § 228.8 (setting forth requirements for environmental protection). Before exploring or

4

mining, claimants must submit their plans of operation for Forest Service review and approval, *id.* §§ 228.4-228.5, including NEPA review. *See* 36 C.F.R. § 220.4(a) (describing proposed actions subject to Forest Service NEPA review).

## 2. The National Environmental Policy Act (NEPA)

NEPA is a procedural statute that ensures agencies consider their proposed actions' environmental consequences and inform the public about their decision making. *Balt. Gas & Elec. Co.*, 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)); *Weinberger v. Cath. Action of Haw./Peace Educ. Project*, 454 U.S. 139, 143 (1981)).

Federal agencies generally follow the Council on Environmental Quality's (CEQ) NEPA-implementing regulations.[1] 40 C.F.R. § 1500.3; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989). Under CEQ's regulations, NEPA compliance may take three forms. 40 C.F.R. § 1501.3. First, if a project "[i]s likely to have significant effects," the agency must prepare an Environmental Impact

---

[1] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). Then, the Council published a new rule, effective September 14, 2020, 40 C.F.R. § 1506.13, which was amended in May 2022. *See* 87 Fed. Reg. 25,453 (May 20, 2022). Unless otherwise noted, all citations in this brief are to CEQ's NEPA regulations in effect as of January 2, 2021, when the Forest Service put the Project on its Schedule of Proposed Actions. NEPA was also recently amended by the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023), but this brief addresses the agency's compliance with the statute as it existed at the time the agency took the challenged actions.

Statement (EIS). *Id.* § 1501.3(a)(3). Second, if an action's significance is uncertain, the agency may prepare an Environmental Assessment (EA), *see id.* §§ 1501.3(a)(2), 1501.5, before deciding to either prepare an EIS or issue a finding of no significant impact. *See id.* § 1501.6. Third, the agency need not prepare an EA or an EIS where the proposed action falls within a "categorical exclusion" or "CE." *See id.* § 1501.4; *see also West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 926-27 (9th Cir. 2000) (describing NEPA requirements).

The previous NEPA regulations defined CEs as "categor[ies] of actions which do not *individually or cumulatively* have a significant effect on the human environment, and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. § 1508.4 (2019) (emphasis added). CEQ's current NEPA regulations—under which the Project was analyzed—define CEs as "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a) (2021). CEs allow agencies to focus their environmental review efforts on major actions that may significantly affect the environment, NEPA's primary aim. *See* 48 Fed. Reg. 34, 263, 34,263-66 (July 28, 1983); *see also* 40 C.F.R. § 1500.4(a) (noting that CEs can reduce excessive paperwork). "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Salazar*, 706 F.3d at

1085. CEs are thus essential to the NEPA framework, and so required by CEQ's regulations. *See* 40 C.F.R. § 1507.3(e) (stating that agency NEPA procedures "*shall include* . . . [s]pecific criteria for and identification of those typical classes of action . . . [w]hich normally do not require either an [EIS] or an [EA] and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4 of this chapter))" (emphasis added)).[2]

The Forest Service's NEPA regulations are at 36 C.F.R. Part 220 and the Forest Service has codified CEs at 36 C.F.R. § 220.6. For the activities listed in subsections (d) and (e), the Forest Service may rely one or more CEs to achieve NEPA compliance. But the Forest Service may not rely on its CEs if there are "extraordinary circumstances in which [the] normally excluded action may have a significant effect." 40 C.F.R. § 1501.4(b); *accord* 36 C.F.R. § 220.6(a). So before relying on a CE, the Forest Service must find that extraordinary circumstances are not present. *See California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). The resource conditions that the Forest Service considers when deciding whether extraordinary circumstances exist are listed at 36 C.F.R. § 220.6(b). The Forest Service relied on two CEs here. Subject to codified limitations, CE-8 covers "mineral, energy, or

---

[2] The recent NEPA amendments expressly excuse the agency's obligation to prepare an EA or EIS where "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." 137 Stat. at 38-46.

geophysical investigations" and CE-6 covers "wildlife habitat improvement activities." 36 C.F.R. § 220.6(e)(8), (6).

### B.    Factual Background

#### 1.    The Long Valley Exploration Drilling Project

The Long Valley Exploration Drilling Project is a mineral exploration project on National Forest System land on the Inyo National Forest in Mono County, California. 2-ER-90. The Project allows Defendant-Intervenor KORE Mining Ltd. access "to evaluate the mineral potential within a claim block controlled by KORE on a portion of a claim area that includes 95 contiguous unpatented mineral claims on 1,848 acres." 2-ER-111. The Project's final design satisfies the Forest Service's various statutory duties by allowing KORE to develop its claims while protecting—and later enhancing—wildlife habitat in the Project area.

The approved Plan of Operations, 2-ER-108-49, allows limited mineral exploration and support activities on twelve temporary drill pads within the Project area, for one year or less. 2-ER-90. Each temporary drill pad will measure 53 feet by 30 feet, and each will allow for up to three core borings. 2-ER-91. The Project will largely use the existing public road network, 2-ER-91, with up to 0.32 miles of temporary access roads. 2-ER-91. In total, the Project will disturb about 0.82 acres across a total Project area about 193 acres in size, about 0.4% of the area. 2-ER-91.[3]

---

[3] Plaintiffs err in calculating the Project Area as over 1800 acres in size. Pls.' Br. 7-8. While the total claim block is over 1800 acres, the map in the plan of operations

This map shows the Project area, with drill pad sites co-located with the existing road network:



2-ER-102.

The Project largely overlaps with previous exploration. 2-ER-104; 2-ER-117-18. "The baseline conditions of the site consist of numerous, previously disturbed constructed roads and drill pads which are evident in aerial photos as a grid pattern." 2-ER-113. Photographs in the record show the Project area, including evidence of

confirms the Project area is substantially smaller. *See also* 2-ER-116 (showing the Project area boundary relative to the claim blocks). If the Court uses Plaintiffs' figure, then the total area disturbed by the Project represents just 0.04% of the Project area.

past disturbance. 2-SER-419-26.[4] During exploration, KORE will follow best management practices, including implementing mitigations to protect wildlife, as described below. 2-ER-91. Upon completion, drill pads and temporary access roads will be reclaimed and graded to the original landforms and sown with native seed mix. 2-ER-91; 2-ER-135.

During phase one of the Project, KORE will complete all mineral exploration and initial site reclamation. "All activities incidental to mining, including drilling, grading, and installation of erosion control features, will be completed within one year of the beginning of operations." 2-ER-91-93. KORE will complete exploration activities within 170 days after operations begin, 2-ER-91, and all activities other than wildlife habitat improvement within twelve straight months. 2-ER-90; 2-ER-92; 2-ER-98. "At the end of the one-year period, all equipment will have been removed from the site and all activities in support of exploration will be complete." 2-ER-91-92. The Project calls for mineral investigation only; it does not authorize mineral extraction.

---

[4] The photograph Plaintiffs include in their brief, Pls.' Br. 9, is outside the Administrative Record for this case and should not be considered. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) ("In general, a court reviewing agency action under the APA must limit its review to the administrative record."). Plaintiffs never sought to supplement the Administrative Record with the photograph in the District Court. *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1177-78 (9th Cir. 2022) (describing "limited circumstances" under which courts consider extra-record evidence). Because the photograph lacks GPS coordinates, the Forest Service cannot determine whether it is taken within the Project area.

Additional regulatory requirements—including preparing a separate NEPA analysis—must be met before any mining can occur. 2-ER-90; 2-ER-98.

During phase two of the project, and for up to three years after the drilling and initial reclamation, a qualified biologist will monitor the Project area to ensure revegetation succeeds. 2-ER-91. The biologist may require more seeding, weeding, or fence maintenance to protect seedlings, as necessary. 2-ER-92-95; 2-ER-126.

### 2.    Design Features that Protect Sage-grouse

The bi-state population of greater sage-grouse use the Project area. 2-ER-162. Sage-grouse are famous for their distinctive appearance and elaborate mating rituals, performed on communal breeding grounds called "leks." 2-ER-166. Though not listed under the Endangered Species Act, sage-grouse have been designated as a species of conservation concern by the Forest Service. 2-ER-93-94. Before approving the Project, the Forest Service reviewed impacts on sage-grouse and modified the Project's design features in response. 2-ER-93-94.

Appendix A to the Decision Memo discusses design features that will mitigate impacts to sage-grouse. 2-ER-104-05. They include: (1) a timing restriction on all operations from March 1st through June 30th to protect sage-grouse during lekking and nesting season; (2) anti-perching devices and wildlife fences to keep sage-grouse from worksites during drilling operations; (3) acoustic screening devices and muffler requirements to mitigate sound impacts; (4) a 15 mile-per-hour speed limit to avoid vehicle strikes; and (5) a worker environmental awareness program that will teach

workers to avoid and minimize impacts to native species and habitat. 2-ER-104; *see also* 1-SER-30-31. The Project also complies with all standards and guidelines in the Inyo National Forest Plan protecting sage-grouse. 2-ER-98 (finding project "is consistent with the Inyo National Forest Land Management Plan"); 2-SER-267-71. (Forest Plan sage-grouse protection standards and guidelines); *see also* 1-SER-204-06 (discussing how Project meets Forest Plan sage-grouse standards and guidelines).

Still, some disturbance will occur. 2-ER-93-94 (acknowledging "minor and temporary" impacts to Wildlife Species of Conservation Concern). The Forest Service discussed "minor and temporary direct impacts to sage-grouse . . . confined to specific pad locations" and "potential indirect impacts . . . from raised ambient noise levels." 1-SER-30. The agency disclosed those effects and adopted mitigation measures to reduce impacts. For example, there will be some increase to ambient noise levels during drilling; "the anticipated construction noise from the project at the nearest identified sage-grouse lek" found a predicted "maximum noise level increase of 8.7 dBA." 1-SER-30; *see also* 1-SER-171 (Noise Report showing increase over baseline noise levels). "This increase is less than the 10 dBA increase criterion established for sage-grouse leks (Patricielli et. al. 2013)." 1-SER-30-31. Still, the plan prohibits operation during lekking season and calls for acoustic screening to protect any nearby sage-grouse. 1-SER-30; 1-SER-174.

Considering the Project's design features, and based on the "short-term and spatially limited" operations, the Forest Service concluded that the Project "will not

result in any impacts to the [sage-grouse] that would affect their viability within the project area or the Inyo National Forest." 2-ER-94.

### 3. Groundwater Resources and Dependent Wildlife

There is no surface water within the project area. 1-SER-29. Before approving the Project, the Forest Service reviewed an extensive hydrogeology report based on drilling records in the area. 1-SER-129-58. The report concludes that the Project is likely to encounter groundwater but is unlikely to encounter artesian conditions.[5] 1-SER-136-37

The Project is designed to prevent any groundwater impacts and—in the unlikely event that drilling encounters artesian conditions—any uncontrolled flow. 2-ER-95; 2-ER-105-06; *see also* 2-ER-124. These design features call for casing holes during drilling, using blowout prevention equipment, and filling in completely cased holes after drilling in compliance with county well-permit standards. 2-ER-95; 2-ER-105-06.

Based on this analysis, the Forest Service concluded that "[g]roundwater will not be extracted by the project," "there should not be any inadvertent groundwater loss," and Project design features will ensure "minimal potential impacts to

---

[5] Artesian conditions occur when water in a confined aquifer is under pressure. This can cause tapped water to rise above the top of the aquifer and potentially onto the land surface. *See* Artesian Water and Artesian Wells, U.S. Geological Survey (June 6, 2018), https://www.usgs.gov/special-topics/water-science-school/science/artesian-water-and-artesian-wells.

groundwater, soil, or surface water resources." 2-ER-95; *see also* 1-SER-131-35 (evaluating previous modeling, including for the aquifer for Mammoth Creek and Hot Creek). Because there is no surface water in the Project area—and because the Project will have only minimal potential effect on groundwater—the Project will not impact aquatic species or habitat. 1-SER-29.

### 4. Environmental Review and Public Participation

As explained in the Decision Memo, the Project calls for: (1) "mineral exploration, including ground-disturbing reclamation activities, for up to one year" and (2) "[p]ost exploration habitat restoration activities that do not involve grading or major ground disturbance [and that] may continue past one year as needed." 2-ER-91. The Forest Service determined that each activity fell within the Forest Service's categorical exclusions (CEs) codified at 36 C.F.R. § 220.6(e). 2-ER-92. Mineral investigation and support activities are covered by 36 C.F.R. § 220.6(e)(8) (CE-8), which applies to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road or use and minor repair of existing roads." 2-ER-92 (quoting 36 C.F.R. § 220.6(e)(8)). Outyear monitoring and low-impact habitat restoration activities are covered by 36 C.F.R. § 220.6(e)(6), which applies to "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not

require more than 1 mile of low standard road construction." 2-ER-92 (quoting 36 C.F.R. § 220.6(e)(6)).

The Forest Service only relied on the CEs after finding that no extraordinary circumstances required more analysis. 2-ER-93-97; *see also* 2-ER-232-33 ("A CE can only be used if the project fits the category (36 C.F.R. 220.6(a)) and there are no extraordinary circumstances identified"). Through scoping, the Forest Service informed the public that the Project appeared to be categorically excluded and invited comments. 2-ER-229-30. Hundreds commented, and those comments informed the Forest Service's analysis. 2-ER-97. Commenters raised "potential impacts to tourism, wildlife, cultural resources, water quality and recreation." 2-ER-97. In response, the Forest Service modified the project to add protection for sensitive resources. 2-ER-97. The Forest Service signed the Decision Memo approving the Long Valley Exploration Drilling Project in September 2021. 2-ER-90.

## C. District Court Proceedings

Plaintiffs brought this case soon after the Service authorized the Project, 2-ER-88, KORE intervened, 1-SER-8-10, and the Parties cross-moved for summary judgment.

After briefing and argument, the District Court denied summary judgment for Plaintiffs and granted summary judgment for Defendants. 1-ER-4-28. The District Court upheld the Forest Service's choice of CEs, explaining that because "an action within one categorical exclusion has no significant effect on the environment, [then]

15

two separate actions within two separate exclusions, respectively, have no significant effect on the environment . . . . Zero plus zero is zero." 1-ER-17. While there might be "some extreme cases" where multiple CEs could "lead to absurd results," the District Court held this is not such a case. 1-ER-18. Just the opposite; the Court explained that the Forest Service's use of two CEs here was reasonable, 1-ER-18, allowing KORE access to its claims while requiring KORE to fully restore the Project area to benefit native species. 1-ER-19 (summarizing post-exploration requirements).

As to impacts to sage-grouse and groundwater resources, the District Court held that "the Forest Service has considered the relevant evidence and explained its decision that there are no 'extraordinary circumstances.'" 1-ER-24. While Plaintiffs disagreed with those conclusions, the District Court explained that "[a]t most, the evidence might show experts could reasonably disagree" and "[i]t is not for the court to decide whether the plaintiffs' conclusions are more persuasively reasoned." 1-ER-26. For this reason, the District Court held that the Forest Service's "decision to rely on categorical exclusions 'was not arbitrary or capricious.'" 1-ER-27 (quoting *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 783 (9th Cir. 2019)).

The District Court likewise rejected Plaintiffs' argument that the Forest Service was required to consider cumulative effects (or other regulatory intensity factors under 40 C.F.R. § 1508.27 (2019)) in the CE process. 1-ER-26. "The Forest Service weighed those factors when it defined the categorical exclusions and the 'resource conditions' it uses to decide whether extraordinary circumstances are present; it was

not necessary to repeat that exercise in response to KORE's proposal." 1-ER-26

(citing *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 680-81 (9th Cir.

2022)). Finally, the District Court held that the Forest Service did not need to issue a

special use permit for the habitat improvement activities, which are authorized under

36 C.F.R. § 228.8. 1-ER-27-28.

For these reasons, the District Court denied summary judgment for Plaintiffs

and granted summary judgment on all claims for Defendants. 1-ER-28. This

expedited appeal followed.

## SUMMARY OF ARGUMENT

The Forest Service's Decision Memo approves a single project with two phases

of work. In the first phase, KORE will carry out a suite of activities directly related to

mineral investigation. 2-ER-92. Those activities are covered by the Forest Service's

CE for "[s]hort-term (1 year or less)" mineral investigations at 36 C.F.R. § 220.6(e)(8).

In the second phase, the Forest Service will monitor to ensure that revegetation work

is successful and (if necessary) require additional light work like scattering a native

seed mix. 2-ER-92. These activities are covered by the Forest Service's CE for

"wildlife habitat improvement activities" at 36 C.F.R. § 220.6(e)(6). The Forest

Service's regulations do not forbid application of more than one CE to a project in a

situation like this, where the CEs apply to distinct phases of the project. And the

Forest Service's decision to use two CEs here was appropriate, as there is no

argument that habitat restoration work will increase the effects of the exploration

17

activities. The Forest Service's interpretations and applications of its CEs are reasonable and entitled to substantial deference.

Before approving the Project, the Forest Service reviewed the resource conditions listed at 36 C.F.R. § 220.6(b) and found no extraordinary circumstances. 2-ER-93-96. The Forest Service concluded that there will be no significant impacts to the Bi-State sage-grouse, 2-ER-93-94, or to groundwater resources. 2-ER-95-96. While Plaintiffs disagree with those conclusions, "[o]nce the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr.*, 189 F.3d at 859 (citation omitted). This Court should uphold that analysis.

Under the plain language of the regulations and this Court's binding precedent, cumulative effects are not part of the two-step CE analysis, which only asks (1) whether the activities fall within a CE and (2) whether extraordinary circumstances preclude use of a CE. And the Forest Service need not issue Special Use Permits for projects approved under the Forest Service's mineral regulations at 36 C.F.R. Part 228. Finally, if this Court reverses on any grounds, it should remand the case to the District Court to decide whether vacatur is appropriate.

## STANDARD OF REVIEW

Appellate courts "review the district court's decision on cross-motions for summary judgment de novo." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024,

1032 (9th Cir. 2020) (citing *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011)).

Under the APA, courts may only set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This "standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) (citation omitted). The reviewing "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Where, as here, the agency's decision rests on factual findings that "'require[] a high level of technical expertise,' [the court] must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)); *see also Balt. Gas & Elec. Co.*, 462 U.S. at 103 ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential").

19

## ARGUMENT

### I.  The Forest Service reasonably found that the Project falls within CEs 6 and 8.

"[A]n agency satisfies NEPA if it applies its [CEs] and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious." *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1178-79 (9th Cir. 2022) (quoting *Bicycle Trails*, 82 F.3d at 1456 n.5). The Forest Service has codified CEs at 36 C.F.R. § 220.6. When a project is covered by one or more of those CEs, the Forest Service need not prepare an EA or EIS so long as the agency documents the lack of extraordinary circumstances.[6] *See* 36 C.F.R. § 220.6(a).

When multiple CEs apply to an activity, the Forest Service may choose from among them. *See Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 680 (9th Cir. 2022) (quoting *Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1180-81 (E.D. Cal. 2017)). An agency's choice of CE must be upheld so long as "the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion." *Mountain Communities*, 25 F.4th at 680 (quoting *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1114 (E.D. Cal. 2017)); *see also Uranium Watch v. U.S. Forest Serv.*, No. 2:10CV721DAK, 2010 WL 3703807, at *6-7 (D. Utah Sept. 4, 2010)

---

[6] We discuss the Forest Service's extraordinary circumstances analysis in the next section.

(denying preliminary injunction against mineral investigation project covered by CE-3 and CE-8).

In reviewing the Forest Service's approval of the Project, the District Court first addressed whether the Forest Service may rely on multiple CEs for a single project, correctly concluding it may do so. The District Court began with the language of the Forest Service's CE regulation, noting the use of singular nouns, "the proposed action" and "a category." *See* 1-ER-14, 17-20 (quoting 36 C.F.R. § 220.6).[7] This language does not weigh against the Forest Service's ability to use multiple CEs for a single project. Under a well-worn rule of interpretation—codified in the Dictionary Act, 1 U.S.C. § 1—"singulars normally include plurals." *Schott v. Comm'r of Internal Rev.*, 319 F.3d 1203, 1206 (9th Cir. 2003). So the singular "a project" includes "projects" and the singular "a category" includes "categories." For that reason, the regulation's excusal from further analysis where a proposed action falls "within a category" listed in 36 C.F.R. 220.6(d)-(e) can, on its face, apply to a proposed action that falls within multiple categories, or to a proposed action that has multiple subparts, each of which falls within different categories.

Nothing in the regulation requires the Forest Service to rely on a single category for a single project—let alone for a project like the one at issue, that consists of related but distinct parts. And by definition, CEs "do not *individually or cumulatively*

---

[7] As the District Court acknowledged, the regulation also uses the plural term "activities," including in defining CEs six and eight. 36 C.F.R. § 220.6(e).

have a significant effect on the environment." 1-ER-17 (quoting *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 661 (9th Cir. 2022)) (emphasis added); *accord* 40 C.F.R. § 1508.4 (2019). For that reason, the use of multiple categories generally should not add up to a significant effect. Or as the District Court put it, "zero plus zero is zero." 1-ER-17. While "[i]n some extreme cases," multiple CEs could "lead to absurd results . . . . [t]his is not such an extreme case," but an example of a responsible use of multiple CEs. 1-ER-18-19.

The record bears out the District Court's conclusion. The Forest Service reviewed the Project's environmental consequences by relying on two appropriate CEs under its NEPA regulations. For mineral investigation and immediate site reclamation activities, the Forest Service relied on CE-8. 2-ER-92. CE-8 applies to "short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities." 36 C.F.R. § 220.6(e)(8); *see also* 2-ER-92. KORE's proposed exploratory drilling qualifies as a "mineral . . . investigation" under the CE. *See* 36 C.F.R. § 220.6(e)(8)(vii) (including as an example a mineral investigation project calling for temporary roads and clearing brush for drill pads). CE-8 contains two substantive limitations.

First, "mineral . . . investigations and their incidental support activities" under CE-8 must be "[s]hort-term (1 year or less)[.]" 36 C.F.R. § 220.6(e)(8). KORE will complete brush clearing and drilling operations within the one-year time limit. *See* 2-ER-91 ("The number of days needed to complete exploration activities could

22

therefore range from about 50 to 170 days, all within 12 consecutive months."); 2-ER-111 ("It is anticipated that drilling and drill hole closure on an individual pad will be completed in 7 to 10 days."); 2-ER-113 ("The drilling program is expected to be completed within 160 days or sooner"). Initial site reclamation—sealing drill holes, recontouring work sites, removing equipment, and scattering seed—will occur just after drilling operations, also within the one-year limit. 2-ER-92; 2-ER-135 (discussing reclamation for worksites). So, CE-8's first substantive requirement is satisfied.

Second, CE-8 restricts activities to those requiring "construction of less than 1 mile of low standard road, or use and minor repair of existing roads." 36 C.F.R. § 220.6(e)(8). Here, the Project requires "no more than 0.32 miles of temporary road construction." 2-ER-91. Thus, the mineral investigation activities comply with CE-8's limits on road construction. With both of CE-8's requirements met, the Forest Service reasonably found that CE-8 covered the Project's mineral investigation activities. *See Mountain Communities*, 25 F.4th at 680.

The Project also calls for wildlife habitat improvement—monitoring to ensure revegetation success, fence retention, and potential new seeding and weeding—that will improve conditions for native wildlife like sage-grouse and mule deer. 2-ER-92-93 ("improving native vegetation . . . is vital for wildlife habitat . . . . [and] will ensure that there is no net loss of habitat and no effect to the capability of Forest species of conservation to persist over the long term in the plan area."). For those activities, the Forest Service relied on CE-6, which is for "[t]imber stand and/or wildlife habitat

improvement activities." 36 C.F.R. § 220.6(e); *see also* 2-ER-92. As in the District Court, "it is undisputed that the seeding, fencing, monitoring, and weed-pulling fall within the limits of CE-6" as wildlife habitat improvement work. 1-ER-19.

CE-6 is also limited in two respects. 36 C.F.R. § 220.6(e)(6). First, activities carried out under CE-6 cannot "include the use of herbicides." *Id.* Second, the activities cannot "require more than 1 mile of low standard road construction." *Id.* The Project's outyear monitoring to ensure successful revegetation fits within those bounds because "[n]o herbicides will be used, and no road will be constructed for the wildlife habitat improvement." 2-ER-92; *cf. Mountain Communities*, 25 F.4th at 678.

Plaintiffs do not and cannot argue that the mineral investigation and support activities are beyond CE-8's scope or that monitoring (and perhaps scattering additional seed or using hand tools to plant native shrubs) is not wildlife habitat improvement. Instead, Plaintiffs raise two technical objections. First, Plaintiffs argue that the Forest Service's citation to two CEs "bifurcates" the Project and departs from the Forest Service's mineral and special use permitting regulations. Pls.' Br. 26. Second, Plaintiffs argue that CE-8 is unavailable because the outyear revegetation work will take more than one year. Pls.' Br. 21-25. Neither argument has merit.

Plaintiffs' first argument fails because using two CEs in a single analysis is not in itself impermissible "bifurcation." *See* Pls.' Br. 26; *see also Earth Island Inst.*, 318 F. Supp. 3d at 1183 ("[The Forest Service] may rely on *one or more* CEs to avoid preparing an EA or EIS for a project." (emphasis added)). The single Decision Memo

authorizes two categories of activities: (1) mineral exploration activities and immediate site reclamation under CE-8 and (2) outyear monitoring (and limited revegetation activities as necessary) under CE-6. 2-ER-92-93; *see also* 2-ER-93 ("Use of two CEs helps me best meet my obligation to allow mineral exploration activities while minimizing resource impacts, and my desire to improve wildlife habitat post-project."). While the latter is only necessary because of the former, the two categories are distinct. They involve different activities, that serve different purposes, and have different (in both cases, minor) impacts. And crucially, there is no reason to think that the minor effects from these two distinct categories compound or exacerbate each other in any way that the use of two CEs fails to capture; this is not, for example, a situation where an agency is accused of treating a project to cut 500 trees as 500 projects to cut a single tree. In that hypothetical, artificially separating repeated instances of the same activity, each with the same function and the same effects, fails to appreciate that the negligible impacts of cutting a single tree may add up when repeated enough times. Here, by contrast, Plaintiffs can make no case that the monitoring and seed scattering contemplated by category two would tip the effects of the mineral activity in category one into significance if they were considered together. Instead, this is truly, in the district court's words, a case in which zero plus zero is zero.

Plaintiffs' second argument is similar to the argument this Court rejected in *Mountain Communities*. 25 F.4th at 679-80. There, the plaintiffs argued that the Forest

Service erred by approving a timber stand improvement project under CE-6, arguing that the project should have been analyzed under CE-12 or CE-14 (and subject to the substantive limitations therein). *Id.* at 679. This Court rejected plaintiffs' suggestion that the Forest Service's reliance on CE-6 impermissibly sought to work around the project acreage limitations that would apply under CE-12 and CE-14. Instead, it held that the Forest Service could choose to rely on CE-6 because the project fell within CE-6's plain text, notwithstanding that the agency would have had to truncate the project in certain ways to fit it within CE-12 or CE-14. *See id.* at 679-80.

Here, Plaintiffs argue that the Forest Service's reliance on CE-6 and CE-8 together improperly sought to avoid the one-year limitation applicable to CE-8. But as *Mountain Communities* highlights, the Forest Service may rely on any CE whose text fairly covers the activities at issue, notwithstanding that the activities may exceed the limitations imposed by a different, arguably applicable CE. Here, the Forest Service appropriately concluded that the Project could be separated into distinct categories of activity. Thus, so long as the part of the Project authorized under CE-8 fits within that CE's wording and the part of the Project authorized under CE-6 fits within *that* CE's wording, it is immaterial whether the Forest Service could have instead conceptualized the Project in a different way, that would fall outside the applicable CE.

Plaintiffs offer no real dispute that the outyear vegetation portion of the project falls within CE-6. Instead, they focus on the Forest Service's use of CE-8 for the mineral investigation activities. But the mineral investigation phase fits the plain text

and limitations of CE-8, discussed above. That the Project's mineral investigation phase fits under CE-8 is reinforced by the regulatory examples set forth in CE-8. Example seven is for "[a]pproving a plan for exploration which authorizes repair of an existing road and the construction of 1/3 mile of temporary road; clearing vegetation from an acre of land for trenches, drill pads, or support facilities." 36 C.F.R. § 220.6(e)(8)(vii). The Project here fits that example: the Project requires one-third mile of temporary road and disturbs less than an acre in total. 2-ER-91 ("Land disturbance resulting from this Project will total approximately 0.82 acres. Of that, roughly 0.43 acres would be from the drill pads and 0.39 from the use of the temporary access roads.").

Indeed, Plaintiffs do not dispute that the Project's mineral investigation or initial site reclamation will be complete within one year. *See* 1-ER-19. They instead argue that CE-8 is inapplicable because monitoring and possible habitat restoration will last beyond one year. So, under Plaintiffs reading, there would be no question that CE-8 applies "if the Forest Service had approved KORE's proposal without requiring any rehabilitation beyond the first year." 1-ER-19. This leads to an absurd result contrary to the purposes of NEPA and categorical exclusions: the agency may only use the relevant categorical exclusion if it adopts quicker, less effective remediation techniques. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

27

None of Plaintiffs' other arguments withstand scrutiny. Citing the Forest Service's minerals manual and mineral regulations, Plaintiffs argue that reclamation is integral to mineral investigation, so the Forest Service should have considered all Project activities under CE-8. Pls.' Br. 29-30. As discussed in the Decision Memo, initial site reclamation was considered under CE-8. 2-ER-92. Only "post-project restoration for habitat improvement" was analyzed under CE-6. 2-ER-92. And Plaintiffs err by conflating the Forest Service's minerals manual and regulations with its NEPA regulations. *See Mountain Communities*, 25 F.4th at 679 ("As the district court held, Appellants 'cite no authority for the proposition' that the Forest Service Manual definitions apply to the Forest Service's NEPA regulations."). While all Project activities fall under the § 228 mineral regulations—which includes reclamation—that does not require the Forest Service to treat all activities under § 228 as mineral investigation within the meaning of CE-8.

The District of Arizona's unpublished decision in *Defenders of Wildlife v. U.S. Forest Service* does not help Plaintiffs either. No. 4:14-cv-02446-RM, (D. Ariz. Sept. 15, 2015). In *Defenders*, the court found that: (1) drilling operations would require 18 months because of a lengthy non-operational period, 2-ER-37 and (2) the project in *Defenders* allowed for significant additional ground disturbance 1-3 years after mineral investigation would be complete. 2-ER-38. Because the company could not complete all activities approved under CE-8 within the one-year time limit, the court held CE-8 was unavailable. 2-ER-37-38. But that is not the case here. All activities the Forest

Service approved under CE-8 will finish within a year. Some "[p]ost-exploration habitat restoration activities that do not involve grading or major ground disturbance may continue past one year." 2-ER-91; *see also* 2-ER-92. But as discussed above, that outyear work falls under CE-6, which the district court in *Defenders* did not construe because the Forest Service in that case did not invoke CE-6.

Plaintiffs also make no mention of the District Court's alternative holding: that any error in form is harmless because "by definition, categorically excluded activities have no significant effects, so it would be pointless to set aside the Forest Service's decision in this case if it sole error was a failure to process KORE's proposal as two 'actions' rather than one." 1-ER-20. Under the APA, courts take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. "The harmless-error analysis asks whether the failure to consult materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (citing *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009)); *see also id.* at 1105 ("the question is whether the failure to consult somehow materially altered the environmental review process, not whether a constituent body was harmed by the agency's ultimate decision." (citing *Cnty. of Del Norte v. United States*, 732 F.2d 1462, 1466–67 (9th Cir. 1984))); 40 C.F.R. § 1500.1(a) ("NEPA's purpose is not to generate

paperwork or litigation, but to provide for informed decision making and foster excellent action."). Plaintiffs' failure to dispute this holding in their opening brief concedes the point. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived." (citations omitted)).

Citing only generic references to public participation in the NEPA process, Plaintiffs also argue that they should have been afforded an opportunity to comment when the Forest Service chose to use CE-6 rather than relying solely on CE-8. Pls.' Br. 27-29. Generally, CEQ does not require that agencies provide public participation opportunities when applying a CE. 75 Fed. Reg. 75628-01, 75636 (Dec. 6, 2010) ("Most Federal agencies do not routinely notify the public when they use a categorical exclusion to meet their NEPA responsibilities."); *see also Lands Council v. Packard*, No. CV05-210-N-EJL, 2005 WL 1353899, at *5 (D. Idaho June 3, 2005) ("because categorical exclusions are so limited, agencies need not provide for public comment for projects meeting the requirements for categorical exclusion." (citing 40 C.F.R. § 1503 (2019))). But when the Forest Service uses CEs, the Forest Service provides a public participation opportunity through scoping. 36 C.F.R. §§ 220.4(e)(1), 220.6(c); *see also Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999) (describing scoping for "all proposed actions, including those that would appear to be categorically excluded.").

30

NEPA does not dictate the parameters of scoping. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1116 (9th Cir. 2002) ("Beyond providing adequate notice and beginning a meaningful dialogue with members of the public about a proposed action, the affirmative duties NEPA imposes on a government agency during the scoping period are limited."), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *Los Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1044 (N.D. Cal. 2011) (noting the specific procedures for scoping are left to agency discretion). And the Forest Service's regulations provide it with broad discretion to conduct scoping as appropriate to the project. *See* 36 C.F.R. § 220.4(e)(2) ("[N]o single scoping technique is required or prescribed."). For CEs, the Forest Service uses scoping as streamlined process to gather information about possible environmental impacts to determine, in part, whether a categorical exclusion applies. *Alaska Center for Env.*, 189 F.3d 851, 858 (9th Cir. 1999) (noting the scoping process is used to identify any significant issues related to the project). In other words, scoping—and the public process more generally—seeks input on the proposed action and its likely effects, *see* 40 C.F.R. § 1501.9, not legal arguments about the Forest Service's regulations.[8]

Here, the Forest Service solicited public comment on the environmental impacts of KORE's mineral exploration through the scoping process, 2-ER-97; *see also*

---

[8] As their extensive comments show, Plaintiffs were able to fully express their concerns about the Project's environmental effects.

2-ER-229-31 (scoping letter). Hundreds commented, 2-ER-92, including Plaintiffs. And the Project was modified in response to reduce environmental impacts. *See, e.g.*, 2-ER-97. While that scoping notice did not include CE-6, it would be onerous and counterproductive to require the agency to start the process over every time a project evolves in response to public comments. *See* 1-ER-20-21("if an agency were required to solicit and review public comments every time a comment led to any change in its thinking about categorical exclusions, the agency could be forced into a vicious cycle of renotice and revision."); *see also Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1178 (E.D. Cal. 2018) (confirming deference to agency where Forest Service relied on an additional categorical exclusion in revised decision). And because the Forest Service's regulations do not require the agency to restart the scoping process in this situation, courts may not require the Forest Service to do so. *See Vt. Yankee*, 435 U.S. at 524; *The Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) (*en banc*).

In sum, the Forest Service has discretion to determine which of its CEs to apply. *See Mountain Communities*, 25 F.4th at 690 (9th Cir. 2022). Here, the Forest Service reasonably relied on CE-8 for the initial road clearing, mineral investigation, and reclamation work, and on CE-6 for outyear monitoring and revegetation work. Plaintiffs' arguments that use of two CEs "bifurcates" the Project or that the entire Project must fit under CE-8 are wrong. And the Forest Service need not solicit public comment on its choice of CE. The District Court properly granted summary judgment on these claims for Defendants, and this Court should affirm.

## II. The Forest Service reviewed the resource conditions listed at 36 C.F.R. § 220.6(b)(1) and found no extraordinary circumstances.

When the Forest Service relied on these CEs, it determined that "there are no extraordinary circumstances related to the proposed action." *Mountain Communities*, 25 F.4th at 680 (quoting 36 C.F.R. § 220.6(a)); *accord* 2-ER-93. The resource conditions the Forest Service considers in determining whether extraordinary circumstances require additional analysis are found at 36 C.F.R. § 220.6(b)(1); *see also Mountain Communities*, 25 F.4th at 680-81 (rejecting argument that the Forest Service needed to consider the intensity factors at 40 C.F.R. § 1508.27(b) (2019) before using a CE). "The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE)." 36 C.F.R. § 220.6(b)(2). "It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, *the degree of the potential effect* of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* (emphasis added).

The Forest Service considered the resource conditions at 36 C.F.R. § 220.6(b)(1) and found no extraordinary circumstances. 2-ER-93-96; 2-ER-92; 1-SER-29-30. Those scientific findings "implicate[] substantial agency expertise and [are] entitled to deference." *Alaska Ctr.*, 189 F.3d at 859. Plaintiffs' disagreements with the Forest Service's conclusions provide no basis to set aside the reasoned decision of the expert agency.

33

A.     **The Forest Service may rely on a categorical exclusion where the agency concludes that impacts on a resource condition are not significant.**

Plaintiffs identify two resource conditions that they argue give rise to extraordinary circumstances: (1) the Bi-State sage-grouse, a Forest Service species of conservation concern present in the Project area, 2-ER-93-94, and (2) the Owens tui chub, a listed species that does not occur within the Project footprint but has suitable habitat nearby. 1-SER-29. The Forest Service determined that the sage-grouse would experience "short-term and spatially limited" impacts that would not be significant. 2-ER-94. For the Owens tui chub, the Forest Service concluded that the Project would not cause significant impacts to groundwater or surface water resources, and so would not affect any nearby Owens tui chub or habitat. 1-SER-29. After reviewing the administrative record, the District Court upheld the Forest Service's review, explaining "[i]n this case, as in *Illano*, the Forest Service has considered the relevant evidence and explained its decision that there are no 'extraordinary circumstances.'" 1-ER-24 (citing *Illano*, 928 F.3d at 779-83).

In *Illano*, this Court upheld a Forest Service tree-thinning project on the Tahoe National Forest "even though individual owls might have suffered negative consequences, even though the Forest Service's experts could not say with certainty the species as a whole would maintain its numbers and viability, and even though the plaintiffs had cited competing evidence." 1-ER-23 (citing *Illano*, 928 F.3d at 782-83); *accord* 1-ER-23 (citing "[a] number of other federal district courts within this circuit

34

[that] have refused to adopt the more stringent standard the plaintiffs propose, some relying on *Illano*."). Plaintiffs believe that the District Court applied the wrong legal standard, Pls.' Br. 34-35, arguing that "under the district court's erroneous interpretation of *Illano*, an extraordinary circumstance cannot exist until widespread species-level harm is likely to occur." Pls.' Br. 37. That is wrong. Rather, the District Court rejected Plaintiffs' argument that, to use a CE, the Forest Service must conclude—with certainty—that "the Project *will not* impact negatively on the species." 1-ER-22; *accord Illano*, 928 F.3d at 782 (upholding timber sale where the Forest Service found that "the project may affect individual [members of a species], but is not likely to result in a trend toward federal listing or a loss of viability for the species as a whole."). As the District Court explained, were the agency required to definitively find zero impact to a species, "the Ninth Circuit could not have affirmed the district court's decision in *Illano*." 1-ER-23.

Moreover, Plaintiffs' theory diverges from the plain language of the regulations that "*the degree of the potential effect* of a proposed action on these resource conditions … determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6(b)(2) (emphasis added). The agency may find some negative but limited effect on a resource condition without finding an extraordinary circumstance under this language. As a general matter, "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006). Thus some negative effects on

35

members of a species are not an extraordinary circumstance where the species as a whole will not be threatened. *See Illano*, 928 F.3d at 782 (project would have negative short-term impacts on owls, but was "'not likely to result in a trend toward federal listing or loss of viability' for the species as a whole.").

Plaintiffs rely heavily on the Eastern District of California's unpublished opinion in *Conservation Congress v. U.S. Forest Service*. No. 2:12–02416 WBS KJN, 2013 WL 2457481, at *8 (E.D. Cal. June 6, 2013). But that court did not hold that any impact on a resource condition forecloses a CE. At first, the court remanded because the Forest Service did not adequately support its conclusions about that project's effects on northern spotted owl. *Id.* at *8. But the court later lifted the injunction and allowed the project to proceed under a CE, explaining that supplemental analyses made "clear that while . . . the Tatham Project 'may affect, but is not likely to adversely affect' the northern spotted owl, *the degree of potential effects on the species is low enough* that a categorical exclusion is still appropriate." *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-02416 WBS KJN, 2016 WL 1162676, at *3 (E.D. Cal. Mar. 24, 2016) (emphasis added) (citations omitted).[9] The District Court here reached the same

---

[9] In a footnote, Plaintiffs argue that this Circuit has adopted a "'bright-line' rule . . . that a 'may affect, but is not likely to adversely affect' decision under the Endangered Species Act automatically mean[s] that an 'extraordinary circumstance' exist[s]." Pls.' Br. 38-39 n.5. Plaintiffs do not identify the source of this supposed rule. As noted above, *Conservation Congress*, which Plaintiffs mention, says the opposite. *Conservation Cong.*, 2016 WL 1162676, at *3. And no such rule exists; "the Ninth Circuit has held that an agency may issue a categorical exclusion even where threatened or endangered species are present if the agency determines that the project will not impact negatively

conclusion. 1-ER-24-25 (summarizing the Forest Service's extraordinary circumstances analysis showing low level of impacts on sage-grouse and groundwater).

Plaintiffs argue that this Court has reasoned that injuries to members of an endangered species may make "the task of preserving that species . . . all the more difficult." Pls.' Br. 37-38 (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018)). In *National Wildlife Federation* this Court held that "[s]howing an extinction-level threat to listed species is not required before an injunction can issue under the ESA." *Nat'l Wildlife Fed'n*, 886 F.3d at 819. But it does not follow that *any* impact to a protected species forecloses the use of a CE. Nor will this project affect a listed species comparable to the harms at issue in *National Wildlife Federation. See* 2-ER-94.

Here, the Forest Service considered sage-grouse and groundwater impacts and found none were significant. That finding must be upheld so long as it "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir. 1985) (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 105). In managing our nation's forests, the Forest Service "must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh*, 490 U.S. at 378; *accord Locke*, 776 F.3d at 992

---

on *the species.*" *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (emphasis added).

(quoting *Marsh*). Plaintiffs' disagreement with the Forest Service's findings cannot overcome the substantial deference owed to the Forest Service's expertise. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1150 (9th Cir. 2007) ("we must defer to the agency's interpretation of complex scientific data." (citing *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989))). As explained in the District Court's opinion, and again below, the Forest Service's analysis meets that standard.

## B.  The Forest Service examined the Project's effects on sage-grouse and reasonably found none were significant.

The Forest Service determined that the Project may disturb sage-grouse in the Project area. 2-ER-93-94. But because the Project has a small footprint, mineral investigation activities will last less than a year, and KORE will implement mitigation measures to minimize disturbance, the Forest Service found those impacts "will not result in any impacts to the species that would affect their viability within the project area or the Inyo National Forest." *Id.* This conclusion is well-supported by the record. *See, e.g.*, 2-ER-131 (Plan of Operations discussing mitigation measures); 2-ER-162 (discussing known leks near the Project area and concluding "Project implementation is not expected to affect greater sage-grouse's (Bi-state DPS) capabilities to persist over the long term in the Project Area."); 1-SER-159-200 (Noise Report). After reviewing the record, the District Court agreed. 1-ER-23 (summarizing evidence in the record and concluding "[t]he Forest Service's decision was reasonable.").

38

Plaintiffs identify nothing the agency overlooked. Instead, they mostly parrot comment letters that the agency considered and which thus informed the Project's design features. *See* Pls.' Br. 40-42. For example, the California Department of Fish and Wildlife (CDFW) recommended that "vegetation removal in the Project area should not occur during the sage-grouse nesting period (15 March - 15 May)," 2-ER-246, and that the Project should seek to "minimize human disturbance impacts during the sage-grouse breeding, nesting and brood rearing periods (March 1 – June 30)." 2-SER-222. To address these concerns, the Forest Service included a timing restriction that prohibits all operations during the lekking and nesting seasons. 2-ER-104 ("No disturbance activity in the project area from March 1st through June 30th unless prior written approval from the Forest Wildlife Biologist is obtained."). Similarly, CDFW commented that "[s]agebrush loss and disturbance resulting from construction of drill pads and temporary access routes" could impact sage-grouse habitat, and CDFW recommended the project use existing roads where possible. 2-ER-246. The Decision Memo responded by affirming that the project will "[m]inimize the creation of new rights-of-way where feasible and less impactful by using existing public or private utility rights-of-way." 2-ER-104. As the District Court found, the Forest Service did not ignore these concerns, but modified the Project in response. 1-ER-24.

Plaintiffs also quibble with the level of certainty required to rely on a CE. Pls.' Br. 40-42. But agencies need not eliminate all doubt—as Plaintiffs argue—in environmental reviews. *See Safari Club Int'l*, 31 F.4th at 1179 ("NEPA regulations do

not anticipate the need for an EIS [or EA] anytime there is some uncertainty."
(quoting *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1008 (9th Cir. 2020)
(alteration in original))); *Ctr. for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063, 1069–
70 (E.D. Cal. 2017), *aff'd*, 928 F.3d 774 (9th Cir. 2019) ("some uncertainty" is not
arbitrary and capricious where "the decision memo does not find any likelihood of
harm significant enough to rise to the level of an extraordinary circumstance"); *see also*
*Wildlands Def. v. Bolling*, No. 4:19-CV-00245-CWD, 2020 WL 5042770, at *11 (D.
Idaho Aug. 25, 2020) ("Uncertainty about the effect of project activities upon
individual sharp-tailed grouse 'is not enough to conclude that the finding of no
extraordinary circumstances was arbitrary and capricious.'" (quoting *Ilano*, 261 F.
Supp. 3d at 1070)). Some "quotient of uncertainty . . . is always present when making
predictions about the natural world." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d
701, 712 (9th Cir. 2009).

     The Forest Service found that any impacts to sage-grouse "will be short-term
and spatially limited, so will not result in any impacts to the species that would affect
[sage-grouse] viability within the project area or the Inyo National Forest." 2-ER-94;
*accord* 1-SER-30 ("Because this area is very small compared to the available adjacent
habitat, and because the area will be re-vegetated, there will be no net loss of sage
habitat from this project."). That conclusion is reasonable considering the Project's
limited scale (land disturbance on less than one-acre), limited duration (mineral
investigation and incidental activities completed within one year, with no operations

during lekking and nesting seasons),[10] and design features. *See generally* 2-ER-90-107.

The Forest Service considered the issues Plaintiffs raise, and this Court should defer to the agency's findings. *See Ilano*, 928 F.3d at 782-83 ("Plaintiffs take issue with the Forest Service's conclusion. We conclude, however, that the Forest Service considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record. Therefore, its decision was not arbitrary or capricious."). Indeed, because the Forest Service's conclusion involves technical expertise, it receives the highest deference. *See San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994 (citing *Marsh*, 490 U.S. at 377; *Balt. Gas & Elec. Co.*, 462 U.S. at 103).

Plaintiffs next complain that the Forest Service summarized its analysis of sage-grouse in a single paragraph. Pls.' Br. 43. But those conclusions flow from extensive technical data, as documented in the record. *See, e.g.*, 1-SER-11-128 (Biological Impact Analysis); 1-SER-159-200 (Noise Report); 1-SER-201-20 (Forest Plan Review). Because a CE involves "a streamlined process allowing minor projects to be quickly implemented," *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 735 (10th Cir. 2006), there is no length requirement. *See Safari Club Int'l*, 31 F.4th at 1178-79 ("By definition, CE's

---

[10] The Tatham Project in *Conservation Congress* involved longer operations periods at work sites than the Long Valley Project but was still able to proceed under a CE. *Compare Conservation Cong.*, 2016 WL 1162676, at *3 ("each unit will be completed within one to three weeks."); *with* 2-ER-97 ("Equipment location will not be static and is expected to be moved to new location every 7 to 10 days.").

are categories of actions that have been predetermined not to involve significant environmental impacts, and therefore require no further agency analysis absent extraordinary circumstances." (quoting *Nat'l Tr. for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987))). All that is required is "a reasoned decision." *Alaska Ctr.*, 189 F.3d at 859. The Forest Service's analysis meets that standard.

Plaintiffs also dispute that the Project's design features will protect sage-grouse. Pls.' Br. 43-47. The March through June timing restriction is ineffective, Plaintiffs argue, because the Forest Service may waive it. *Id.* at 44. That concern will be moot when this Court holds argument in August; by then, it will be plain that the Forest Service did not waive the restriction. And at bottom, the Forest Service cannot waive the restriction at will as Plaintiffs suggest. The restriction protects the sage-grouse during the sensitive lekking and nesting seasons. 1-SER-31. The March through June restriction is conservative and based on the best available science. The Forest Service may only adjust the timing restriction if the "nesting conditions or risk assessment" change. 1-SER-31; *accord* 2-ER-171 (same); 2-ER-94 (requiring "pre-construction nesting bird clearance survey shall be conducted within 3 days of any vegetation removal or ground disturbance" to determine whether sage-grouse are present).

Plaintiffs quibble with the sufficiency of the timing restriction because sage-grouse may use the Project area year-round. Pls.' Br. 44-45. But the legal standard is not whether there might be some impact to a species of conservation concern, but

42

whether there is an extraordinary circumstance present such that an activity that is normally exempt from further analysis under NEPA might have a significant effect. The Forest Service considered that the project would have some sage-grouse impacts outside the lekking and nesting seasons and concluded that the impacts did not present an extraordinary circumstance because the Project is short term and spatially limited. 2-ER-93-94. Plaintiffs' disagreement does not establish the Service's conclusions were arbitrary and capricious. *See Ilano*, 261 F. Supp. 3d at 1071 ("Scientists might disagree about the decision memo's conclusion about the project's effects on the spotted owl, but it was supported by the Forest Service's careful explanation, as well as the evidence in the record. At a minimum, it was not arbitrary or capricious."), *aff'd*, 928 F.3d at 783.

The Decision Memo also considers the other concerns raised by Plaintiffs. Plaintiffs argue that operations could cause "noise, vibration, traffic, and lighting" impacts on sage-grouse. Pls.' Br. 42 (citing comments in scoping letters). These impacts were not missed; the timing restriction prevents those effects during the sensitive lekking and nesting seasons, 2-ER-104, and the Forest Service concluded that impacts at work sites "will be short-term and spatially limited" and so were not significant. 2-ER-94. Plaintiffs argue that the Project does not address habitat degradation from access roads and drill pads. Pls.' Br. 45-46. Again, the total land disturbance for the Project is less than one acre. 2-ER-120-24. Based on that limited footprint—as well as the reclamation and revegetation requirements—the Forest

43

Service reasonably concluded that habitat impacts would be minor and temporary, and so not an extraordinary circumstance. 2-ER-93-95; *see also* 2-ER-92 (revegetation "will ensure that there is no net loss of habitat").

While Plaintiffs acknowledge that acoustic screening and anti-perching devices will discourage sage-grouse from visiting work sites, they erroneously argue the Forest Service did not adequately consider impacts from vehicle traffic. Pls.' Br. 46-47. First the Project area contains existing, public roads, 2-ER-91 (discussing existing roads in the Project area). As the Plan of Operations states, during operation, the Project will require a drill rig, a water truck, and two pickup trucks. 2-ER-126. If KORE drills two pads simultaneously, these numbers would double. 2-ER-126. Vehicle traffic will only be intermittent; the vehicles will be used for each 12-hour shift, with the pickups making "one round trip per day, per shift" and the water truck making "one round trip per shift to the water source." 2-ER-125. Thus, the total increase in traffic is minimal. Second, the Forest Service imposed mitigation: "[a] 15-mph speed limit for all project equipment will be enforced. Vehicle speeds will be reduced in areas of disturbance to . . . protect any wildlife." 2-ER-128. Because the Project will not significantly increase traffic, will last less than a year, and is subject to a speed limit in Project areas, the Forest Service concluded traffic impacts on the sage-grouse did not reach the level of extraordinary circumstances. 2-ER-93-94.

Plaintiffs speculate that the limited mineral exploration authorized by the Decision Memo "could very well have population level effects to the Bi-state sage-

grouse." Pls.' Br. 48-49. The Forest Service, after reviewing the issue, found only short term and spatially limited effects that will not affect the viability of sage-grouse in the area. 2-ER-93-94. The District Court correctly granted summary judgment for Defendants on this claim, and this Court should affirm.

### C. The Forest Service considered the Project's potential to affect groundwater and reasonably concluded that the Project would not degrade groundwater quality or quantity.

There is no surface water within the Project area. 1-SER-29. Thus, the only harm the Project could pose to aquatic species would be from impacts to groundwater. *See* 1-SER-27 (nearest Owens tui chub habitat is outside the Project area). To assess how the Project would impact the water table, the Forest Service thoroughly reviewed the history of drilling operations in the area. 1-SER-129-58. That review revealed that, while drilling operations will encounter groundwater, the water table's composition and the Project's design features would prevent degradation of groundwater quality or quantity. 2-ER-94-95. Because the Project is designed to avoid groundwater impacts, there will be no impacts to groundwater-dependent species, like the tui chub. The District Court, after reviewing the Decision Memo and record, upheld this finding. 1-ER-24-27.

Plaintiffs still insist that the Forest Service mistakenly concluded that drilling would not encounter groundwater. Pls.' Br. 51-52. Plaintiffs are wrong. The Project's hydrogeology report concludes that drilling will likely encounter groundwater based on the records from previous drilling in the area. *See* 1-SER-136 (explaining that water

depth ranges from 69 to 425 feet with an average depth of 175 feet based on bore hole logs with a range of 225 to 865 feet with an average depth of 430 feet). But encountering groundwater will not inevitably lead to significant impacts to groundwater resources, much less to the Owens tui chub.

Responding to the concerns in Plaintiffs' cited comment letters, Pls.' Br. 50-51, the hydrogeology report explained that no artesian conditions are expected in the Project area based on records of previous bore holes, 1-SER-137, but even if encountered, "[p]roper planning will be used to prevent the uncontrolled release of artesian flow." 1-SER-137. Plaintiffs cite an email alleging artesian conditions encountered by the Royal Gold Exploration projects. Pls.' Br. 9 (citing 2-ER-280). The email chain shows the Forest Service's diligence. In response to anecdotal reports, the Forest Service consulted the U.S. Geological Survey seeking any relevant records. *See* 2-ER-284-85; *see also* 2-ER-167 (discussing anecdotal report of artesian conditions "in at least one Royal Gold boring"). None were found. 2-ER-281-83. But again, even if drilling encounters artesian conditions, the Project's design features— such as blowout protection equipment—will protect the groundwater. 2-ER-95; 2-ER-105-06; 1-SER-137.

The report likewise rejected Plaintiffs' concerns about aquifer mixing. Pls.' Br. 51-52. Commenters expressed concern that "the claim block is underlain by a groundwater system geothermally heated (average of 130 °F) but without artesian pressures" and that drilling could cause intermixing between a "upper, cool water

aquifer [and] the deeper geothermal aquifer in the area." 1-SER-137. "In fact, based on the temperatures measured in wells within the claim block and extensive surface thermal features, there does not appear to be a significant upper, cool water aquifer in the claim block. Therefore, it is not likely that drilling will cause intermixing of the two aquifers in this area." 1-SER-137. The Forest Service likewise found that concerns about groundwater contamination from uncased holes, Pls.' Br. 5, were unfounded because "[a]s each core hole is completed it will immediately be abandoned through cementation." 1-SER-137. For these reasons, the report concludes that "[t]he limited drilling campaign that KORE has planned will not result in any impacts to regional spring flow or groundwater or surface water quality." 1-SER-137. Because no impacts on surface or groundwater resources are likely, the Project is unlikely to have *any* impacts, much less significant impacts, on Owens tui chub outside the Project area. 1-SER-29.

The Forest Service's conclusion that the Project will not impact Owens tui chub does not assume that drilling will not encounter groundwater. Rather, based on an extensive review of previous bore holes—and considering the Project's design features—the Forest Service concluded that the Project will not cause a loss in groundwater quality or quantity. Because the Project will not adversely affect groundwater resources, it will not injure the Owens tui chub. Plaintiffs' speculative fears to the contrary do not overcome the deference owed to these technical findings. *Alaska Ctr.*, 189 F.3d at 859.

47

**III.    The Forest Service's extraordinary circumstances review appropriately does not require a "Cumulative Impacts Analysis."**

Plaintiffs' brief incorrectly states that "the CEQ regulations existing prior to September 14, 2020 . . . apply to the project and this Court's review." Pls.' Br. 28 n.3. In fact, although the initial Plan of Operations was submitted in July 2020, 2-ER-90, the NEPA process began with scoping in 2021. *See* 2-ER-229-31 (scoping letter). By that point, the 2020 NEPA regulations were in effect. 40 C.F.R. § 1506.13. And those regulations do not include the term "cumulative impacts" or require a cumulative effects analysis for CEs.

It would have been no different under the previous NEPA regulations. Those regulations required agencies preparing *an EA* to "consider two broad factors to determine whether an agency action may 'significantly affect' the environment [and thus require an EIS]: 'context' and 'intensity.'" *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting 40 C.F.R. § 1508.27 (2014)). Cumulative impacts were one of the "intensity factors" in that regulation. 40 C.F.R. § 1508.27(b)(7) (2019). Plaintiffs argue that the old regulation required the Forest Service to consider cumulative effects for its CEs. Pls.' Br. 53-57. Plaintiffs are wrong.

On its face, 40 C.F.R. § 1508.27 (2019) did not apply to categorical exclusions, but only to EAs. And this Court has held that the intensity inquiry did not apply to CEs. *Mountain Communities*, 25 F.4th at 681. "The Forest Service . . . did not have to

48

examine the intensity factors when analyzing whether extraordinary circumstances prevented the use of CE-6." *Id.* This was sensible, as CEQ's NEPA regulations defined a "categorical exclusion" as "a category of actions which do not *individually or cumulatively have a significant effect on the human environment* and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4 (2019) (emphasis added). As the District Court explained, "the Forest Service decided that actions within the categories listed in 36 C.F.R. § 220.6(e) have no cumulatively significant effects absent the extraordinary circumstances defined in § 220.6(b)." 1-ER-26.

This Court and other courts have also held that CEQ's pre-2020 regulation requiring consideration of "'connected actions,' and 'indirect' and 'cumulative' environmental 'impacts' . . . . applies only to environmental impact statements," not to categorical exclusions. *Salazar*, 706 F.3d at 1096-97;[11] *accord Siera Club v. U.S. Forest Serv.*, 828 F.3d 402, 411 (6th Cir. 2016) ("in order to comply with NEPA, the agency must determine whether a CE applies and whether an 'extraordinary circumstance' exists that precludes the use of a CE; the agency is not required to independently

---

[11] "Though not required to do so by section 1508.25," the Bureau of Land Management (BLM) regulations in *Salazar* "required BLM to consider whether issuance of the gravel permit would '[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.'" *Salazar*, 706 F.3d at 1097 (emphasis added). The Forest Service has no equivalent regulation. *Conservation Congress*, 2013 WL 2457481, at *10 (BLM regulations require cumulative impacts analysis for CE, Forest Service regulations do not).

evaluate cumulative impacts because this process already takes cumulative impacts into account."); *Wong v. Bush*, 542 F.3d 732, 737 (9th Cir. 2008) ("where agency action falls under a categorical exclusion, it need not comply with the requirements for preparation of an EIS." (citation omitted)).

In an opinion cited with approval in *Salazar*, 706 F.3d at 1097, the Tenth Circuit explicitly held that the Forest Service need not consider cumulative impacts as part of its extraordinary circumstances analysis. *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 740 (10th Cir. 2006). Though both *Mountain Communities* and *Salazar* are cited in the District Court's opinion as addressing this question, 1-ER-26, Plaintiffs' opening brief never mentions either. Neither do Plaintiffs discuss *Bosworth*. Plaintiffs' silence forfeits any argument that *Mountains Communities* and *Salazar* do not govern and that *Bosworth* is not persuasive. *Yosemite Valley*, 520 F.3d at 1033.

Plaintiffs contend that the Forest Service Handbook requires the agency to consider cumulative effects during its extraordinary circumstances review. Pls.' Br. 55-57. Nowhere does the Handbook require a cumulative impacts analysis as part of the CE extraordinary circumstances review. The Handbook section Plaintiffs cite instead discusses scoping, explaining how the level of analysis required "should be commensurate with project complexity." Forest Service Handbook § 1909.15, Ch. 31.3. Here, the record shows a thorough review of relevant resource conditions, which complies with the Handbook. *See id.* Ch. 31.2 (citing 36 C.F.R. § 220.6(b)). Nothing more was required.

50

In any event, and as the District Court explained, 1-ER-26-27, pronouncements in the Forest Service's manuals and handbooks lack the "force and effect of law," and so are not binding on the agency. *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). The Forest Service's regulations are binding on the agency because they are both substantive and subject to the APA's "notice and comment" rulemaking procedures. *Id.* at 901. But the Handbook does not purport to "prescribe substantive rules" and was not subject to "procedural requirements imposed by Congress." *Id.* (quoting *United States v. Fifty–Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982)). Instead, the "Manual and Handbook are a series of 'procedures for the conduct of Forest Service activities" that "do[] not act as a binding limitation on the Service's authority." *Id.* at 901 (citations omitted); *see also id.* at 902 ("Because we hold that neither the Manual nor the Handbook has the force and effect of law, we review the Service's issuance of a permit *only under its binding regulations*." (emphasis added)). Cumulative effects are not part of the analysis for CEs, so the Forest Service was not required to perform that analysis under its binding regulations. 36 C.F.R. § 220.6.

Plaintiffs rely on several district court cases that are inconsistent with this Court's precedent. Pls.' Br. 54-55. In finding that the Forest Service needed to prepare a cumulative effects analysis for a CE under the prior regulations, the *Defenders of Wildlife* court applied the significance factors discussed at 40 C.F.R. § 1508.27 (2019). 2 ER 35-36. But as discussed above, this Court later expressly held that the significance factors are not part of the extraordinary circumstances analysis. *Mountain*

51

*Communitie*s, 25 F.4th at 681. *Hells Canyon Preservation Council v. Connaughton* committed the same misstep. *See* No. 3:11–cv–00023–PK, 2013 WL 665134, at *7 (D. Or. Feb. 22, 2013). Again, the intensity factors were supposed to guide an agency in deciding whether a project's environmental effects are significant. *Mountain Communities,* 25 F.4th at 675. That inquiry had no purpose for "activities that a federal agency has found 'do not have a significant effect on the human environment.'" *Id.* (citation omitted). The error Plaintiffs invite—importing EIS procedural requirements into the CE process—would swallow the exclusions and defeat their purpose. *See id.* at 681 (requiring the Forest Service to analyze intensity factors for a CE "would be 'inconsistent with the efficiencies that the abbreviated categorical exclusion process provides." (quoting *Salazar*, 706 F.3d at 1097); *Utah Env't Cong.*, 443 F.3d at 740-41 noting that requiring cumulative impacts analysis for a CE "would effectively render useless the purpose of categorical exclusions generally"). This Court has rightly rejected Plaintiffs' argument.

The Forest Service was not required to consider alleged cumulative impacts in its extraordinary circumstances analysis because the applicable NEPA regulations do not require it. Even if the pre-2020 regulations applied to this project, they do not require a cumulative impacts analysis when undertaking the extraordinary circumstances analysis. The District Court correctly granted summary judgment on this claim for Defendants. 1-ER-27. This Court should affirm.

52

## IV. Outyear revegetation monitoring does not require a Special Use Permit.

In an attempt to further call into question the Forest Service's application of two categorical exclusions to the two phases of work for the Project, Plaintiffs argue that an independent habitat restoration project requires a Special Use Permit under regulations implementing the Forest Service Organic Act—and thus that if the Forest Service treats outyear monitoring activities as a habitat restoration project under CE-6, it was required to issue a Special Use Permit. Pls.' Br. 31-33. But here again, Plaintiffs fail to recognize that the Forest Service's NEPA regulations and its mining regulations are distinct. *See supra* p. 29.

There is no independent habitat restoration project here within the meaning of the mineral regulations implementing the Organic Act. Rather, the single Project approved in the Decision Memo includes: (1) mineral investigation and immediate support activities—including ground-disturbing site reclamation—lasting one year or less, covered by CE-8, and (2) outyear monitoring and possible low-impact revegetation work to improve wildlife habitat in the Project area, covered by CE-6. All these project activities fall under the Forest Service's mineral regulations at 36 C.F.R. § 228 because all activities are part of an authorized mineral investigation project. *See* 1-ER-27; *see also* 36 C.F.R. § 228.8(e) ("operator shall take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."), (g) ("operator shall, where practicable . . . tak[e] such measures as will

53

prevent or control onsite and off-site damage to the environment and forest surface resources, including . . . [r]eshaping and revegetation of disturbed areas; and . . . [r]ehabilitation of fisheries and wildlife habitat."). Thus, the agency's special use permitting regulations do not apply: '[a]ll uses of National Forest System lands, improvements, and resources, *except those authorized by the regulations governing . . . minerals (part 228)* are designated 'special uses.' Before conducting a special use, individuals or entities . . . must obtain a special use authorization . . ." 36 C.F.R. § 251.50(a) (emphasis added)). The agency's NEPA regulations are separate; nothing in either set of regulations suggests that activities covered by the mining regulations may not be covered by non-mining CEs, nor that application of a non-mining CE to an activity precludes the Forest Service from subjecting that activity to the mining regulations.

For this reason, the District Court granted summary judgment on this claim for Defendants. 1-ER-27-28. This Court should affirm.

## V. If the Court finds an error, the Court should remand to the District Court to consider remedy in the first instance.

Under this Court's precedent, whether a court vacates an agency decision on remand requires balancing the seriousness of the error against vacatur's disruptive consequences. *Cal. Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *see also* 5 U.S.C. § 706 (in reviewing a final agency action, "due account shall be taken of the rule of prejudicial error").

54

If the Court finds a non-harmless error, the Court should remand the issue to the District Court to decide—in the first instance—whether vacatur is warranted, applying equity principles to the facts adduced by the parties. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080-81 (9th Cir. 2010); *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) (remanding to district court because "[a]dditional factfinding is necessary to determine whether vacatur . . . is warranted at this juncture." (citing *Cal. Cmties. Against Toxics*, 688 F.3d at 993–94)). Here, that factfinding will likely weigh against vacatur. Operations are scheduled to begin as soon as September 1. Given the timing of this case, it is likely this Court's opinion will only issue after the bulk of ground disturbing work has been completed but before the wildlife habitat improvement work. In that scenario, vacatur would strongly injure the public—and Plaintiffs'—environmental interests. For this reason, any remedy decision should be left to the District Court.

## CONCLUSION

The Forest Service's decision was reasonable and complied with the agency's statutory and regulatory obligations.

For the reasons stated above, this Court should affirm the district court's judgment.

/s/ Tyler M. Alexander
TODD KIM
*Assistant Attorney General*

Of Counsel:

JAMIE ROSEN
*Attorney*
U.S. Department of Agriculture

June 20, 2023
DJ: 90-1-4-16473

ROBERT P. STOCKMAN
TYLER M. ALEXANDER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
tyler.alexander@usdoj.gov

## STATEMENT OF RELATED CASES

Federal Defendants are not aware of any related cases pending before this

Court.

<div style="text-align: right">

*/s/ Tyler M. Alexander*

TYLER M. ALEXANDER
*Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
tyler.alexander@usdoj.gov

</div>

57

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 23-15492**

I am the attorney or self-represented party.

**This brief contains 13,778 words,** excluding the items exempted by Fed. R.

App. P. 32(f), and including the 19 words in the image from the record. See Cir. R.

31-1(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and

(6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    /s/ Tyler M. Alexander

**Date**    June 20, 2023

## ADDENDUM

All applicable statutes, etc., are contained in the addendums of Plaintiffs and Defendant-Intervenors