No. 23-15492

UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

FRIENDS OF THE INYO, a non-profit organization; WESTERN WATERSHEDS PROJECT, a non-profit organization; CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; and THE SIERRA CLUB, a non-profit organization,

*Plaintiffs-Appellants*

*v.*

U.S. FOREST SERVICE; and LEEANN MURPHY, in her official capacity as Acting Mammoth District Ranger,

*Defendants-Appellees,*

*and*

KORE MINING LIMITED,

*Intervenor Defendant- Appellee*

APPEAL FROM DENIAL OF MOTION FOR SUMMARY JUDGMENT

By the United States District Court, Eastern District of California
Honorable Kimberly J. Mueller, Chief U.S. District Judge

**APPELLANTS' REPLY BRIEF**

Roger Flynn
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

Talasi B. Brooks
Western Watersheds Project
P.O. Box 2863
Boise, ID 83714
(208) 336-9077
tbrooks@westernwatersheds.org

Lisa Belenky
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7107
lbelenky@biologicaldiversity.org

Justin Augustine
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
jaugustine@biologicaldiversity.org

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iv

ARGUMENT ...................................................................................... 1

I. **CE-8 Does Not Apply Because The Project Will Not Be Completed In One Year.** ...................................................................... 1

A. **All of the Reclamation Is a Necessary Part of the Project.** ...................... 1

B. **The USFS Cannot Carve Off Some of the Required Reclamation Into a Separate Project.** ................................................................................ 8

C. **"Post-Project" Reclamation Cannot Both be Part of the Exploration Project for Permitting Purposes, and Separate for Purposes of CE-8's Time Limit.** .................................................................................... 13

II. **The USFS Violated NEPA by Approving the Project Without Analyzing Cumulative Impacts and in the Face of Extraordinary Circumstances.** ................................................................................ 15

A. **By Overlooking Cumulative Impacts USFS Failed to Properly Analyze the Significance of the Project's Impacts.** ................................................. 15

B. **Uncertainty About the Potential for Significant Impacts to Protected Species is an "Extraordinary Circumstance" Precluding Use of any CE.** ................................................................................ 23

1. *There is uncertainty about impacts to Bi-state sage-grouse.* ................... 26

2. *There is uncertainty about impacts to the Owens tui chub* .................... 30

III. **USFS and the District Court Ignored the Real Differences Between Review Under a CE Versus an EA.** ........................................... 33

IV. **USFS Has Not Overcome The Presumption That Illegal Agency Actions Should Be Vacated.** .......................................................... 36

CERTIFICATES OF COMPLIANCE AND SERVICE ......................................... 38

INDEX OF ADDENDUM ..................................................................... 39

ADDENDUM ................................................................................ 40

## **TABLE OF AUTHORITIES**

### **Cases**

Alaska Ctr. For Env't v. U.S. Forest Serv.,
189 F.3d 851 (9th Cir.1999) ................................................................. 24

Atchinson v. Wichita Bd. of Trade,
412 U.S. 800 (1973) ......................................................................... 20

Bob Marshall All. v. Hodel,
852 F.2d 1223, 1228–29 (9th Cir. 1988) ................................................. 34

Cal. Cmtys. Against Toxics v. EPA,
688 F.3d 989 (9th Cir. 2012) ............................................................... 36

Cascade Forest Conservancy v. Heppler,
No. 3:19-cv-00424-HZ, 2021 WL 641614 (D. Or. Feb. 15, 2021) ........................ 35

Conservation Congress v. Forest Serv.,
2:12-02416 WBS KJN, 2013 WL 2457481 (E.D. Cal. June 5, 2013) .................... 25

Ctr. for Biological Diversity v. Ilano,
928 F.3d 774 (9th Cir. 2019) ......................................... 19, 23, 24, 25, 26

Ctr. for Biological Diversity v. Ilano,
261 F. Supp. 3d 1063 (E.D. Cal. 2017) .................................................. 27

Center for Biological Diversity v. Salazar,
706 F.3d 1085 (9th Cir. 2013). .......................................................... 21, 22

Center for Biological Diversity v. Salazar,
791 F. Supp. 2d 687 (D. Ariz. 2011) .................................................... 21, 22

Ctr. for Biological Diversity v. Stahn,
No. CV 08-8031-PHX-MHM (D. Ariz. April 10, 2008) ........................................ 18

Defenders of Wildlife v. U.S. Forest Service,
4:14-cv-02446-RM (D. Ariz. Sept. 15, 2015) ................................................... *passim*

Earth Island Inst. v. Elliott,
318 F. Supp. 3d 1155 (E.D. Cal. 2018). ..................................................... 8

Env'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.,
36 F.4th 850 (9th Cir. 2022) ...................................................... 35

Env'l Prot. Info. Ctr. v. U.S. Forest Serv.,
451 F.3d 1005, 1010 (9th Cir. 2006) ...................................................... 24

ForestWatch v. U.S. Forest Serv.,
No. 19-25925, 2020 WL 4931892 (C.D. Cal. Aug. 20, 2020) ............................... 9

Gifford Pinchot Task Force v. Perez,
No. 03:13-cv-00810-HZ, 2014 WL 3019165 (D. Or. July 3, 2014) ...................... 35

Hells Canyon Pres. Council v. Connaughton,
3:11-cv-00023-PK, 2013 WL 665134 (D. Or. Feb. 22, 2013) ........................ 17, 18

Humane Soc'y v. Locke,
626 F.3d 1040 (9th Cir. 2010) ...................................................... 27, 36

Idaho Conservation League v. U.S. Forest Service,
429 F. Supp. 3d 719 (D. Idaho 2019) .................................................. 35

Idaho Conservation League v. U.S. Forest Service,
No. 1:18-CV-504-BLW, 2020 WL 2115436 (D. Idaho, May 4, 2020) ................. 37

Idaho Farm Bureau Federation v. Babbitt,
58 F.3d 1392 (9th Cir. 1995) .................................................. 37

Idaho Wool Growers Ass'n v. Vilsack,
816 F.3d 1095 (9th Cir. 2016) .................................................. 35

<u>Mountain Communities for Fire Safety v. Elliot</u>,
25 F.4th 667 (9th Cir. 2022) ............................................................ 2, 8, 9

<u>Native Ecosystems Council v. Dombeck</u>,
304 F.3d 886, 894 (9th Cir. 2002) ...................................................... 10

<u>Native Ecosystems Council v. Tidwell</u>,
No. CV 08-121-M-DWM, 2009 WL 10695236 (D. Mont. June 1, 2009) .............. 9

<u>Native Ecosystems Council v. Tidwell</u>,
371 Fed.Appx. 718 (9th Cir. 2010) ....................................................... 9

<u>Native Ecosystems Council v. U.S. Forest Service</u>,
428 F.3d 1233 (9th Cir. 2005) ........................................................... 24

<u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>,
886 F.3d 803 (9th Cir. 2018) ............................................................ 28

<u>Natural Resources Defense Council v. EPA</u>,
38 F.4th 34 (9th Cir. 2022 ............................................................... 20

<u>Oregon Natural Desert Ass'n v. U.S. Bureau of Land Mgmt.</u>,
625 F.3d 1092 (9th Cir. 2010) ........................................................... 26

<u>Oregon Natural Desert Ass'n v. Jewell</u>,
840 F.3d 562 (9th Cir. 2016) ............................................................ 36

<u>San Luis & Delta-Mendota Water Auth. v. Locke</u>,
776 F.3d 971 (9th Cir. 2014) ............................................................ 27

<u>Save Our Cabinets v. U.S. Dept. of Agriculture</u>,
254 F. Supp. 3d 1241 (D. Mont. 2017) ................................................... 5

<u>Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.</u>,
100 F.3d 1443 (9th Cir. 1996) ........................................................... 24

<u>Te-Moak Tribe v. U.S. Dept. of Interior</u>,
608 F.3d 592 (9th Cir. 2010) ............................................................ 34

Town of Barnstable v. FAA,
659 F.3d 28, 34-36 (D.C. Cir. 2011) ....................................................... 19

Uranium Watch v. U.S. Forest Service,
No. 2:10-cv-721-DAK, 2010 WL 3703807 (D. Utah, Sept. 14, 2010) ...... 12, 16, 17

Utah Environmental Congress v. Bosworth,
443 F.3d 732 (10th Cir. 2006) .................................................. 15, 16, 17

Western Watersheds Project v. Bernhardt,
392 F. Supp. 3d 1225 (D. Or. 2019) ....................................................... 29

Western Watersheds Project v. Bernhardt,
543 F.Supp.3d 958 (D. Idaho 2021) ....................................................... 35

W. Watersheds Project v. Kraayenbrink,
620 F.3d 1187 (9th Cir. 2010) ......................................................... 23, 25

W. Watersheds Project v. Salazar,
No. 4:08-cv-516-BLW, 2011 WL 4526746 (D. Idaho Sept. 28, 2011) .................. 19

**Statutes**

42 U.S.C. § 4332(2)(E). ....................................................................... 34

**Regulations**

36 C.F.R. §220.4(f) ............................................................................. 16
36 C.F.R. §220.6 ................................................................................. 9
36 C.F.R. §220.6(b)(2) ........................................................................ 24
36 C.F.R. §220.6(c) .................................................... 19, 24, 27, 29, 30
36 C.F.R. §220.6(e)(8) ........................................................................... 2
36 C.F.R. §220.6.6(f)(2)(ii) .................................................................... 9
36 C.F.R. §228.1 ................................................................................ 15
36 C.F.R. §228.3 ............................................................................... 2, 4
36 C.F.R. §228.8 .............................................................................. 5, 13
36 C.F.R. §228.8(g) .......................................................................... 2, 5

## **Other Authorities**

73 Fed. Reg. 60233 (Oct. 10, 2008). ...................................................... 18

87 Fed. Reg. 23453 (April 20, 2022)...................................................... 16

BLM NEPA Handbook §1909.15, Ch. 31.3. ............................... 18, 20, 22

USFS Minerals Manual §2840.3–Reclamation Policy ............................ 4

Plaintiffs-Appellants Friends of the Inyo, et al. (Friends) submit this Reply to the Response briefs filed by U.S. Forest Service (USFS)(USFS Resp.) and KORE Mining (KORE)(KORE Resp.).

This case involves the first-ever attempt by USFS to avoid the strict time limit of CE-8 by recharacterizing required full reclamation of a mining exploration Project's impacts as a new "habitat restoration" project covered by a new CE-6, thus avoiding its duty to prepare an Environmental Assessment (EA) under NEPA. Without an EA, USFS evaded its duty to thoroughly analyze potentially-significant effects to the imperiled Bi-state distinct population segment (DPS) of greater sage-grouse and water resources that support the Endangered Owens tui chub from the Project.

## ARGUMENT

### I. CE-8 Does Not Apply Because The Project Will Not Be Completed In One Year.

### A. All of the Reclamation Is a Necessary Part of the Project.

USFS's and KORE's arguments suffer from the same fundamental misreading and manipulation of the agency's mining and NEPA regulations – asserting that the agency can split off many of the required Project reclamation operations to avoid the one-year timing limitation under CE-8. But the agency may only avoid preparing an EA or an EIS when a project "fits within" a specified

1

categorical exclusion. <u>Mountain Communities for Fire Safety v. Elliot</u>, 25 F.4th 667, 675 (9th Cir. 2022).

CE-8 applies to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations **and their incidental support activities**." 36 C.F.R. §220.6(e)(8) (emphasis added). Those incidental support activities include reclamation, since USFS' mining regulations require that "all operations shall" be conducted to minimize environmental impacts, including by "[r]ehabilitation of fisheries and wildlife habitat." 36 C.F.R. §228.8(g). "Operations" are defined as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." <u>Id</u>. §228.3. To fall within CE-8, the entire Project, including reclamation, thus must be able to be completed within one year or less. <u>Id</u>. §220.6(e)(8).

Indeed, USFS claimed that CE-8 "is applicable because this is a one-year Plan of Operations, **including reclamation**…." Decision 3, 2-ER-92. As USFS contends, "**[a]ll activities incidental to** mining, including **drilling**, grading, and installation of erosion control features, **will be completed within one year of the beginning of operations**." USFS Resp. 10, quoting Decision (emphasis added).

But that is false. There is no dispute that the Project cannot be completed within one year, as the reclamation activities required to be done after the drilling

is completed, i.e. the "incidental support activities," will take up to three years, maybe longer. *See* Opening 22-24 (detailing USFS and KORE statements explaining the required multi-year reclamation).

USFS/KORE do not refute that reclamation required by the agency's mining regulations includes "habitat restoration activities." *See* Opening 21 (discussing USFS definitions of "reclamation" and "operations" covered by the approval of a mining exploration plan). USFS does not deny that it can only approve an exploration plan that results in "satisfactory reclamation" and meets the strict reclamation requirements of the 36 C.F.R. Part 228A regulations and controlling agency policy. "[P]ost-exploration habitat restoration activities that…may continue past one year" are "needed for satisfactory reclamation." Decision 2, 2-ER-91.

Instead, USFS created an artificial distinction between "immediate reclamation" which will be done shortly after the drilling ends (such as initial reseeding and grading), versus the revegetation and monitoring activities required for "satisfactory reclamation" which will take three or more years. The agency admits that it split the Project into "two phases" to avoid having to conduct an EA.[1] The "Decision Memo approves a single project with two phases." USFS Resp. 17.

---

[1] USFS asserts that it did not "bifurcate" the Project. USFS Resp. 24. But that is exactly what it did by splitting the Project into two "phases" for the first time in the Decision.

Notably, USFS/KORE do not dispute that there was no mention of a two-phase project, or of utilizing two different CEs, until the Decision came out, long after public comment ended.

"During phase one of the Project, KORE will complete all mineral exploration and **initial** site reclamation." USFS Resp. 10 (emphasis added). *See also* id. at 11 (additional reclamation will occur "[d]uring phase two of the project, and for up to three years after drilling and initial reclamation….").  The agency labels the additional years of reclamation as "[o]utyear monitoring and low-impact habitat restoration," USFS Resp. 14, and "post-project restoration for habitat improvement." USFS Resp. 28.

The agency's controlling regulations, however, require that all of the operations approved by the Decision are part of—i.e., are "incidental supporting activities" to—the drilling project and cannot be peeled off into another category to avoid the one-year limit. *See* 36 C.F.R. §228.3 (defining "operations" to include "uses reasonably incident" to "exploration").  The rules do not contemplate any distinction between "immediate" reclamation and "outyear" or "post-project" reclamation, as the USFS mining direction provides that all reclamation is an "integral part" of the approved mining plan of operations:  "Reclamation shall be an integral part of Plans of Operation that propose surface disturbance." USFS Minerals Manual §2840.3–Reclamation Policy, Addendum to Opening 112.

4

"Reclamation" includes: **"**(4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and (5) Rehabilitation of fisheries and wildlife habitat." 36 C.F.R. §228.8(g). The 1897 Organic Act and the Part 228A rules "require that mining operators … take all practicable measures to maintain and protect fisheries and wildlife habitat." <u>Save Our Cabinets v. U.S. Dept. of Agriculture</u>, 254 F.Supp.3d 1241, 1250 (D. Mont. 2017). Thus, "rehabilitation of wildlife habitat" is, by definition, an integral part of the exploration project, not some "post-project" work.

USFS justifies the invocation of CE-6 by claiming that "[i]n order to minimize effects to natural resources, I am **also** requiring post-project restoration for habitat improvement." Decision 3, 2-ER-92 (emphasis added). That is a subterfuge, as USFS is already required to "rehabilitat[e]…fisheries and wildlife habitat" and "minimize adverse impacts" as part of its duty to reclaim impacts from mining exploration. 36 C.F.R. §228.8. The purported "post-reclamation" and "outyear" activities are not extra – they were required in the first place in order to meet USFS's duty to minimize impacts and "maintain and protect fisheries and wildlife habitat." <u>Save Our Cabinets</u>, 254 F. Supp. 3d at 1250; *see also* 36 C.F.R. §228.8(g).

USFS created this artificial distinction to argue that the longer-term reclamation is not part of the Project's "incidental support activities" under CE-8.

Under this view, although the "immediate/initial" reclamation is considered part of, and in support of, the exploration (as it has to be under the regulations), the additional "outyear/post-project" reclamation is somehow not part of, or incidental to, the same exploration drilling Project.

Again, that cannot be, because without the so-called "outyear/post-project" reclamation, USFS could not lawfully approve the Project under the Organic Act and Part 228A regulations. USFS has not disputed that the "post-project" reclamation is required to meet the strict reclamation requirements in these regulations. *See* Decision 2, 2-ER-91 (acknowledging that the "post-exploration habitat restoration activities" are "needed for successful reclamation."). Indeed, USFS admits it only approved one single Project: "The Forest Service's Decision Memo approves a single project with two phases of work." USFS Resp. 17.

USFS/KORE also fail to distinguish the directly applicable opinion from the Arizona federal district court, <u>Defenders of Wildlife v. U.S. Forest Service</u>, No. 4:14-cv-02446-RM (D. Ariz. Sept. 15, 2015), which rejected the **exact same agency argument** that post-drilling reclamation lasting more than one year is not "incidental support activity" that should be counted when determining whether a drilling project fits within CE-8's one-year limit. 2-ER-31-47.

USFS/KORE argue that the court did not decide that issue, as there was evidence that the drilling itself would last more than one year. USFS Resp. 28;

6

KORE Resp. 37. But that is exactly what that ruling said. Defenders held that post-drilling reclamation lasting more than one year precludes the use of CE-8, regardless of the timing of the initial drilling. Defenders, 2-ER-38 ("the Decision Memorandum anticipates that additional ground-disturbing reclamation activities may be required during the three-year monitoring period.").

At bottom, after Friends notified the agency of the Defenders opinion, USFS realized that the Project did not fit within CE-8. But instead of preparing the required Environmental Assessment (EA) under NEPA, USFS manufactured an excuse to split the Project and authorize the needed reclamation that would take longer than a year to complete under CE-6.

As justification, USFS relies on a straw man argument, portraying Friends as arguing that the "satisfactory reclamation" beyond the first year of the Project should not occur since it would not be completed within a year. The district court based its order on this flawed premise. See 1-ER-19. But Friends does not argue that reclamation exceeding one year should not be completed; indeed, Friends argues that activities beyond the first year are required for "satisfactory reclamation" by USFS' mining regulations. USFS can indisputably require reclamation that exceeds one year, but where full reclamation will take more than one year, it just cannot avail itself of CE-8, and must prepare an EA. All Friends argues is that the agency cannot use CE-8 to cover the Project, when it is

undisputed that reclamation work, which is an "integral part" of the Project, will last more than a year.

It is clear that USFS/KORE wanted to avoid preparing an EA. So, they invented this chimera that the Project's required reclamation constituted additional "rehabilitation" requirements that USFS could approve under a separate CE-6 to avoid the time limitation in CE-8. Such a position, untethered from the agency's own regulations, is the essence of an arbitrary and capricious action.

## B. USFS Cannot Carve Off Some of the Required Reclamation Into a Separate Project.

USFS/KORE spend considerable energy arguing that different projects may qualify under multiple CE categories. But Friends do not assert that different projects cannot qualify under different CE categories. Instead, Friends assert that USFS may not artificially split one project in two, using two CEs, to avoid preparing an EA.

Thus, much of USFS/KORE's caselaw is inapplicable. Indeed, the district court analyzed and rejected those arguments and caselaw. 1-ER-14-17 (refuting USFS/KORE's reliance on, among other cases, Mountain Communities for Fire Safety, 25 F.4th at 680 and Earth Island Inst. v. Elliott, 318 F. Supp. 3d 1155, 1180-81 (E.D. Cal. 2018)). As the court noted, the cases allowing the agency to

use multiple CEs involved **different and separate** projects. 1-ER-14-18.[2]  That is not the situation here.

The district court also correctly discussed how the agency CE regulations, 36 C.F.R.§220.6, as well as numerous cases, focus on the use of one CE for one project. 1-ER-16-17.  "[W]hen the same regulation mentions multiple categorical exclusions, it assumes the agency will select just one. … So, 'if more than one category' could cover an action, the Forest Service must select a single category and explain 'why the specific category was chosen.'" 1-ER-16, quoting 36 C.F.R. §220.6.6(f)(2)(ii).  "As another district court concluded, when 'more than one categorical exclusion comes into play, the Forest Service may 'determine which one applies.'" 1-ER-16-17, quoting ForestWatch v. U.S. Forest Serv., No. 19-25925, 2020 WL 4931892, at *5 (C.D. Cal. Aug. 20, 2020).

Yet the court then based its order approving the use of two CEs on the premise that USFS essentially approved two projects (drilling and

---

[2] KORE relies on Native Ecosystems Council v. Tidwell, No. CV 08-121-M-DWM, 2009 WL 10695236, at *1 (D. Mont. June 1, 2009), aff'd 371 Fed.Appx. 718 (9th Cir. 2010).  There, USFS approved two separate timber harvests, one for live trees under one CE and the other for dead trees under a different CE.  While it was framed as a single project, each separate harvest "fit[] within a specified categorical exclusion." Mountain Communities, 25 F.4th at 675.  It was not a case where the activities exceeded the legal time limit of a CE utilized, when framed as a single project, as here.

reclamation/restoration) instead of one. *See* 1-ER-18 ("this case illustrates how a patchwork theory of categorical exclusions might be reasonable.").  Although the district court determined the agency's "patchwork" approach may have "rested on an incorrect understanding of what the relevant regulations permit," it nevertheless found the agency's use of two CEs reasonable. 1-ER-20.  It reasoned that since USFS found that the environmental effects of each project were not "significant," the use of two CEs was acceptable because "zero plus zero is zero." 1-ER-17.

But if the Project does not fit within a CE, then its impacts are **by definition**, potentially significant. *See* 36 C.F.R. §220.6(a).  USFS may not "divid[e] a project into multiple actions" to avoid finding its effects significant. Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir. 2002).

Here USFS itself said it approved a single project: "There is no independent habitat restoration project here." USFS Resp. 53.  Indeed, USFS's 36 C.F.R. Part 228A regulations provide that the required reclamation is part of the single Project here because reclamation must include all necessary wildlife habitat restoration, and is a necessary "incidental support activity" for mining exploration under CE-8. The Project cannot be completed in one year, and does not fit within CE-8.

The district court also relied on USFS' distortion of Friends' argument, that Friends is arguing that KORE **must** complete all reclamation in the first year. 1-ER-19.  Again, this is wrong.  Friends argues that **if** the agency relies on CE-8,

10

then KORE must complete all reclamation (as "incidental support activities" to the drilling) in that first year. Friends is not arguing that, due to this regulatory limitation, the agency can forego its duties to require that all needed reclamation is completed in order to fit within CE-8.

The issue is also not whether an arguably relevant CE category, like CE-6 for a "habitat improvement" project, could apply to activities on USFS land. Instead, the issue is whether the agency can split off required habitat restoration into a new "action" to avoid the time limit in CE-8. Since the multi-year reclamation of wildlife habitat is required by the Part 228A regulations as an integral part of the drilling project, it is not a separate project. That is true even if that habitat restoration, on its own, could qualify under CE-6. While the district court speculated that "splitting an action into pieces" in this way "might be consistent with the regulations and NEPA's purposes," it recognized that none of the cases cited by USFS/KORE stood for the proposition that USFS may do this. 1-ER-17.

In support of USFS's surprise invocation of CE-6 in the Decision, KORE asserts that the CE-6 reclamation is "additional habitat restoration work," to what it proposed to do when it submitted its plan to the USFS. KORE Resp. 22. That is also not true. When the agency applied the new CE-6 to the Project (for the first time in the Decision) it did not add any new reclamation/restoration requirements

11

beyond what KORE had previously proposed. KORE submitted the eventually-approved Plan of Operations about a month before it was approved, and there was no mention of "additional" or "extra" reclamation work subject to a new CE. PoO 1, 2-ER-111.

The district court and USFS/KORE rely on Uranium Watch v. U.S. Forest Service, No. 2:10-cv-721-DAK, 2010 WL 3703807 (D. Utah, Sept. 14, 2010), an opinion on a preliminary injunction motion from outside the Ninth Circuit. But that case does not support the agency here, as the district court acknowledged that the case involved two separate, albeit related, uranium projects. 1-ER-17-18.

Here, in contrast, USFS admits that it "approved a single project." USFS Resp. 17. Further, the court in Uranium Watch, specifically found that the exploration drilling project was separate from the "vent holes" construction project and thus the projects had "independent utility." 2010 WL 3703807, at *5. That is different from this case, where USFS used CE-8 and CE-6 to cover the same reclamation operations, and the CE-6 operations would not be necessary but for the need for reclamation from the CE-8 mining exploration. In Uranium Watch, all reclamation would be completed within one year, unlike this case. Id. at *7.

The agency cannot artificially split the Protect into "two phases" to avoid the fact that the drilling and required reclamation are one Project that must comply with CE-8. As Friends has shown, the single Project does not fit into CE-8, as the

approved reclamation greatly exceeds the one-year limit, and USFS unlawfully approved the Project without first preparing an EA.

**C.    "Post-Project" Reclamation Cannot Both be Part of the Exploration Project for Permitting Purposes, and Separate for Purposes of CE-8's Time Limit.**

The Project cannot simultaneously be two separate Projects for purposes of CE-8 and a single mining project for permitting purposes.  To avoid complying with the one-year limit in CE-8, USFS and KORE assert that some of the required "post-project" reclamation is a separate action from the mining exploration.  Yet, at the same time, USFS considered the habitat restoration/reclamation project as a mineral operation approved pursuant to a "right" under the 1872 Mining Law. *See* USFS Resp. 4 (stating that KORE has a "right" under the Mining Law to conduct all activities approved in the Decision).

USFS asserts that the purported habitat restoration project does not need a special use permit under 36 C.F.R. Part 251, required for projects **not** governed by rights under the 1872 Mining Law, because it was approved as part of KORE's exploration and reclamation plan under the Part 228A regulations. USFS Resp. 17 (the habitat reclamation activities "were authorized under 36 C.F.R. §228.8").

That highlights the contortions USFS used to avoid preparing an EA.  The agency says that it approved a "single project" and that "[t]here is no independent habitat restoration project here." USFS Resp. 53.  But if the "outyear" and "post-

13

project" reclamation work is "incidental" to, and part of, a single mining exploration project approved under the Part 228A regulations, then that reclamation work counts when determining whether the Project meets CE-8's one-year limit. Conversely, if it is not "incidental" to the drilling, then the "outyear" and "post-project" reclamation are not mining operations under the 1872 Mining Law as defined in the Part 228A regulations, and a special use permit is required.

USFS/KORE claim that USFS's reclamation requirements under its mining regulations and policies are inapplicable (especially the rule that all reclamation is part of, and thus incidental, to the drilling), because USFS invoked CE-6 under its NEPA regulations, not the mining regulations. USFS Resp. 53-54. Again, that misses the point. It is the NEPA regulations, not the mining regulations, that impose the one-year limit for CE-8.

The district court, in rejecting Friends' claim that the agency manipulated the CE process, noted that the purported "additional restoration work" was part of a mineral project authorized by the Part 228A mining regulations. 1-ER-27-28. Yet that supports Friends' case, as the only way the reclamation work could be conducted pursuant to a right under the Mining Law would be if it were a "support activity" to the exploration and part of the Project. And if that is the case, then the USFS cannot divorce it from drilling activities so as to avoid the strict time limits in CE-8. Meanwhile, if the "outyear/post-project" reclamation were essentially

separate from the initial drilling, and thus could be covered by the new CE-6, the work would not be "authorized by the United States mining laws" as part of the mineral exploration project. 36 C.F.R. §228.1.

USFS cannot claim that the work approved under CE-6 is "authorized by the mining laws" while also arguing that the work is not incidental to, or in support of, the drilling (the test for whether the work should be covered by CE-8). USFS's decision to approve part of the Project reclamation under the Mining Law, instead of under the agency's multiple use and special use permitting processes (36 C.F.R. Part 251), either violates NEPA (by failing to comply with the CE-8 limits), or improperly avoids the 1897 Organic Act and the agency permitting regulations.

## II. The USFS Violated NEPA by Approving the Project Without Analyzing Cumulative Impacts and in the Face of Extraordinary Circumstances.

### A. By Overlooking Cumulative Impacts USFS Failed to Properly Analyze the Significance of the Project's Impacts.

In attempting to justify USFS's decision to forego preparing an EA, USFS/KORE apply new legal standards contrary to Ninth Circuit precedent. They urge this Circuit to adopt the Tenth Circuit's rule from Utah Environmental Congress v. Bosworth, 443 F.3d 732 (10th Cir. 2006), that an agency need not consider whether there are cumulative impacts when invoking a CE. *See* USFS Resp. 50; KORE Resp. 59. Case law from within this Circuit, however, requires

agencies to consider cumulative impacts before employing a CE, to determine whether there is uncertainty about the significance of an action's effects.

USFS has not done the analysis required to support a determination that the Project could not have the potential for significant effects because it admits that it never considered cumulative impacts. USFS does not deny that it never considered the potential cumulative impacts from the "past, present, and reasonably foreseeable" activities in the area. Instead, USFS argues that, as a matter of law, it does not have to make that inquiry. USFS contends that the mere invocation of one or more CEs automatically means that there is no potential for significant impacts.[3]

But that is the rule in the Tenth Circuit, not the Ninth Circuit. *See* <u>Utah Env'l Congress</u>, 443 F.3d at 741-42. Indeed, in <u>Uranium Watch,</u> the District of Utah opinion upon which USFS/KORE rely, the court acknowledged that the Tenth

---

[3] USFS erroneously argues that the revised NEPA regulations in 2020 control, rather than the rules in place when it began the NEPA process after receiving KORE's Plan of Operations in 2020. USFS Resp. 48. The agency asserts that the CEQ's removal of the definition of "cumulative impacts" in 2020 eliminates the need to consider them in the NEPA process. That view was expressly contradicted by the CEQ in 2022, when it determined that "the deletion of the definition of 'cumulative impacts' in the 2020 rule did not absolve agencies from evaluating reasonably foreseeable cumulative impacts." 87 Fed. Reg. 23453, 23463 (April 20, 2022). In any event, the USFS' NEPA regulations never eliminated the need to review cumulative impacts. *See* 36 C.F.R. §220.4(f)("The final analysis documents an agency assessment of the cumulative effects of the actions considered (including past, present, and reasonable foreseeable future actions) on the affected environment.").

16

Circuit does not follow the Ninth Circuit's rule that cumulative impacts must be considered before applying a CE: "Plaintiffs rely on several Ninth Circuit cases stating that the Forest Service must consider cumulative impacts before categorically excluding an action." 2010 WL 3703807, at *4 (instead relying on Utah Env'l Congress to avoid considering cumulative impacts). Thus, USFS/KORE's reliance on cases from the Tenth Circuit actually shows how USFS's actions in this case are contrary to caselaw from within the Ninth Circuit.

USFS/KORE fail to rebut the opinions from the federal courts in Oregon and Arizona requiring agencies to consider cumulative impacts *before* employing a CE. "In determining whether a proposed action has 'significant' environmental effects, an agency should consider whether the action is related to other actions with individually insignificant but cumulatively significant impacts." Defenders, 2-ER-43-44. "[O]nly where the potential effect on the resource condition is known to be insignificant does the action comply with the Forest Service's policy on extraordinary circumstances." Hells Canyon Pres. Council v. Connaughton, No. 3:11-cv-023-PK, 2013 WL 665134, at *6 (D. Or. Feb. 22, 2013). Determining the significance of the potential effects requires USFS to consider the cumulative effects and impacts of "past, present, and reasonably foreseeable future actions." Id. at *8.

Now-Chief Judge of the Ninth Circuit, Judge Murguia, held the same when she was a district court judge in Arizona. In Center for Biological Diversity v. Stahn, Judge Murguia enjoined USFS's approval of a (smaller) mining exploration project, finding that, among other issues, USFS's use of CE-8 violated NEPA for failing to consider the cumulative impacts associated with a mineral exploration project. Order, Ctr. for Biological Diversity v. Stahn, No. CV 08-8031-PHX-MHM, 3 (D. Ariz. April 10, 2008)(ECF No. 60), 1-FER-6 ("In relying on a categorical exclusion, Defendants failed to adequately consider: … cumulative impacts from this and other past, present, and reasonably foreseeable exploratory projects, or impact to wildlife and groundwater."). In response to Judge Murguia's Order, USFS agreed to prepare a full Environmental Impact Statement. 73 Fed. Reg. 60233 (Oct. 10, 2008).

USFS/KORE also ignore the agency's own regulations and policy, which expressly require USFS to consider cumulative impacts as a threshold matter during the scoping process. As noted in Defenders and Hells Canyon, the USFS NEPA Handbook requires that "[s]coping should . . . reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects." FSH §1909.15, Ch. 31.3 (Addendum to Opening 110). If the agency "determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the

18

agency must "prepare an EA." <u>Center for Biological Diversity v. Ilano</u>, 928 F.3d 774, 782 (9th Cir. 2019), quoting 36 C.F.R. §220.6(c).

USFS argues that it can ignore its own NEPA policies because they are not regulations with the force of law. USFS Resp. 50-51. Regardless of whether USFS's Handbook has the force of law, however, USFS is not free to cavalierly disregard its direction, especially when its action expressly contradicts its policy, as it does here.

"It does not matter whether the Policy and Strategy contain requirements or only guidelines—either way, the BLM violates FLPMA by completely disregarding its own policies … without discussion or analysis." <u>W. Watersheds Project v. Salazar</u>, No. 4:08-cv-516-BLW, 2011 WL 4526746, at *17 (D. Idaho Sept. 28, 2011). Where an agency "abandon[s] its own established procedure" set forth in its handbook, and thus "catapult[s] over the real issues and analytical work required by its handbook," that "improper application of its own handbook" means that the agency necessarily "did not adequately explain its result." <u>Town of Barnstable v. FAA</u>, 659 F.3d 28, 34-36 (D.C. Cir. 2011). In <u>Barnstable</u>, the Court remanded the decision to the agency for proper "application of the handbook's guidelines" because "it surely is enough to trigger the standard requirement of reasoned decision-making, i.e., to require the [agency] to address the issues and explain its conclusion." <u>Id</u>. at 36.

19

This Circuit recently similarly held an agency's action invalid where it failed to comply with guidelines: "Despite EPA's repeated invocation of its Cancer Guidelines, the Interim Decision fails to abide by those Guidelines. Inconsistent reasoning is, absent explanation, the hallmark of arbitrary action. It cannot survive substantial-evidence review." Natural Resources Defense Council v. EPA, 38 F.4th 34, 51 (9th Cir. 2022)(cleaned up). An agency must "explain its departure from prior norms" clearly, so "the reviewing court may understand the basis of the agency's action." Atchinson v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973). Here, USFS has not justified its departure from its Handbook's direction or even considered the requirement to conduct cumulative impacts analysis.

Further, both USFS and KORE misinterpret Friends's argument on cumulative impacts as only dealing with whether the other activities in the area present an "extraordinary circumstance" precluding use of a CE. USFS Resp. 48-52; KORE Resp. 59. Instead, Friends contend the agency has a duty to analyze cumulative effects during the initial scoping process as required by the Handbook to determine whether the Project could present significant impacts to any other resources when coupled with the other "past, present, and reasonably foreseeable" activities in the area. FSH §1909.15, Ch. 31.3. USFS never did this analysis, and therefore could not reasonably conclude that it was certain that there was no potential for significant impacts.

20

USFS/KORE rely on <u>Center for Biological Diversity v. Salazar</u>, 706 F.3d 1085, 1096-97 (9th Cir. 2013). USFS Resp. 2; KORE Resp. 59.  But that case actually supports Friends.  That opinion affirmed the district court's opinion that the federal land agency (Bureau of Land Management (BLM)) had fully considered the cumulative impacts from nearby activities in relying on a CE.  The district court had initially rejected the BLM's argument that it adequately considered the cumulative impacts.  "Contrary to the law of this Circuit, however, BLM failed to explain its reasons for finding no cumulatively significant impacts." <u>Center for Biological Diversity v. Salazar</u>, 791 F.Supp.2d 687, 703 (D. Ariz. 2011).  The district court held that BLM's "'cursory statement' of no cumulatively significant impacts in applying the categorical exclusion" was insufficient under NEPA. <u>Id</u>.  Upon remand, the agency submitted a new cumulative impacts explanation, which plaintiffs challenged again.  The district court then accepted BLM's new explanation as meeting NEPA's requirements and plaintiffs appealed to the Ninth Circuit.

The Ninth Circuit agreed with the district court that the agency (the second time around) had adequately analyzed the cumulative impacts of other activities in the area and provided a "comprehensive explanation that BLM considered all appropriate factors, including the cumulative impacts" of other projects. <u>Salazar</u>,

21

706 F.3d at 1098. But the need for the agency to analyze those impacts was never questioned by the federal government or the federal courts.

Indeed, the court in <u>Defenders</u> relied on the district court's opinion in <u>Salazar</u>, agreeing that the "agency's unexplained conclusion that the proposed action had no cumulatively significant environmental impacts was insufficient to support use of a categorical exclusion." 2-ER-45. Thus, <u>Salazar</u>, while deferring to the agency's new analysis of cumulative impacts submitted after the initial remand, shows that those impacts must be considered before invoking a CE.

Importantly, both the Ninth Circuit and the district court in <u>Salazar</u> relied on the fact, like here, the agency's "NEPA Handbook" required the analysis of cumulative impacts. 791 F.Supp.2d at 702. *See also* <u>Salazar</u>, 706 F.3d at 1097, citing "BLM NEPA Handbook." Thus, USFS/KORE's argument that Friends are relying on the NEPA requirements for EISs (*e.g.*, 40 C.F.R. §1508.25) is wrong, as Friends highlight the agency's NEPA Handbook provisions dealing with CEs, just as plaintiffs did in <u>Salazar</u>.[4]

---

[4] BLM's NEPA Handbook requires cumulative impacts be considered in the analysis of "extraordinary circumstances." <u>Salazar</u>, 706 F.3d at 1097. That is somewhat different from the USFS's NEPA Handbook, which requires consideration of cumulative impacts during initial scoping to determine whether impacts may be significant. Handbook §1909.15, Ch. 31.3. (Addendum to Opening 110).

Thus, USFS's position in this case, that as matter of law, it does not have to consider cumulative impacts when invoking a CE, is contrary to precedent and the agency's own policy.

**B.      Uncertainty About the Potential for Significant Impacts to Protected Species is an "Extraordinary Circumstance" Precluding use of any CE.**

USFS also ignored or downplayed information showing the Project's potential risks to significantly impact Sensitive Bi-state sage-grouse and Endangered Owens tui chub.  For both species, the agency relied on bare conclusions, unsupported by detailed analysis, that impacts would not be significant.  The Circuit owes no deference to such unsupported conclusions, which are counter to record evidence. Western Watersheds Project v. Kraayenbrink, 632 F.3d 472, 493 (9th Cir. 2011).

USFS/KORE advocate for adoption of the district court's new standard under which there can be no "extraordinary circumstances" with respect to wildlife unless the Project would result in a trend towards federal listing under the Endangered Species Act or a total loss of viability for the species. Decision 5, 2-ER-94 (Project "will not result in any impacts to the species that would affect their viability within the project area or the Inyo National Forest.").

But that is not the standard, and this Circuit did not hold that it was in Center for Biological Diversity v. Ilano, 928 F.3d 774 (9th Cir. 2019).  Rather, "an agency may issue a categorical exclusion even where threatened or endangered species are

23

present if the agency determines that **the project will not impact negatively on the species**." Id. at 782, quoting Sw Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996)(emphasis added).  The agency's explanation for such a determination must be "convincing." Alaska Ctr. for Env't v. U.S. Forest Service, 189 F.3d 851, 859 (9th Cir. 1999). *See also* Defenders, 2-ER-43.

This makes sense, since any "uncertainty" about whether a project "may" have a significant impact requires an EA. 36 C.F.R. §220.6(c).  USFS counters that it is the "degree" of the effect that determines whether extraordinary circumstances exist. USFS Resp. 35, citing 36 C.F.R. §220.6(b)(2).  While this may be true, the degree of effect to raise "uncertainty" must be less than the degree to reach the "may have a significant impact" threshold requiring an EIS. 36 C.F.R. §220.6(c).  USFS conflates the two when it relies on Env'l Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1010 (9th Cir. 2006). *See* USFS Resp. 35.  Although "the presence of some negative effects" to members of a protected species does not necessarily "[rise] to the level of demonstrating a **significant** effect," it could certainly create uncertainty about whether effects may be significant.  Env'l Prot. Info. Ctr., 451 F.3d at 1010, quoting Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1240 (9th Cir. 2005)(emphasis added).

24

In <u>Ilano</u>, this Circuit was convinced by the agency's explanation for why uncertainty about impacts to the California spotted owl did not rise to the level of an extraordinary circumstance because the agency ensured the project did not affect the owl's most important habitat and determined that the Project would actually "benefit [the species] in the long run." 928 F.3d at 782.  In reaching its decision, the agency "considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record." <u>Id</u>. at 783.  Thus, the agency supported its decision that the project would benefit— not impact negatively on—the protected species there.

In contrast, USFS's determination here "does not appear to be supported by the record." <u>Conservation Congress v. U.S. Forest Service</u>, 2:12-02416 WBS KJN, 2013 WL 2457481, at *7 (E.D. Cal. June 5, 2013).  After scoping showed uncertainty about whether impacts to Bi-state sage-grouse and Owens tui chub could be significant, USFS "gave short shrift to a deluge of concerns from its own experts…and state agencies" and forged ahead without the EA it had initially recognized was necessary to study the Project's impacts. <u>Kraayenbrink</u>, 632 F.3d at 493.  It dismissed uncertainty about impacts to the sage-grouse in a single paragraph and did not even mention the Owens tui chub.  While USFS/KORE claim USFS's determination is entitled to deference, the court cannot "defer to a

void." Or. Nat. Desert Ass'n v. U.S. Bureau of Land Mgmt., 625 F.3d 1092, 1121

(9th Cir. 2010).

    *1. There is uncertainty about impacts to Bi-state sage-grouse.*

USFS/KORE argue that the USFS reasonably determined that impacts "will

be short-term and spatially limited, so will not result in any impacts to the species

that would affect [sage-grouse] viability within the project area or the Inyo

National Forest." USFS Resp. 40.  Notably, USFS did not conclude that impacts

"are certain to be environmentally insignificant." Defenders, 2-ER-43.  It did not

even conclude there would not likely be negative species-level impacts, it only

determined the effects would not affect the species' viability.  USFS thus did not

actually determine there was no uncertainty about significant impacts.

Indeed, unlike in Ilano, the Project occurs in the middle of important Bi-state

sage-grouse habitat and will not benefit the species.  USFS admits that the Project

would cause sage-grouse "physiological stress, reduced foraging success, and

exposure to higher predation rates due to increased movements" to avoid the

drilling and other Project activities—even **with** implementation of avoidance and

minimization measures. Decision 4-5, 2-ER-93-94.  The information presented in

comments from CDFW, Mono County, Mammoth Lakes, and the general public,

and accompanying scientific literature, suggests that whether these impacts may be

significant is at least uncertain, which requires an EA under USFS's regulations. *See* Opening 48-49; 36 C.F.R. §220.6(c).

USFS/KORE nevertheless contend that USFS's dismissal of impacts is "technical" in nature, and deserves essentially unquestioned deference. USFS Resp. 41. "[E]ven when [the agency's] conclusions are scientific," however, the deference owed an agency "is not unlimited." San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 994 (9th Cir. 2014). "Under the APA, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Humane Soc. of U.S. v. Locke, 626 F.3d 1040, 1048 (9th Cir. 2010) (cleaned up). The court may not "supply a reasoned basis for the agency's decision that the agency itself has not given." Id.

Here, the entire "reasoned basis" to which USFS and KORE ask the Circuit to defer is one paragraph. Without the kind of analysis of the status and trends of sage-grouse populations in the Project area or the larger Long Valley PMU that an EA would have included (and the record in Ilano supplied, *see* Ctr. for Biological Diversity v. Ilano, 261 F.Supp.3d 1063, 1069 (E.D. Cal. 2017)), USFS could not rationally assess whether those unavoidable negative impacts would impact population viability or otherwise be significant. There is no authority to support USFS's bare conclusion that impacts would be minor simply because they would

last for only a few months within the Project area—when USFS itself acknowledged that they would lead to increased sage-grouse mortality from predation and decreased fitness. *See* Decision 4-5, 2-ER-93-94.

The Decision does not disclose whether the Project's anticipated adverse impacts would be limited to a few individuals or occur throughout the local population. Evidence in the record suggests that disturbance from traffic on the Project's access roads could affect resident birds that breed on up to four of the eight leks in the Long Valley population. Opening 48-49; CDFW Comment 3, 2-ER-246; Bi-State Action Plan 44, 2-ER-241. As this Circuit recognized in Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., harm to individual members of an imperiled species may also be significant—indeed, irreparable—because it may decrease the likelihood that the species will survive. 886 F.3d 803, 818 (9th Cir. 2018). USFS cannot acknowledge adverse impacts will occur, yet dismiss the potential for those impacts to be significant without meaningful analysis.

USFS/KORE try to portray the dismissal of impacts as based on "extensive" technical data, but examining these sources reveals that is false. The Biological Impact Analysis (BIA) provides a one-paragraph summary of biological information about sage-grouse, lists leks in the Project area, lists avoidance and minimization measures, and, without any analysis, concludes: "Project implementation is not expected to affect greater sage grouse's (Bi-state DPS)

capabilities to persist over the long term in the Project Area," with no conclusion on significance. BIA 16, 19, 1-USFSSER-028, 1-USFSSER-031. The noise report contains a two-paragraph dismissal of noise impacts to sage-grouse. *See* Noise Report 14, 1-USFSSER-174. The Forest Plan Review spreadsheet summarizes purported compliance with Plan sage-grouse standards. 1-USFSSER-204-205. None of these references describes the effects of anticipated "physiological stress, reduced foraging success, and exposure to higher predation rates due to increased movements" to the dwindling population of sage-grouse in Long Valley.

Friends are not arguing that *any* impact to a protected species would necessarily constitute an extraordinary circumstance. But when scoping raises uncertainty about whether impacts from a Project to a species in dire straits, like the Bi-state sage-grouse, may be significant, USFS's regulations require the agency to prepare an EA. 36 C.F.R. §220.6(c). USFS cannot simply reject acknowledged likely mortality of members of a protected species as an insignificant impact. Without the more thorough analysis an EA would involve, USFS relies on a "conclusory opinion that is unsupported by meaningful analysis," which is not due deference. W. Watersheds Project v. Bernhardt, 392 F.Supp.3d 1225, 1251 (D. Or. 2019).

*2. There is uncertainty about impacts to the Owens tui chub.*

There is no dispute that impacts to listed species (including the Owens tui chub) must be considered in the extraordinary circumstances analysis. USFS asserts that "[b]ecause the Project will not adversely affect groundwater resources, it will not injure the Owens tui chub." USFS Resp. 47. Notably, though, the actual approval Decision does not even mention the Owens tui chub. 2-ER-90-107.

USFS's purported "no impacts" conclusion is unsupported by detailed analysis. USFS/KORE acknowledge that impacts to groundwater could occur and that is why the Decision adopted Project design features to purportedly minimize potential impacts from potential mixing of cool and hot aquifers, "to further minimize any risk of groundwater intermixing." Decision 6, 2-ER-95. It is that risk and uncertainty about the effects to groundwater and to the endangered Owens tui chub that shows the need for detailed NEPA analysis in an EA, and makes reliance on a CE here improper. *See* 36 C.F.R. §220.6(c)("If … it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA.").

Because the Project will encounter and may impact groundwater, it may affect the endangered Owens tui chub and its habitat that is dependent on the groundwater resources that also underlie the Project site. Opening 16-18, 50-52.

CDFW recommended specific groundwater modeling to evaluate impacts to groundwater and habitat for the Owens tui chub:

> Because this Project has the potential to adversely impact federally and State endangered fish species, CDFW recommends that the proponents construct a groundwater flow model … to determine the potential impacts to adjacent springs.

CDFW Comment 5, 2-ER-248.  Yet USFS refused to undertake the requested groundwater modeling. Rather, it relied solely on a hydrogeologic evaluation prepared for KORE based on old information from earlier drilling records. USFS Resp. 45-46.

Further, USFS's brief oversells the agency's conclusions regarding the Owens tui chub.  For example, USFS's brief states that "the Project **will not** impact Owens tui chub" because the drilling "**will not** cause a loss in groundwater quality or quantity." USFS Resp. 47 (emphasis added).  KORE makes a similar absolute assertion, that "CDFW's concern that the underlying groundwater was separated into an 'upper, cool water aquifer' and a 'deeper geothermal aquifer,' was **completely unfounded**." KORE Resp. 55-56 (emphasis added).

But the USFS's Decision, in contrast, qualifies its conclusions, and admits to the outstanding uncertainties associated with the Project:

> **It is not expected** that this exploration effort will encounter these conditions either, and therefore there **should not be** any inadvertent groundwater loss. … In summary, there **does not appear to be** a significant upper, cool water aquifer in the claim block. Therefore, **it**

31

**is not likely** that drilling will cause intermixing of the two aquifers in this area.

2-ER-95 (emphasis added).

Regarding the potential for artesian conditions, KORE acknowledges that "artesian conditions, which, if present could potentially impact groundwater-dependent species like the Owens tui chub." KORE Resp. 55. But KORE states unequivocally that no such potential exists. The record shows that this risk is real.

USFS and KORE attempt to brush off the evidence in the record from USFS and USGS staff discussing previously-encountered artesian conditions in the Long Valley area. *See* Opening 16-18. But KORE's hydrogeologic investigation upon which USFS/KORE rely (USFS Resp. 46-47; KORE Resp. 55-56), simply states: "There were no reports **available to the author** of artesian conditions encountered in any of the borings drilled by Royal Gold, the author acknowledges that there are anecdotes of this occurring in at least one Royal Gold boring." 2-ER-167 (emphasis added).

Thus, rather than showing "diligence" on the part of the agency in investigating this potential impact of the Project to groundwater that could significantly impact the endangered Owens tui chub's habitat in Hot Creek, the record raises more questions than it answers.

The record shows that there remain unknowns and uncertainties regarding impacts to the groundwater, and the agency made no definitive conclusion with

respect to impacts to Owens tui chub. Because there are remaining uncertainties about the potential impacts to groundwater from the Project drilling and potential cumulative impacts, and since impacts to groundwater may affect the endangered Owens tui chub and its habitat adjacent to the Project site, USFS's statements that there are no extraordinary circumstances cannot stand.

## III. USFS and the District Court Ignored the Real Differences Between Review Under a CE Versus an EA.

The USFS asserts that the district court found that the agency's bifurcation of the Project into two CEs was "harmless error." USFS Resp. 29-30. But the court never said that. Thus, USFS's appellate counsel's "harmless error" analysis is inapplicable.

Instead, the court based its ruling on its view that "it would be pointless to set aside the Forest Service's decision if its sole error was its failure to process KORE's proposal into two 'actions' rather than one." 2-ER-20. That is wrong, as Friends challenges not only the split of the Project into two actions, but also the use of the CEs in the face of extraordinary circumstances and without considering cumulative impacts.

More importantly, the agency's argument actually highlights the error of the court's reasoning. The court stated that: "Nothing suggests the Forest Service ignored the project's environmental effects. Nothing suggests it attempted to

obscure the project's environmental effects behind multiple categorical exclusions." 2-ER-21.

But that is exactly what happened. The agency's primary reason for invoking the two CEs was to avoid preparing an EA. If the agency had done an EA, its environmental review would have, by law, been much more extensive.

For example, a fundamental component of an EA is the analysis of cumulative impacts from other "past, present, and reasonably foreseeable activities." *See* Te-Moak Tribe v. U.S. Dept. of Interior, 608 F.3d 592, 605 (9th Cir. 2010)(cleaned up) (EA for mineral exploration project failed to adequately consider cumulative impacts of nearby activities). Here, it is undisputed that the agency did not conduct **any** analysis of cumulative impacts since it believed that it had no such duty once it invoked the CEs.

Further, NEPA requires that EAs contain an analysis of alternatives to the Project. 42 U.S.C. § 4332(2)(E). "Informed and meaningful consideration of alternatives—including the no action alternative—is thus an integral part of the statutory scheme." Bob Marshall All. v. Hodel, 852 F.2d 1223, 1228–29 (9th Cir. 1988). "The consideration of alternatives requirement . . . guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit balance." Id. at 1228 (cleaned up). "NEPA requires agencies

34

to 'give full and meaningful consideration' to all viable alternatives 'in [the] environmental assessment.'" Env'l Def. Ctr. v. Bureau of Ocean Energy Mgmt., 36 F.4th 850, 877 (9th Cir. 2022)(citations omitted).

EAs must also include a detailed analysis of the baseline conditions of all resources that may be affected by the Project. *See* Idaho Conservation League v. U.S. Forest Service, 429 F.Supp.3d 719, 731-32 (D. Idaho 2019); Gifford Pinchot Task Force v. Perez, No. 03:13-cv-00810-HZ, 2014 WL 3019165 (D. Or. July 3, 2014); Cascade Forest Conservancy v. Heppler, No. 3:19-cv-00424-HZ, 2021 WL 641614 (D. Or. Feb. 15, 2021). All of these cases held that a USFS EA violated NEPA by failing to analyze baseline ground water conditions that could be affected by mineral exploration projects similar to this case. Courts have also held that an agency must provide accurate and adequate information about sage-grouse and other wildlife as part of the baseline and analysis. *See* Western Watersheds Project v. Bernhardt, 543 F.Supp.3d 958, 985-995 (D. Idaho 2021).

None of that analysis occurred here. As the agency states, it commits reversable error if "the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." USFS Resp. 29, quoting Idaho Wool Growers Ass'n v. Vilsack, 816 F.3d 1095, 1104 (9th Cir. 2016).

Here, without an EA, neither the agency, nor the public, have an accurate and full picture of the Project's environmental impacts. USFS belittles NEPA's public review requirements, saying that Friends made "only generic references to public participation in the NEPA process." USFS Resp. 30. But public review is at the heart of NEPA and cannot be so easily brushed aside. *See* Opening 28-29.

By the agency's own position in this case, by splitting the Project in two, it avoided its NEPA duties to analyze cumulative impacts, all reasonable alternatives, baseline conditions and other EA requirements, and subject that to full public review.

## IV. USFS Has Not Overcome The Presumption That Illegal Agency Actions Should Be Vacated.

Although vacatur of an agency action found to violate federal law is not automatically applied, absent "rare" or "unusual" circumstances, vacatur of illegal agency action is the presumptive remedy in cases such as this. *See* Oregon Natural Desert Ass'n v. Jewell, 840 F.3d at 575; Cal. Cmtys. Against Toxics v. EPA, 688 F.3d 989, 994 (9th Cir. 2012)("we have only ordered remand without vacatur in limited circumstances"); Locke, 626 F.3d at 1053 n.7 ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action.").

Although the court does consider the "equities" of vacatur, in cases where allowing operations to proceed would harm the environment and valuable public resources, vacatur is the proper remedy. *See* Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1401–05 (9th Cir. 1995)(leaving unlawful ESA listing rule in place to protect imperiled wildlife until new listing rule is completed). *See also* Idaho Conservation League v. U.S. Forest Service, No. 1:18-CV-504-BLW, 2020 WL 2115436 (D. Idaho, May 4, 2020)(vacating USFS approval of mineral exploration project).

There is no compelling public interest in allowing a mineral exploration project, looking for gold to serve KORE's financial interests, to proceed in the face of an illegal agency approval. The extensive impacts to protected species, public uses of these lands, and to the environment in general warrants the prohibition of operations until the agency has complied with federal law.

Lastly, the agency's argument for more briefing on vacatur would undoubtedly result in immediate and irreparable injury to wildlife and other environmental values. As USFS acknowledges, "[o]perations are scheduled to begin as soon as September 1 [2023]." USFS Resp. 55. Thus, in order to protect the public resources at risk from the Project, and in light of the agency's violation of federal law, this Court should vacate the Decision as soon as practicable.

Respectfully submitted this 5th day of July, 2023.

*/s/ Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*/s/ Talasi Brooks*
Talasi B. Brooks
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

*/s/ Justin Augustine*
Justine Augustine
Lisa Belenky
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
lbelenky@biologicaldiversity.org
jaugustine@biologicaldiversity.org

## CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32 (a)(7)(C) AND CIRCUIT RULE 32-1

I certify that: Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-2, the attached Reply brief is: Proportionately spaced, has a typeface of 14 points or more and contains fewer than 8,400 words. This complies with the length limit permitted by Cir. R. 32-2(b) for **a single brief in response to multiple briefs**.

*/s/ Talasi Brooks*

## CERTIFICATE OF SERVICE OF ELECTRONIC FILING OF BRIEF

38

I also certify that on July 5, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all of participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Talasi Brooks*